



CENTER for BIOLOGICAL DIVERSITY                    Because life is good.

June 26, 2017

Patrick Talbott, Contract Manager
California Department of Housing and Community Development
Division of Financial Assistance
2020 West El Camino Avenue, Suite 400
Sacramento, CA  95833

Scott Tangenberg, Acting Forest Supervisor
Stanislaus National Forest
19777 Greeley Road
Sonora, CA  95370

Elliot Vander Kolk, CDBG-NDR Project Coordinator
Sierra Nevada Conservancy
11521 Blocker Drive, Suite 205
Auburn, CA  95603

Transmitted via email: ca-ndrc@hcd.ca.gov


Re: Comments—Adoption of Reforestation FEIS
Comments—Adoption of Recovery FEIS


Dear Mr. Talbott, Mr. Tangenberg, and Mr. Vander Kolk:

We, the undersigned organizations, are writing to urge the California Department of Housing and Community Development (HCD) to withdraw its proposal to accept a grant of $28,604,459 from the Trump Administration's Department of Housing and Urban Development (HUD) to conduct logging, herbicide spraying, and artificial tree planting on approximately 25,000 acres (about 39 square miles) within the Rim fire of 2013 on the Stanislaus National Forest.  We also urge you to withdraw your proposal to adopt the U.S. Forest Service's 2014 and 2016 Environmental Impact Statements (EISs) as a means to comply with the National Environmental Policy Act (NEPA) as

Declaration of Chad Hanson, Exhibit 3, Page 1

those documents are insufficient and/or significantly outdated with respect to several key issues such as climate change impacts and natural regeneration of conifer forest.  Moreover, as discussed in separate comments, HCD must comply with the California Environmental Quality Act (CEQA) before taking any steps to approve or carry out any part of the overall project for which HUD funds are sought.

The HCD proposal is based on two premises: first, that there is little or no natural post-fire regeneration of conifer seedlings and saplings in high-intensity fire patches in the Rim fire area, and second, that there are large areas of barren ground where there is significant erosion potential in these high-intensity fire patches.  However, neither of these premises reflects the reality of the Rim fire as it exists today in the areas that have not been logged.

As we discuss below, implementation of the HCD proposal would: (a) severely undermine California's goals in fighting climate change and supporting the Paris Accord; (b) destroy abundant natural forest regeneration that has increased substantially since the Forest Service last gathered field data in the Rim fire area in 2015; (c) strip vegetation from tens of thousands of acres on which post-fire growth is now stabilizing soils and thus cause widespread erosion and watershed damage; and (d) destroy thousands of acres of ecologically vital and unique post-fire habitat, which a growing consensus of scientists is identifying as some of the most important forest wildlife habitat in the western U.S.

For these reasons, the logging/tree-plantation proposal should be withdrawn, and the grant of $28,604,459 should be rejected.  Also, before further actions are taken in the Rim fire area, HCD must both comply with CEQA and prepare a supplemental draft EIS under NEPA that fully considers and analyzes previously unaddressed climate change impacts and significant new information and changed circumstances that have occurred in the past two years of natural succession and which the 2014 and 2016 EISs did not address or incorporate into their analyses.[1] The 2014 and 2016 Rim fire EISs cannot be relied upon as to (1) analyses that never occurred, or (2) information, such as the natural regeneration information, that is outdated and in error, and therefore, HCD cannot comply with either NEPA or CEQA by simply adopting the prior Rim fire EISs.

## Failure to Analyze Climate Change Impacts of Logging

The funding at issue here seeks, among other things, to be used within the 2013 Rim Fire area to support (1) logging biomass material by chipping and removing to a biomass facility, (2) piling and burning woody material on site, as well as (3) artificially planting trees on about 25,000 acres.  The woody biomass combustion is not carbon-neutral, as acknowledged by numerous

---

[1] 24 C.F.R. § 58.52 ("An adopted EIS may have to be revised and modified to adapt it to the particular environmental conditions and circumstances of the project if these are different from the project reviewed in the EIS. In such cases the responsible entity must prepare, circulate, and file a supplemental draft EIS in the manner prescribed in §58.60(d) and otherwise comply with the clearance and time requirements of the EIS process . . . .")

scientific studies (see, e.g., Brandão et al. 2013, Repo et al. 2011, Searchinger et al. 2009),[2] the Intergovernmental Panel on Climate Change (IPCC), and the EPA's science advisors.  Rather, the combustion of wood for energy instantaneously releases virtually all of the carbon in the wood to the atmosphere as $CO_2$.  Further, burning wood for energy is typically less efficient, and thus far more carbon-intensive per unit of energy produced, than burning fossil fuels (even coal). Measured at the smokestack, replacing fossil fuels with biomass actually *increases* $CO_2$ emissions.[3]  One recent study found that the climate impact per unit of $CO_2$ emitted seems to be even higher for the combustion of slow-growing biomass than for the combustion of fossil carbon in a 100-year time frame.[4]  Thus, the warming effect from biogenic $CO_2$ can continue for decades or even centuries depending on the "feedstock."  As just one example of the impacts of bioenergy, measured at the smokestack, burning forests for kilowatts emits 45% more CO2 than burning coal, for an equivalent amount of energy produced.[5]

This $CO_2$ impact of burning logs and woody material in biomass plants (or piling and burning them on-site) must be addressed by HCD.  The substantial greenhouse gas impacts of these desired actions remain unanalyzed, however, because the 2014 and 2016 Rim fire EISs, on which HCD seeks to rely, did not analyze these impacts.  Therefore, HCD must conduct this analysis itself and cannot simply adopt the 2014 and 2016 Rim fire EISs.

This is a major issue because, to date, roughly 4,000 to 5,000 acres of the planned logging in the Rim fore area has been completed,[6] which means that most of the acres planned for logging and artificial planting have not been logged.  Whether or not the remaining acres become logged is therefore highly dependent on the HCD funding, as are the resulting climate change impacts of

---

[2] Searchinger, T.D., et al. 2009. Fixing a critical climate accounting error. Science 326: 527-528; Repo, A., M. Tuomi, and J. Liski. 2011. Indirect carbon dioxide emissions from producing bioenergy from forest harvest residues. Global Change Biology Bioenergy 3: 107-115; Brandão, M., et al. 2013. Key issues and options in accounting for carbon sequestration and temporary storage in life cycle assessment and carbon footprinting. International Journal of Life Cycle Assessment 18: 230-240.

[3] Typical CO2 emission rates for facilities: Gas combined cycle 883 lb CO2/MWh; Gas steam turbine 1,218 lb CO2/MWh; Coal steam turbine 2,086 lb/CO2/MWh; Biomass steam turbine 3,029 lb CO2/MWh.  *Sources*: EIA, Electric Power Annual, 2009: Carbon Dioxide Uncontrolled Emission Factors. Efficiency values used to calculate emissions from fossil fuel facilities calculated using EIA heat rate data. (http://www.eia.gov/cneaf/electricity/epa/epat5p4.html); biopower efficiency value is 24%, a standard industry value.

[4] Holtsmark, B. 2013. The outcome is in the assumptions: analyzing the effects on atmospheric $CO_2$ levels of increased use of bioenergy from forest biomass. Global Change Biology Bioenergy 5: 467-473.

[5] See http://pfpi.net/wp-content/uploads/2014/08/PFPI-GHG- rule-writeup-August-7.pdf; http://www.sciencedirect.com/science/article/pii/S0301421512001681)

[6] See page 3 of Appendix C of the Record of Decision for the Forest Service's 2016 Rim fire EIS

logging these remaining acres of post-fire habitat, and burning the resulting logs and woody material to generate kilowatts (or simply piling and burning them).

The failure of the 2014 and 2016 Rim fire EISs to fully analyze the climate impacts of burning forest-sourced woody biomass are documented in the EISs (or their associated record of decision) themselves.  On page 23 of the Forest Service's 2014 EIS regarding biomass logging in the Rim fire, the Forest Service states the following with regard to biomass logging: "Biomass treatments would entail the mechanical removal of un-merchantable trees between 4 inches and 16 inches dbh."  Page 8 of the 2014 Record of Decision (ROD) then states that the decision authorizes "2,671 acres of biomass removal" on national forest lands in the Rim fire area.  Therefore, the 2014 EIS (pp. 65-74) analyzed climate change impacts from greenhouse gas emissions based only on removal of small snags (generally less than 16 inches in diameter) on 2,671 acres.

The 2014 decision authorized the logging of 15,383 acres of post-fire habitat through "salvage logging" for lumber, plus several thousand acres of additional logging for lumber in post-fire habitat along dirt roads not maintained for public use.  However, by the time of the Forest Service's 2016 EIS—which incorporated the 2014 EIS and added over 22,000 acres of "reforestation" and herbicide spraying, plus a few thousand acres of additional post-fire logging—the agency fundamentally changed the planned logging, after acknowledging that the unlogged fire-killed trees were no longer merchantable as lumber, due to some decay.  The Forest Service stated that planned logging would now be conducted for biomass burning for energy production instead of as standard "salvage" logging.[7]

As a result of the change in plans, the acreage that was changed to biomass logging has not been analyzed in the 2014 and 2016 EISs with respect to the climate change impacts of the greenhouse gas emissions that will result from burning in biomass plants (or piling and burning) fire-killed trees of all sizes on more than 20,000 acres, as opposed to removing and burning as biomass just small snags on only 2,671 acres;[8] nor did the EISs analyze the climate change, or wildlife habitat, impacts of the additional $22 million grant from the Trump Administration that would be used to create new forest biomass energy production plants in California.  Consequently, these

---

[7] See pages 2-3 of Appendix C of the Record of Decision for the Forest Service's 2016 Rim fire EIS

[8] On pages 2-3 of Appendix C of the Record of Decision for the 2016 EIS, the Forest Service attempts to dismiss this issue by suggesting that, on page 71 of the 2014 EIS, greenhouse gas emissions were analyzed as being the same for logging for lumber versus burning all trees that are cut for bioenergy, but there is no such analysis in the 2014 EIS, and nowhere does it assess the immediate greenhouse gas emissions that would result from completing the entire logging project and burning all cut trees (all sizes on all acres) for bioenergy.  The tables on pages 68-72 of the 2014 EIS explicitly pertain only to removal of small trees (under 16 inches) on about 7,000 acres of combined biomass and pile burning activities—not to the full acreage of logging, or to medium and large snags, where the vast majority of the carbon is stored.  Therefore, the greenhouse gas emissions from completing the full logging project as planned in the EISs was never analyzed.

Re: Comments on Adoption of Reforestation FEIS and Recovery FEIS          Page 4 of 9
June 26, 2017

deficiencies must be analyzed in a supplemental draft EIS, as required by the regulations at issue here.

**Most Areas Planned for Logging and Reforestation Now Have Abundant New Conifer Growth, Which Would be Killed by Planned Logging**

Not only does HCD funding seek to finance biomass burning, it seeks to create tree plantations (via artificial planting) in areas that would not need to be artificially planted absent the logging. Rather, as discussed below, unlogged areas of the Rim fire now contain abundant natural regeneration that must be addressed.

The Forest Service's 2016 EIS (p. 233) states that, in 2014 and 2015 (just one to two years post-fire), the Forest Service gathered data on natural post-fire conifer regeneration within field plots. The 2016 EIS (p. 240) acknowledged that the Forest Service's post-fire logging operations killed 72% of the natural post-fire conifer regeneration, but the EIS (p. 256) downplayed this impact by reporting that there was no conifer regeneration in 71% of the Forest Service's plots within high-intensity fire patches.  However, in 2017 (four years post-fire), after two to three more years of post-fire growth and recruitment of new conifer seedlings and saplings, these 2014/2015 data are now outdated and inaccurate.  Consequently, this new information must be addressed, and as a result, neither the 2014 nor the 2016 EISs can be relied upon under either NEPA or CEQA to conduct further logging, herbicide-spraying, or reforestation activities in the Rim fire.

Specifically, due to abundant new natural recruitment of conifer seedlings in high-intensity fire patches in 2016 and 2017, there is now natural conifer regeneration in well over 80% of field plots (see Appendix A, B), and even the relatively few plots with no conifer regeneration within plot boundaries have conifer seedlings/saplings growing just outside the plots.  Overall, there are now hundreds of naturally regenerating conifer seedlings/saplings growing in the high-intensity fire patches—and thousands per acre in many places.  Nowhere has the impact of planned logging on this new forest regeneration growth been analyzed under NEPA or CEQA, nor has the EISs' claimed reforestation need been reevaluated under NEPA or CEQA in light of this new information.  Moreover, nowhere has the climate change impacts of crushing and killing this abundant and vigorous new forest growth—and the resulting release of $CO_2$, as well as the forgone or reduced carbon sequestration opportunities—been analyzed under NEPA or CEQA. Thus, in order to adequately and meaningfully address this new natural conifer regeneration, a supplemental draft EIS is necessary.



*Typical natural conifer regeneration in large high-intensity fire patches in Rim fire, June 2016. (See also Appendix B)*

### The Logging Plan's Watershed Goals are Misguided, and the Plan Would Harm, Not Help, Watersheds

As mentioned above, one of the two main premises of the proposed logging plan in the Rim fire is the assumption, based on Forest Service surveys conducted in 2014/2015, that there is low or no ground cover in high-intensity fire patches, creating potential for significant erosion and sedimentation in watersheds during rains. However, as with natural conifer regeneration, this premise is now outdated and inaccurate. In reality, unlogged high-intensity fire areas consistently have 90-100% ground cover (Appendix A)—far higher than the thresholds used by the Forest Service to indicate potential for erosion.

Moreover, post-fire logging, because it is ground-based, using heavy machinery, kills and removes nearly all of the existing ground cover, and creates increased potential for erosion and sedimentation in watersheds; these effects tend to be chronic and long-lasting after post-fire logging.[9] So, for this reason as well, the Forest Service's 2014 and 2016 EISs cannot be lawfully adopted under NEPA or CEQA.

### The Logging Plan Would Destroy Nearly 20,000 Acres of Unique, Imperiled, and Highly Biodiverse "Complex Early Seral Forest" Wildlife Habitat

The vast majority of ecologists see the rare and unique forest type called "complex early seral forest", or "snag forest habitat" (patches of forest dominated by snags, downed logs, montane chaparral, and regeneration of conifers and oaks) as highly important wildlife habitat, not "fuel" or "waste". For example, in September 2015, over 260 scientists sent a letter to President Obama

---

[9] Wagenbrenner, J.W., L.H. MacDonald, R.N. Coats, P.R. Robichaud, and R.E. Brown. 2015. Effects of post-fire salvage logging and a skid trail treatment on ground cover, soils, and sediment production in the interior western United States. Forest Ecology and Management 335: 176-193.

and Congress opposing proposals to conduct more logging of snag forest habitat on federal public lands, noting that "'complex early seral forest,' or 'snag forest,' is quite simply some of the best wildlife habitat in forests".[10]   As the scientists concluded:

> Though it may seem at first glance that a post-fire landscape is a catastrophe, numerous scientific studies tell us that even in the patches where forest fires burn most intensely, the resulting wildlife habitats are among the most ecologically diverse on western forestlands and are essential to support the full richness of forest biodiversity. Post-fire conditions also serve as a refuge for rare and imperiled wildlife species that depend upon the unique habitat features created by intense fire. These include an abundance of standing dead trees, or "snags," which provide nesting and foraging habitat for woodpeckers and many other plant and wildlife species responsible for the rejuvenation of a forest after fire. The post-fire environment is rich in patches of native flowering shrubs that replenish soil nitrogen and attract a diverse bounty of beneficial insects that aid in pollination after fire. Small mammals find excellent habitat in the shrubs and downed logs, providing food for foraging spotted owls. Deer and elk browse on post-fire shrubs and natural conifer regeneration. Bears eat and disperse berries and conifer seeds often found in substantial quantities after intense fire, and morel mushrooms, prized by many Americans, spring from ashes in the most severely burned forest patches.

Moreover, while logging advocates promote the logging of snag forest and subsequent artificial tree planting, and describe these logging policies as creating "heterogeneity" and "resilience," the 262 scientists who wrote the September 2015 letter specifically rejected this claim as unscientific.  The scientists concluded that this "unique habitat [snag forest habitat] is not mimicked by clearcutting," and pointed out that snag forest habitat "is the least protected of all forest habitat types, and is often as rare, or rarer, than old-growth forest."  Further, they noted that the published science strongly indicates that logging destroys snag forest habitat, severely harms natural forest regeneration, and often increases, rather than decreases, future fire intensity.

The HCD proposal would promote the destruction of this important habitat in the Rim fire area. In addition, since the last time the Forest Service conducted field surveys in the Rim fire, in 2014/2015, there may be many rare and sensitive plant species that have grown in, and which would be harmed by planned ground-based logging, herbicide spraying, and artificial tree planting.

## Objections to HCD's Public Process and Request for Release of Funds

In addition to the issues described above, HCD has failed to provide for meaningful public comment.  HCD intends to request release of funds on June 27, 2017, and thus HCD can not evaluate and address public comments before taking action.  We are thus notifying HCD of our objection to any request for release of funds under either NOI pursuant to 24 C.F.R sections

---

[10] See http://johnmuirproject.org/wp-content/uploads/2015/09/Final2015ScientistLetterOpposingLoggingBills.pdf

Declaration of Chad Hanson, Exhibit 3, Page 7

58.73 and 58.75(b) and (d). Specific grounds for objection include, but are not necessarily limited to, HCD's failure to comply with 24 C.F.R. sections 58.14 (requiring coordination of federal and state environmental review responsibilities), 58.52 (requiring preparation of a supplemental EIS if the "project" under consideration is different from that considered in the adopted EIS), and 58.53 (requiring evaluation of environmental factors not previously addressed, analysis of consistency between the project under consideration and the project evaluated in the prior EIS, and updating of EIS to reflect "new environmental issues and data . . . which may have significant environmental impact on the project area covered by the prior EIS").

The basis, facts, and legal authority for these objections are as set forth in this letter and in the separate Center for Biological Diversity comments. In brief summary, HCD has failed to supplement the EIS as required by 24 C.F.R. section 58.52 because the "whole project" under HCD's consideration is considerably broader than, and different from, the discrete components of the Project HCD claims were addressed in the 2014 FEIS and 2016 FEIS. Further, HCD has failed to make or support the findings required by 24 C.F.R. section 58.53 because it has failed to consider new environmental data on natural regeneration, as well as differences between the Project under consideration and the activities contemplated in the 2014 FEIS and 2016 FEIS. Finally, HCD has failed to coordinate its state and federal environmental review obligations as required by 24 C.F.R. section 58.14 by failing to conduct any CEQA review, failing to give adequate notice of any intent to rely on the 2014 FEIS or 2016 FEIS in lieu of a CEQA document, and failing to determine whether (and/or improperly determining that) the 2014 FEIS and 2016 FEIS meet the requirements of the CEQA Guidelines.

We ask that HCD notify us immediately if a request for release of funds is submitted to HUD so that a separate notice of objection may be lodged with HUD and the State as quickly as possible. Please direct electronic notice to Justin Augustine (jaugustine@biologicaldiversity.org).

**Conclusion**

The HCD proposal, and the Forest Service EISs, do not acknowledge the current situation on the ground in the Rim Fire area, and thus do not adequately address impacts as required by both NEPA and CEQA. If spent as proposed, the federal funds would contribute to the degradation of the forest habitat, not its regeneration. Acquiring and expending the funds based on the Forest Service EISs would be a disservice to the environment and the people of California who are committed to preserving and protecting healthy forests.

Sincerely,


Justin Augustine, Attorney
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612


/s/ Chad Hanson                                    /s/ Kathryn Phillips
Chad Hanson, Ph.D., Ecologist              Kathryn Phillips, Director


Re: Comments on Adoption of Reforestation FEIS and Recovery FEIS          Page 8 of 9
June 26, 2017

58.73 and 58.75(b) and (d).  Specific grounds for objection include, but are not necessarily limited to, HCD's failure to comply with 24 C.F.R. sections 58.14 (requiring coordination of federal and state environmental review responsibilities), 58.52 (requiring preparation of a supplemental EIS if the "project" under consideration is different from that considered in the adopted EIS), and 58.53 (requiring evaluation of environmental factors not previously addressed, analysis of consistency between the project under consideration and the project evaluated in the prior EIS, and updating of EIS to reflect "new environmental issues and data . . . which may have significant environmental impact on the project area covered by the prior EIS").

The basis, facts, and legal authority for these objections are as set forth in this letter and in the separate Center for Biological Diversity comments.  In brief summary, HCD has failed to supplement the EIS as required by 24 C.F.R. section 58.52 because the "whole project" under HCD's consideration is considerably broader than, and different from, the discrete components of the Project HCD claims was addressed in the 2014 FEIS and 2016 FEIS. Further, HCD has failed to make or support the findings required by 24 C.F.R. section 58.53 because it has failed to consider new environmental data on natural regeneration, as well as differences between the Project under consideration and the activities contemplated in the 2014 FEIS and 2016 FEIS. Finally, HCD has failed to coordinate its state and federal environmental review obligations as required by 24 C.F.R. section 58.14 by failing to conduct any CEQA review, failing to give adequate notice of any intent to rely on the 2014 FEIS or 2016 FEIS in lieu of a CEQA document, and failing to determine whether (and/or improperly determining that) the 2014 FEIS and 2016 FEIS meet the requirements of the CEQA Guidelines.

We ask that HCD notify us immediately if a request for release of funds is submitted to HUD so that a separate notice of objection may be lodged with HUD and the State as quickly as possible. Please direct electronic notice to Justin Augustine (jaugustine@biologicaldiversity.org).

**Conclusion**

The HCD proposal, and the Forest Service EISs, do not acknowledge the current situation on the ground in the Rim Fire area, and thus do not adequately address impacts as required by both NEPA and CEQA.  If spent as proposed, the federal funds would contribute to the degradation of the forest habitat, not its regeneration.  Acquiring and expending the funds based on the Forest Service EISs would be a disservice to the environment and the people of California who are committed to preserving and protecting healthy forests.

Sincerely,

Justin Augustine, Attorney
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612

/s/ Chad Hanson                                          /s/ Kathryn Phillips
Chad Hanson, Ph.D., Ecologist                  Kathryn Phillips, Director

Re: Comments on Adoption of Reforestation FEIS and Recovery FEIS            Page 8 of 9
June 26, 2017

John Muir Project of Earth Island Institute
P.O. Box 897
Big Bear City, CA  92314

Sierra Club California
909 12th St., Suite #202
Sacramento, CA  95814-2920

# Appendix A

Natural Conifer Regeneration in High-Intensity Fire Areas Currently Proposed for Logging, Herbicide-Spraying, and Tree Plantations in the Rim fire (0.02-hectare plots [1/20th of an acre each] spaced by 100 meters along transects conducted on June 1-2, 2017).

| Date | Unit # | Plot ID | Center UTM Coordinates | Total | Fir/ Cedar | Pond./Sugar Pine | Height >1 m | Deceased Seedlings | Elev. | Surveyor | Ground cover % |
|------|--------|---------|------------------------|-------|-----------|------------------|-------------|--------------------|-------|----------|----------------|
| 6/1/17 | BB036 | T1 | 11 S 0244824; 4192942 | 17 | 14 | 3 | 1 Ponderosa | 0 | 1383 m | CS, CH, TC | 90-100 |
| | | T2 | 11 S 0244799; 4192846 | 0 | 0 | 0 | 0 | 0 | 1402 m | CS, TC | 90-100 |
| | | T3 | 11 S 0244754; 4192754 | 0 | 0 | 0 | 0 | 0 | 1411 m | CS, TC | 90-100 |
| | | T4 | 11 S 0244740; 4192673 | 3 | 3 | 0 | 0 | 0 | 1414 m | CS, TC | 90-100 |
| | | T5 | 11 S 0244736; 4192579 | 4 | 2 | 2 | 0 | 0 | 1410 m | CS, TC | 90-100 |
| | | T6 | 11 S 0244727; 4192490 | 5 | 1 | 4 | 0 | 0 | 1435 m | CS, TC | 90-100 |
| | | T7 | 11 S 0244724; 4192393 | 2 | 0 | 2 | 0 | 0 | 1446 m | CS, TC | 90-100 |
| | | T8 | 11 S 0244716; 4192295 | 0 | 0 | 0 | 0 | 0 | 1464 m | CS, TC | 90-100 |
| | BB022 | T1 | 11 S 0244418; 4193120 | 10 | 7 | 3 | 1 Ponderosa | 0 | 1390 m | CS, TC | 90-100 |
| | | T2 | 11 S 0244512; 4193093 | 0 | 0 | 0 | 0 | 0 | 1383 m | CS, TC | 90-100 |
| | | T3 | 11 S 0244607; 4193060 | 71 | 69 | 2 | 0 | 0 | 1378 m | CS, TC | 90-100 |
| | | T4 | 11 S 0244691; 4193013 | 31 | 31 | 0 | 0 | 0 | 1389 m | CS, TC | 90-100 |
| | | T5 | 11 S 0244783; 4192970 | 12 | 12 | 0 | 0 | 0 | 1387 m | CS, TC | 90-100 |
| 6/2/17 | AA008 | T1 | 11 S 0241524; 4191519 | 37 | 35 | 2 | 0 | 4 dead fir | 1354 m | CS, TC | 90-100 |
| | | T2 | 11 S 0241462; 4191574 | 8 | 4 | 4 | 1 Ponderosa | 0 | 1328 m | CS, TC | 90-100 |
| | | T3 | 11 S 0241416; 4191653 | 20 | 0 | 20 | 0 | 0 | 1328 m | CS, TC | 90-100 |
| | | T4 | 11 S 0241353; 4191752 | 23 | 0 | 23 | 0 | 0 | 1336 m | CS, TC | 90-100 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | T5 | 11 S 0241291; 4191831 | 32 | 1 | 31 | 0 | 0 | 1349 m | CS, TC | 90-100 |
| | | T6 | 11 S 0241238; 4191910 | 21 | 1 | 20 | 0 | 0 | 1349 m | CS, TC | 90-100 |
| | BB062 | T1 | 11 S 0245998; 4194258 | 2 | 1 | 1 | 1 Ponderosa | 0 | 1473 m | CS, TC | 90-100 |
| | | T2 | 11 S 0246030; 4194358 | 50 | 22 | 28 | 0 | 0 | 1481 m | CS, TC | 90-100 |
| | | T3 | 11 S 0246063; 4194444 | 3 | 1 | 2 | 0 | 0 | 1471 m | CS, TC | 90-100 |
| 6/21/17 | L005 | T1 | N 38.00056 W 120.01620 | 269 | 254 | 15 | 0 | 0 | 1500 m | CS, GS | 90-100 |
| | | T2 | N 37.99968 W 120.01636 | 18 | 16 | 2 | 0 | 0 | 1485 m | CS, GS | 90-100 |
| | | T3 | N 37.99878 W 120.01650 | 8 | 6 | 2 | 0 | 0 | 1470 m | CS, GS | 90-100 |
| | | T4 | N 37.99763 W120.01663 | 0 | 0 | 0 | 0 | 0 | 1465 m | CS, GS | 80-90 |
| | L006 | T1 | N 37.99327 W120.01634 | 4 | 4 | 0 | 0 | 0 | 1455 m | CS, GS | 90-100 |
| | | T2 | N 37.99264 W120.01668 | 3 | 2 | 1 | 0 | 0 | 1460 m | CS, GS | 90-100 |
| | L003 | T1 | N 38.00039 W119.99072 | 325 | 229 | 96 | 0 | 0 | 1680 m | CS, GS | 90-100 |
| | | T2 | N 38.00095 W119.99061 | 277 | 259 | 18 | 0 | 0 | 1685 m | CS, GS | 90-100 |
| | | T3 | N 38.00182 W119.99033 | 9 | 9 | 0 | 0 | 0 | 1690 m | CS, GS | 90-100 |
| | | T4 | N 38.00238 W119.99026 | 53 | 53 | 0 | 0 | 0 | 1690 m | CS, GS | 90-100 |

**Appendix B**
**Photos were taken in Rim Fire Burn Area in unlogged high intensity fire patches**
**threatened by logging under the Rim Fire Reforestation FEIS in May and June of 2017.**

**Conifer Regeneration**





Appendix B:   *Center for Biological Diversity, John Muir Project and Sierra Club Comments*                          1

Declaration of Chad Hanson, Exhibit 3, Page 13





Appendix B:   *Center for Biological Diversity, John Muir Project and Sierra Club Comments*                    2















Declaration of Chad Hanson, Exhibit 3, Page 19





**Flowers and Shrubs = groundcover**





Declaration of Chad Hanson, Exhibit 3, Page 23



**Clear Streams and Creeks**

Declaration of Chad Hanson, Exhibit 3, Page 24







**Clear water downstream of large unlogged high intensity fire patch**

**Areas that were Post Fire Logged by USFS in 2014 and 2015**



