1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   EARTH ISLAND INSTITUTE, et al.,          No.  1:19-cv-01420-DAD-SAB

12              Plaintiffs,                    ORDER DENYING PLAINTIFFS' MOTION
                                              FOR PRELIMINARY INJUNCTION,
13        v.                                   DENYING DEFENDANTS' MOTION TO
                                              STRIKE, AND DENYING PLAINTIFFS'
14   KIMBERLY NASH, et al.,                    MOTION FOR A TEMPORARY
                                              RESTRAINING ORDER
15              Defendants.
                                              (Doc. Nos. 47, 67, 91)
16

17

18        This matter is before the court on a motion for preliminary injunction brought by plaintiffs

19   Earth Island Institute ("Earth Island"), Greenpeace, Inc., Sequoia ForestKeeper, and James

20   Hansen (collectively, "plaintiffs").  (Doc. No. 67.)  A hearing on the motion was held on

21   December 3, 2019.  On behalf of plaintiffs, attorney Meriel Darzen appeared at the hearing in

22   person and attorneys Ralph Bloemers and Dan Galpern appeared telephonically.  Attorneys Tyler

23   Alexander and Dustin Weisman of the Natural Resources Section of the U.S. Department of

24   Justice appeared on behalf of defendants Kimberly Nash, United States Department of Housing &

25   Urban Development ("HUD"), Jason Kuiken, and United States Forest Service ("Forest Service")

26   (collectively, "the federal defendants").  California Deputy Attorney Generals Awbrey Yost and

27   Kimberly Gosling appeared on behalf of defendants Janice Waddell and California Department of

28   Housing and Community Development ("California HCD") (collectively, "the state defendants").

                                        1

1   Attorney Lawson Fite appeared telephonically on behalf of amicus party Yosemite Stanislaus

2   Solutions.  Having reviewed the parties' briefing and heard oral argument, and for the reasons

3   explained below, plaintiffs' motion for a preliminary injunction will be denied and defendants'

4   motion to strike will be denied.[1]

5                                        **BACKGROUND**

6           In their complaint, plaintiffs allege the following.  In 2013, the Rim Fire burned 257,000

7   acres in Stanislaus National Forest and part of Yosemite National Park.  (Doc. No. 1 ("Compl.")

8   at ¶ 53.)  President Barack Obama declared the Rim Fire a national disaster.  (*Id.*)  Subsequently,

9   defendant Forest Service proposed two projects for logging and reforestation work in the

10  Stanislaus National Forest.  (*Id.* at ¶ 54.)  The projects were entitled the Rim Fire Recovery

11  ("Recovery") and Rim Fire Reforestation ("Reforestation") projects.  (*Id.*)  In order to satisfy

12  requirements of the National Environmental Policy Act of 1969 ("NEPA"), defendant Forest

13  Service completed and issued environmental impact statements ("EIS") for the Recovery and

14  Reforestation projects in 2014 and 2016, respectively.  (*Id.*)

15          The Recovery project is intended to

16              restore the forest at a landscape scale; conserve ecological structures,
                processes, and functions that are desirable and sustainable for future
17              forested conditions; . . . restore ecosystem function, process, and
                resiliency by addressing issues related to vegetative composition and
18              structure, forest health, fuels,[2] hardwood and wildlife habitat
                improvement, and socio-economic objectives.
19

20  /////

21  [1]  On April 20, 2020, plaintiffs filed another motion seeking a temporary restraining order,
    incorporating by reference the likelihood of success arguments raised in their motion for
22  preliminary injunction.  (Doc. No. 91.)  Therein, plaintiffs aver that the Logging Project's harm is
    heightened at this time of season due to bird nesting and fledging.  (*Id.* at 4.)  This does not,
23  however, change the court's analysis of the balance of the hardships as set forth in this order.  The
    additional harm to wildlife now alleged by plaintiffs does not sharply tip that balance in plaintiffs'
24  favor because there remain compelling circumstances on both sides of that balance.  Having
    reviewed plaintiffs' recently filed motion for a temporary restraining order, the court finds that all
25  of the issues raised therein are addressed by this order.  Therefore, plaintiffs' motion for a
    temporary restraining order will be denied as having been rendered moot.
26

27  [2]  "'Fuels' are combustible materials that fuel a fire, including burned and dead organic material,
28  dead trees from beetle kill, live trees, and bushes, shrubs, and grasses."  (Doc. No. 71-4 at ¶ 5.)

(*Id.* at ¶ 55.)  The Reforestation project is intended to "[c]reate a fire resilient mixed conifer forest," and its EIS notes that "[n]atural conifer regeneration cannot be counted on within large portions of the Rim Fire."  (*Id.* at ¶ 56.)  In August 2014 and August 2016, defendant Forest Service issued Records of Decision[3] for the Recovery and Reforestation EISs.  (*Id.* at ¶ 57.)  Since those decisions were issued, defendant Forest Service has not collected updated plot-level data for the areas proposed for logging to determine the extent to which the forest was regenerating on its own and, specifically, to identify the current levels of conifer regeneration in the Rim Fire area.  (*Id.* at ¶ 58.)

In 2016, defendant HUD awarded California $70,359,459 in National Disaster Resilience Competition (NDRC) Community Development Block Grant money to assist with the recovery efforts in Tuolumne County.  (*Id.* at ¶ 64.)  The NDRC grant is a competitive grant sourced from funds allocated by the Disaster Relief Appropriations Act of 2013 ("Relief Act").  (*Id.* at ¶62.)  Defendant California HCD is the "responsible entity"[4] for the NDRC grant to California.  (*Id.* at ¶ 70.)  Defendant California HCD submitted the California NDRC grant application, titled the Community Watershed Resilience Program.  (*Id.* at ¶ 65.)  The application was for a program divided into three components:  the Forest and Watershed Health Program ("the Logging Project"), the Biomass Utilization Facility ("the Biomass Facility"), and the Community Resiliency Centers.  (*Id.*)

---

[3]  NEPA regulations require an agency—at the time of its decision on a proposed action—to "prepare a concise public record of decision."  40 C.F.R. § 1505.2.  The Record of Decision is to state:  (1) what the decision was; (2) all considered alternatives, including whether specific alternatives were environmentally preferable and discussion of essential national policy considerations; and (3) "whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not."  *Id.*

[4]  The "responsible entity" is the recipient of the HUD disaster relief funding and is responsible for environmental review, decision making, and action that would otherwise apply to HUD under NEPA and other applicable provisions of law.  24 C.F.R. §§ 58.2(a)(7), 58.4; *see also* 42 U.S.C. § 5304(g) (stating that recipients of HUD Community Development Block Grant funds may assume all responsibilities for environmental review, and must certify compliance before requesting release of funds).  Here, defendant Waddell is the "certifying officer" pursuant to 24 C.F.R. § 58.13.  (Doc. No. 63 at ¶ 24.)  The "certifying officer" is responsible for all of the requirements of 24 C.F.R Part 58, in addition to section 102 of NEPA and related regulations.  24 C.F.R. § 58.13.

1    The Logging Project involves passing approximately $28 million back to the federal

2 government and other entities to fund some of the activities contemplated in the Recovery and

3 Reforestation EISs, including but not limited to logging, herbicide spraying, and tree planting on

4 approximately 25,000 acres of the Stanislaus National Forest within the Rim Fire area.  (*Id.* at

5 ¶ 66.)  The original Recovery and Reforestation EISs focused on logging for dimensional lumber.

6 *Id.* at ¶ 67.)  In contrast, the goal of the present Logging Project is to log trees from the forest for

7 biomass[5] energy production.  (*Id.*)  Under the Logging Project, the cut trees and vegetation are

8 being piled and burned onsite or chipped and trucked away to be incinerated at a power plant.

9 (*Id.* at ¶ 69.)  As the responsible entity, defendant California HCD engaged in an environmental

10 review of the Logging Project.  (*Id.* at ¶ 71.)  Defendant California HCD, however, did not

11 produce its own EISs analyzing the proposed activities.  (*Id.*)  Instead, it issued Records of

12 Decision merely adopting defendant Forest Service's Recovery and Reforestation EISs[6] to satisfy

13 the NEPA requirements for the Logging Project and authorizing distribution of the grant money

14 to defendant Forest Service to pay for the logging.  (*Id.*)  Defendant California HCD's Records of

15 Decision were issued on October 5, 2017.  (*Id.*)  The NDRC grant also allocates funds to the

16 Biomass Facility and includes funding for construction of a "wood products and energy campus"

17 that may be either a power plant or a wood processing facility, or both.  (*Id.* at ¶ 91.)  According

18 to plaintiffs, no environmental review has been completed with respect to the Biomass Facility's

19 impacts on wildlife habitat or greenhouse gas emissions and the climate crisis, nor has such a

20 review been included in any environmental review of the Logging Project.  (*Id.* at ¶ 92.)

21    In June 2017, while defendant California HCD was considering adoption of the EISs,

22 plaintiff Earth Island and other environmental organizations wrote a letter to defendant California

23 HCD requesting that it (1) withdraw its proposal to adopt the Recovery and Reforestation EISs

24 and (2) withdraw its request for HUD funding to log in the Rim Fire area.  (*Id.* at ¶ 73.)  Plaintiffs

25 _____

[5] "'Biomass' consists of dead trees that are harvested for chipping on site, with the chips hauled
26 down to an end user."  (Doc. No. 71-4 at ¶ 5.)

27 [6] Nor did defendant California HCD update defendant Forest Service's Recovery and
Reforestation EISs or undertake any additional environmental review before adopting them.
28 (Compl. at ¶ 71.)

4

1    wrote that the EISs were factually incorrect and outdated because they failed to disclose the

2    subsequent extensive natural conifer regeneration in the Rim Fire area and failed to analyze the

3    impacts of logging on this young, emerging forest that was providing habitat for multiple species

4    of wildlife.  (*Id.*)  Moreover, plaintiffs took issue with the EISs' failure to analyze the

5    environmental impacts of logging for biomass energy production, which involves clearcutting

6    vegetation of all sizes both live and dead, rather than commercial logging of larger dead trees for

7    dimensional lumber.  (*Id.*)  Defendant California HCD did not respond to that letter.  (*Id.* at ¶ 75.)

8         In October 2017, defendant California HCD filed a request with defendant HUD for the

9    release of $28 million of the disaster relief funds.  (*Id.* at ¶ 76.)  Plaintiff Earth Island objected to

10   this release of funds on October 23, 2017.  (*Id.* at ¶ 77.)  In doing so, plaintiff contended that

11   circumstances had changed significantly because the area now has significant conifer

12   regeneration and newly created habitat that would be destroyed and degraded by the planned

13   logging.  (*Id.*)  Additionally, plaintiffs argued that the climate and greenhouse gas impacts of the

14   planned logging are now different than what was analyzed in the original EISs; that post-fire

15   logging would kill most of the natural post-fire conifer regeneration now occurring in the Rim

16   Fire area, particularly in the current or short-term; and that the impacts upon bird species is

17   substantially different than what was assumed in the Recovery and Reforestation EISs.  (*Id.*)

18        Defendant HUD acknowledged plaintiff Earth Island's objections and requested that

19   defendant California HCD respond before the funds could be released.  (*Id.* at ¶ 78.)  On January

20   11, 2018, defendant California HCD sent a letter to defendant HUD stating that circumstances

21   and conditions had not changed significantly since the EISs were completed.  (*Id.* at ¶ 79.)

22   Defendant California HCD also wrote that the activities proposed in the grant application were

23   the same as those analyzed in the EISs.  (*Id.* at ¶ 80.)  Ultimately, defendant California HCD

24   declined to prepare a supplemental EIS ("SEIS").  (*Id.* at ¶ 81.)  On February 18, 2018, defendant

25   HUD rejected plaintiffs' objections, approved California HCD's request to release funds, and

26   passed those funds on to defendant Forest Service.  (*Id.* at ¶ 82.)

27        Plaintiffs and officials from defendants California HCD and Forest Service visited the

28   project area on May 30, 2019.  (*Id.* at ¶ 83.)  Officials from California HCD and Forest Service

1   viewed natural new tree growth in the forests burned by the Rim Fire, and which are planned for

2   logging.  (*Id.* at ¶ 84.)  Plaintiffs documented growth and tree stocking at or above levels

3   identified in the EISs to be achieved by replanting and again wrote to defendant HUD on August

4   14, 2019.  (*Id.* at ¶ 85–86.)  At that time, plaintiffs included documentation of additional natural

5   recovery of the burned areas; new studies published by Forest Service scientists which they

6   contended arguably contradicted the need for replanting in most of post-fire areas; and a new

7   study and findings documenting the toxic and carcinogenic effects of the herbicide glyphosate,

8   which defendant Forest Service plans to utilize in the Rim Fire area in order to suppress

9   vegetation that might compete with trees artificially planted after logging.  (*Id.* at ¶ 87–89.)

10  Nonetheless, defendants have continued to implement the Logging Project and, at the time

11  plaintiffs filed this motion, defendants were still conducting logging operations within the project

12  area.  (*Id.* at ¶ 90.)

13       Plaintiffs filed their complaint for declaratory and injunctive relief on September 16, 2019

14  in the U.S. District Court for the Northern District of California.  (Compl.)  Plaintiffs' complaint

15  alleges four claims for relief:  (1) a claim against defendants HUD and California HCD for failure

16  to reevaluate, modify and supplement the environmental review when presented with significant

17  new information and changed circumstances, in violation of NEPA, HUD regulations, and the

18  Administrative Procedure Act ("APA"); (2) a claim against defendants HUD and California HCD

19  for failure to analyze the combined impact of the Logging Project and the Biomass Facility in

20  violation of NEPA, HUD regulations, and the APA; (3) a claim against defendant Forest Service

21  for failure to supplement the environmental analysis when presented with significant new

22  information and changed circumstances, in violation of NEPA and the APA; and (4) a claim

23  against defendants HUD and California HCD for improper use of funds in violation of the Relief

24  Act and the APA.  (*Id.*)  On September 13, 2019, the federal defendants filed a motion to dismiss

25  on the grounds of improper venue or, in the alternative, to transfer the case.  (Doc. No. 15.)  On

26  September 24, 2019, plaintiffs filed a motion for temporary restraining order and preliminary

27  injunction seeking emergency relief stopping defendant HUD from passing the federal disaster

28  funding through the State of California to defendant Forest Service.  (Doc. Nos. 26; 27 at 5.)  On

6

1   October 7, 2019, U.S. District Judge Richard Seeborg of the Northern District of California

2   denied plaintiffs' motion for a temporary restraining order and granted defendants' motion for

3   discretionary transfer of the case to the Eastern District of California, noting that the lands in

4   question lie entirely within the boundaries of this district.  (Doc. No. 52.)  Judge Seeborg declined

5   to rule on plaintiffs' motion for preliminary injunction "so as not to tie the hands of the transferee

6   court on this important question."  (*Id.* at 10 n.5.)

7          Plaintiffs filed the current motion for preliminary injunction on November 5, 2019.  (Doc.

8   No. 67.)  On November 19, 2019, defendants filed their oppositions (Doc. Nos. 70, 71), in which

9   the federal defendants also renewed their previously filed motion to strike (Doc. No. 47), and the

10  state defendants raised evidentiary objections (Doc. No. 71-2).  Amicus party Yosemite

11  Stanislaus Solutions filed an amicus brief in support of the oppositions on November 25, 2019.[7]

12  (Doc. No. 75.)  Plaintiffs replied on November 26, 2019.  (Doc. No. 78.)

13         Below, the court will first summarize the various legal standards and statutory schemes

14  that are applicable to consideration of the pending motion before addressing plaintiffs' specific

15  claims.

16                                      **LEGAL STANDARDS**

17  **A.     Administrative Procedure Act**

18         Under the APA, a district court can "set aside only agency actions that are 'arbitrary,

19  capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *The Lands Council*

20  *v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (citing 5 U.S.C. § 706(2)(A)), *overruled*

21  *on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *see also Earth*

22  *Island Institute v. Carlton*, 626 F.3d 462, 468 (9th Cir. 2010).  An agency's "determination in an

23  area involving a 'high level of technical expertise'" is to be afforded deference.  *McNair*, 537

24  F.3d at 993.  The district court's role "is simply to ensure that the [agency] made no 'clear error

25  of judgment' that would render its action 'arbitrary and capricious.'"  *Id.* (citing *Marsh v. Or. Nat.*

26  *Res. Council*, 490 U.S. 360, 378 (1989)).  "Factual determinations must be supported by

27  _____

28  [7]  The motion for leave to file the amicus brief was later granted by the court on December 12, 2019.  (Doc. No. 85.)

1  substantial evidence," and "[t]he arbitrary and capricious standard requires 'a rational connection

2  between facts found and conclusions made.'"  *League of Wilderness Defs./Blue Mountains*

3  *Biodiversity Project v. Connaughton*, 752 F.3d 755, 759–60 (9th Cir. 2014) (internal citations

4  omitted).

> This requires the court to ensure that the agency has not, for instance,
> "relied on factors which Congress has not intended it to consider,
> entirely failed to consider an important aspect of the problem, offered
> an explanation for its decision that runs counter to the evidence
> before the agency, or [an explanation that] is so implausible that it
> could not be ascribed to a difference in view or the product of agency
> expertise."

9  *McNair*, 537 F.3d at 987 (citing *Motor Vehicle Mfrs. Assn., Inc. v. State Farm Mut. Auto. Ins.*

10  *Co.*, 463 U.S. 29, 43 (1983)).

11  **B.     Motion for Preliminary Injunction**

12        A preliminary injunction is "an extraordinary remedy that may only be awarded upon a

13  clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

> The proper legal standard for preliminary injunctive relief requires a
> party to demonstrate "that he is likely to succeed on the merits, that
> he is likely to suffer irreparable harm in the absence of preliminary
> relief, that the balance of equities tips in his favor, and that an
> injunction is in the public interest."

17  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20);

18  *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*,

19  'plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a

20  preliminary injunction.'"); *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th

21  Cir. 2009).  A plaintiff seeking a preliminary injunction must make a showing on all four of these

22  /////

23  /////

24  /////

25  /////

26  /////

27  /////

28  /////

1  prongs.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).[8]  The party

2  seeking the injunction bears the burden of proving these elements.  *Klein v. City of San Clemente*,

3  584 F.3d 1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d

4  668, 674 (9th Cir. 1988) ("A plaintiff must do more than merely allege imminent harm sufficient

5  to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to

6  preliminary injunctive relief.").

7  **STATUTORY AND REGULATORY SCHEMES**

8  **A.    National Environmental Policy Act**

9  "[R]ecognizing the profound impact of man's activity on the interrelations of all

10  components of the natural environment," Congress enacted NEPA in 1969.  42 U.S.C. § 4331.

11  NEPA established the Council of Environmental Quality ("CEQ"), which interprets the Act by

12  "promulgat[ing] regulations to guide federal agencies in determining what actions are subject to

13  that statutory requirement."  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (citing 40

14  C.F.R. § 1500.3).  NEPA requires an agency to prepare an EIS for "major Federal actions

15  significantly affecting the quality of the human environment[.]"  42 U.S.C. § 4332(2)(C).  Among

16  other specifications, an EIS details the environmental impact of the proposed action, any

17  unavoidable adverse environmental effects, and alternatives to the proposed action.  *Id.*  NEPA

18  imposes procedural rather than substantive requirements.  *Robertson v. Methow Valley Citizens*

19  *Council*, 490 U.S. 332, 350 (1989); *Center for Biological Diversity v. Ilano*, 928 F.3d 774, 777

20  (9th Cir. 2019).  So long as "the adverse environmental effects of the proposed action are

21  adequately identified and evaluated, the agency is not constrained by NEPA from deciding that

22

23  [8]  The Ninth Circuit has also held that "[a] preliminary injunction is appropriate when a plaintiff
   demonstrates . . . that serious questions going to the merits were raised and the balance of

24  hardships tips sharply in the plaintiff's favor."  *All. for the Wild Rockies*, 632 F.3d at 1134–35
   (quoting *McNair*, 537 F.3d at 997)).  Although some have debated "the continuing validity of

25  'serious questions' approach to preliminary injunctions after *Winter*," the Ninth Circuit has found
   that this version of the circuit's sliding scale approach survives "when applied as part of the four-

26  element *Winter* test."  *Id.* at 1134.  "'[S]erious questions going to the merits' and a balance of
   hardships that tips *sharply* towards the plaintiff can support issuance of a preliminary injunction,

27  so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the
   injunction is in the public interest."  *Id.* at 1135 (emphasis added).

28

1    other values outweigh the environmental costs." *Robertson*, 490 U.S. at 350; *see also Conner v.*

2    *Burford*, 848 F.2d 1441, 1450 (9th Cir. 1988) ("NEPA does not require that mitigation measures

3    completely compensate for the adverse environmental effects"); *Japanese Village, LLC v.*

4    *Federal Transit Administration*, 843 F.3d 445, 455 (9th Cir. 2016).

5    **B.     The Disaster Relief Appropriations Act**

6            Congress passed the Relief Act to provide "supplemental appropriations for the fiscal year

7    ending September 30, 2013, to improve and streamline disaster assistance for Hurricane Sandy,

8    and for other purposes."  Pub. L. No. 113-2, 127 Stat. 4.  The Act appropriated funds to defendant

9    HUD "for necessary expenses related to disaster relief, long-term recovery, restoration of

10   infrastructure and housing, and economic revitalization in the most impacted and distressed

11   areas[.]"  *Id.*, 127 Stat. at 36; *see also* Notice of National Disaster Resilience Competition Grant

12   Requirements, 81 Fed. Reg. at 36,558.  The Secretary of HUD has discretion to award funds to

13   state or local government grantees for "activities authorized under title I of the Housing and

14   Community Development Act of 1974 (42 U.S.C. § 5301 et seq.) (HCDA)."  Pub. L. No. 113-2,

15   127 Stat. at 36.

16           For any such activities, grantees become the "responsible entity" for NEPA purposes.  42

17   U.S.C. § 5304(g)(1); *see also* note 4, above.  HUD regulations set forth "instructions and

18   guidance to recipients of HUD assistance and other responsible entities for conducting an

19   environmental review for a particular project or activity and for obtaining approval of a Request

20   for Release of Funds."  24 C.F.R. § 58.1(a).  When requesting a release of funds, a grantee must

21   certify its consent "to assume the status of a responsible Federal official under [NEPA]."  42

22   U.S.C. § 5304(g)(3)(D); *see also* 24 C.F.R. § 58.13.  HUD's approval of such a certification

23   "shall be deemed to satisfy [HUD's] responsibilities under [NEPA]" respecting the release of

24   funds.  42 U.S.C. § 5304(g)(2); 24 C.F.R. § 58.77(a).  "Persons . . . seeking redress in relation to

25   environmental reviews covered by an approved certification shall deal with the responsible entity

26   and not with HUD."  24 C.F.R. § 58.77(b).

27   /////

28   /////

1        **ANALYSIS**

2    **A.      Motion to Strike and Evidentiary Objections**

3            The federal and state defendants first challenge the declarations and exhibits submitted by

4    plaintiffs in support of their motion for a preliminary injunction.  (Doc. Nos. 47, 71-2.)  At the

5    outset, the court notes that

6                    [t]he purpose of a preliminary injunction is merely to preserve the
                    relative positions of the parties until a trial on the merits can be held.
7                    Given this limited purpose, and given the haste that is often necessary
                    if those positions are to be preserved, a preliminary injunction is
8                    customarily granted on the basis of procedures that are less formal
                    and evidence that is less complete than in a trial on the merits.
9

10   *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  Accordingly, in considering a motion for

11   preliminary injunction, a court may consider and rely upon declarations, affidavits, and exhibits

12   submitted by the parties.  *Lane v. CitiMortgage, Inc.*, No. 2:14-cv-02295-KJM, 2014 WL

13   6670648, at *3 (E.D. Cal. Nov. 21, 2014) (citing *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th

14   Cir.2009) ("A district court may . . . consider hearsay in deciding whether to issue a preliminary

15   injunction.").  "Such evidence need not conform to the standards for a summary judgment

16   motion. . . . And the weight to be given such evidence is a matter for the court's discretion, upon

17   consideration of the competence, personal knowledge and credibility of the affiant.'" *Id.* (internal

18   citations and quotation marks omitted).

19           Here, the federal defendants contend that "most, if not all, of Plaintiffs' declarations will

20   be irrelevant because the declarations amount to extra-record evidence that do not fall within an

21   exception for admission."  (Doc. No. 47 at 2 n.1.)  When reviewing an agency action, "the focal

22   point for judicial review should be the administrative record already in existence, not some new

23   record made initially in the reviewing court."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729,

24   743 (1985) (internal citation and quotation marks omitted).  However, consideration of extra-

25   record materials is appropriate "if necessary to determine whether the agency has considered all

26   relevant factors and has explained its decision."  *Ctr. for Biological Diversity v. U.S. Fish &*

27   *Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006) (internal citations and quotation marks omitted);

28   *see also Humane Society of U.S. v. Locke*, 626 F.3d 1040, 1058 (9th Cir. 2010) (same); *Sw. Ctr.*

11

1  *for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996) (same).  Such is

2  the case here.  The court's primary function in enforcing NEPA "is to insure [*sic*] that the

3  information available to the decision-maker includes an adequate discussion of environmental

4  effects and alternatives, which can sometimes be determined only by looking outside the

5  administrative record to see what the agency may have ignored." *Animal Def. Council v. Hodel*,

6  840 F.2d 1432, 1437 (9th Cir. 1988), *amended*, 867 F.2d 1244 (9th Cir. 1989).  Here, plaintiffs

7  allege that defendants have failed to consider significant new circumstances and information that

8  were absent from and unaddressed in the administrative record.  (Doc. No. 67 at 16–18, 25–30.)

9  In keeping with the authorities cited above, the court is permitted to consider extra-record

10  materials, such as those offered by plaintiffs here, in determining whether the agency considered

11  all relevant factors and adequately explained its decision.

12         Next, both the state and federal defendants contend that several declarations[9] and exhibits

13  offered by plaintiffs in support of the pending motion are inadmissible because they constitute

14  "new" evidence, introduced for the first time in plaintiffs' reply brief in support of their motion

15  for a temporary restraining order when this case was pending before the Northern District of

16  California.  Defendants note that courts should not consider new evidence presented in a reply to

17  a motion without giving the non-movant an opportunity to respond.  *See Provenz v. Miller*, 102

18  F.3d 1478, 1483 (9th Cir. 1996).  However, this principle is inapplicable here for two reasons.

19  First, "where evidence is submitted in direct response to proof adduced in opposition to a motion

20  it is not 'new.'" *Villery v. Beard*, No. 1:15-cv-00987-DAD-BAM (PC), 2018 WL 6304410, at *2

21  (E.D. Cal. Dec. 3, 2018).  As plaintiffs explained when they offered these declarations and

22  exhibits, the challenged evidence is not "new" but instead directly rebuts evidence presented by

23  _____

24  [9]  Both the state and federal defendants take issue with the second declarations of Tonja Chi, a
wildlife biologist (Doc. No. 39), and Maya Kholsa, a published author, filmmaker, and wildlife

25  biologist (Doc. No. 41).  Declarants Chi and Kholsa both conducted research within the Rim Fire
area.  (*See* Doc. Nos. 39 at ¶¶ 3, 5; 40 at ¶¶ 3, 5.)  The state defendants also take issue with the

26  declaration of Ralph Bloemer, plaintiffs' counsel and an attorney with the Crag Law Center (Doc.
No. 40); the second declaration of Chad Hanson, director and staff ecologist of the John Muir

27  Project at Earth Island (Doc. No. 42); the second declaration of Meriel Darzen, plaintiffs' counsel
and an attorney with the Crag Law Center (Doc. No. 43); and the second (corrected) Hanson

28  declaration (Doc. No. 45).

1    defendants in their briefs in opposition to the plaintiffs' motion for a temporary restraining

2    order.[10]  (Doc. No. 50 at 2.)  Second, even if the challenged declarations and exhibits constituted

3    "new" evidence at the temporary restraining order stage of this litigation, it is certainly not "new"

4    now as the court considers plaintiffs' motion for a preliminary injunction.  Plaintiffs cited these

5    declarations and exhibits in their opening brief in support of the pending motion.  Unlike at the

6    temporary restraining order stage—where defendants may have had insufficient opportunity to

7    respond to evidence submitted in a reply brief—defendants have had ample opportunity to

8    respond to that evidence now.  Accordingly, the court rejects defendants' objections and

9    alternative request to be granted additional time to respond to plaintiffs' evidence.

10          Next, the state defendants challenge the reliability of certain evidence submitted by

11   plaintiffs in support of their motion.  Specifically, the state defendants object to declarant

12   Hanson's video interview as hearsay.  (Doc. No. 71-2 at 4.)  Additionally, they argue that several

13   photographs submitted by plaintiffs were taken from misleading perspectives and angles that give

14   unfair and inaccurate impressions of the impact of the recovery and reforestation work.  (*Id.* at 2,

15   4.)  They also contend that declarant Hanson's video is misleading and contains unsubstantiated

16   scientific claims and statements comparing the Rim Fire to another forest fire.  (*Id.* at 2, 4.)  The

17   federal defendants also object to the two videos submitted as part of the second Kholsa

18   declaration (Doc. No. 41), because some of the dialogue in those videos is narrated by

19   unidentified parties who were not placed under oath.  (Doc. No. 47 at 5.)

20          As noted above, a motion for a preliminary injunction's urgent nature allows the court to

21   "give even inadmissible evidence some weight, when to do so serves the purpose of preventing

22   irreparable harm before trial."  *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)

23

24   _____

     [10]  Plaintiffs contend that the photographs and videos submitted with the second Chi declaration

25   and the second Kholsa declaration are responsive to the declaration of Maria Benech—a Rim Fire
     restoration coordinator for the Stanislaus National Forest—in which declarant Benech averred

26   that green trees are not being cut and are "being avoided as much as possible."  (Doc. No. 50 at
     2.)  Plaintiffs also argue that the Bloemer declaration is responsive rebuttal evidence to

27   defendants' claim that there is an immediate risk of wildfire.  (*Id.* at 3.)  Lastly, plaintiffs assert
     that the videos submitted with the second Hanson declaration are responsive to defendants'

28   contention that post-fire logging reduces fire risk.  (*Id.*)

13

1    (admitting evidence that was challenged on hearsay grounds for purposes of considering such a

2    motion); *see also Johnson*, 572 F.3d at 1083.  Following this reasoning, the court declines to

3    strike declarant Hanson's video as hearsay.  Nor will the court strike the challenged photographs

4    and videos as unreliable.  *Accord Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*, No. 3:12-cv-

5    00431-HA, 2013 WL 12120102, at *7 (D. Or. May 16, 2013) ("While the draft documents may

6    not be admissible at trial, and are certainly not the most reliable evidence in the record, the court

7    utilizes relaxed evidentiary standards when considering a preliminary injunction.").  Moreover, to

8    the extent that the federal defendants object under Federal Rule of Civil Procedure 56 (Doc. No.

9    47 at 5), their objection lacks merit because that rule governs summary judgment procedures, not

10   those relating to resolution of motions for injunctive relief.  *See Loguidice v. Rich*, No. 1:18-cv-

11   01652-JDP, 2019 WL 112981, at *4 (E.D. Cal. Jan. 4, 2019), *report and recommendation*

12   *adopted*, No. 1:18-cv-01652-AWI-JDP (PC), 2019 WL 934988 (E.D. Cal. Feb. 26, 2019).  To the

13   extent there are narrations accompanying videos submitted as part of the second Kholsa

14   declaration, the court has not listened to or considered in any way the narrations in resolving the

15   pending motion.

16         Last, the state defendants object to certain declarations and exhibits offered by plaintiffs in

17   support of their motion as being unsupported by personal knowledge or on relevance grounds.

18   Specifically, the state defendants argue that declarant Chi never attests to having personal

19   knowledge of the images submitted as exhibits to her declaration.  (Doc. No. 71-2 at 2–3.)  The

20   state defendants also assert that a 2015 photograph of logging operations in an area that is

21   currently subject to the Logging Project is irrelevant to resolution of the pending motion because

22         Plaintiffs seek to enjoin ongoing alleged harm to the environment,
23   not work conducted in 2015.  Moreover, Chi fails to support her
      comparison of recovery work conducted in 2015 to the current
24   reforestation work with personal knowledge.

25   (*Id.* at 3.)  Additionally, the state defendants contend that declarant Hanson likewise has not

26   attested to any personal knowledge of the video submitted as part of his declaration that he claims

27   was made by a filmmaker who interviewed him in 2018 about the Rim and Camp Fires.  (*Id.*)

28   /////

1      These objections will be overruled.  Each declarant has signed their declaration under

2  penalty of perjury and stated that they would testify to the matters contained therein if called as

3  witnesses.  This weighs in favor of overruling defendants' objections, even if the evidence is

4  ultimately ruled inadmissible at trial.  *See Fid. Nat. Title Ins. Co. v. Castle*, No. C 11-00896 SI,

5  2011 WL 5882878, at *4 (N.D. Cal. Nov. 23, 2011) ("All of these declarations are signed under

6  penalty of perjury and state that all declarants will testify as to the matters contained in the

7  declarations at the time of trial. . . . Defendants may object to the admissibility of the evidence

8  before trial if necessary.")  Moreover, the video submitted as part of the second Hanson

9  declaration is an interview of declarant Hanson himself.  (*See* Doc. No. 45 at ¶ 10.)  Declarant

10  Hanson attests that he has personal knowledge of the matters stated in his declaration.  (*Id.* at ¶ 2.)

11  That he did not also attest to his personal knowledge of the video itself and any of the

12  filmmaker's claims does not persuade the court that it should exclude the video.  However,

13  acknowledging the valid concerns raised by the objection, the court will disregard any claims

14  expressed in the challenged video that are not made by declarant Hanson himself.  *See A.A. v.*

15  *Raymond*, No. 2:13-cv-01167-KJM, 2013 WL 3816565, at *7 (E.D. Cal. July 22, 2013) (allowing

16  evidence challenged as speculative and lacking foundation and personal knowledge, but adjusting

17  the weight of the evidence).

18  **B.**    **Motion for Preliminary Injunction**

19      As noted at the outset, as the party seeking preliminary injunctive relief, plaintiffs must

20  make a sufficient showing on all four prongs of the *Winter* test in order to be entitled to the

21  requested preliminary relief.  *All. for the Wild Rockies*, 632 F.3d at 1135.  Below, the court

22  addresses those factors and plaintiffs' showing with respect to each.

23      1.    <u>Likelihood of Success on the Merits</u>

24      Plaintiffs bear the burden of demonstrating that they are likely to succeed on the merits of

25  this action or, at the very least, that "serious questions going to the merits were raised."  *Id.*

26  at 1131.

27  /////

28  /////

15

1

2

a. *Whether Defendants Violated a Duty to Supplement, Update, or Modify the EISs*

3    Plaintiffs first contention is that defendants violated HUD and CEQ regulations—and

4    therefore violated NEPA—by failing to supplement or modify the Recovery and Reforestation

5    EISs in light of changes in environmental conditions and circumstances.  "An agency will have

6    acted arbitrarily and capriciously only when 'the record plainly demonstrates that [the agency]

7    made a clear error in judgment in concluding that a project meets the requirements' of NEPA."

8    *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1052 (9th Cir. 2012) (quoting *Tri–Valley*

9    *CAREs v. U.S.D.O.E.*, 671 F.3d 1113, 1124 (9th Cir. 2012)).  "At a minimum, an agency must

10   support its conclusions with studies that the agency deems reliable."  *Id.* at 1051 (quoting *Tri–*

11   *Valley CAREs*, 671 F.3d at 1124).  But "an agency that has prepared an EIS cannot simply rest on

12   the original document."  *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir.

13   2000); *see also Protect our Communities Foundation v. LaCounte*, 939 F.3d 1029, 1041 (9th Cir.

14   2019); *North Idaho Community Action Network v. U.S. Dept. of Transportation*, 545 F.3d 1147,

15   1155 (9th Cir. 2008) ("This continuing obligation . . . extends only to new information or

16   circumstances regarding environmental impacts that may not have been appreciated or considered

17   when the EIS was prepared.").  Rather, the agency "must be alert to new information that may

18   alter the results of its original environmental analysis, and continue to take a 'hard look at the

19   environmental effects of [its] planned action, even after a proposal has received initial approval.'"

20   *Friends of the Clearwater*, 222 F.3d at 557; *see also Great Old Broads for Wilderness v. Kimbell*,

21   709 F.3d 836, 855 (9th Cir. 2013).

22

23

24

i. Plaintiffs Have Not Shown That They Are Likely to Prevail on Their Claim That Defendants California HCD and Forest Service Violated a Duty to Consider Whether New Information Warranted Preparing a SEIS

25   Plaintiffs' first and third causes of action assert that defendant California HCD violated

26   HUD regulations, and defendants California HCD and Forest Service violated CEQ regulations,

27   /////

28   /////

16

1   when neither agency considered whether the data presented by plaintiffs in 2018 constituted

2   significant new circumstances warranting preparation of a SEIS.[11]

3          HUD regulations require an SEIS "[w]hen substantial changes are proposed in a project or

4   when significant new circumstances or information becomes available during an environmental

5   review."[12]  24 C.F.R. § 58.60.  Likewise, CEQ regulations require an agency to prepare an SEIS

6   "if [t]here are significant new circumstances or information relevant to environmental concerns

7   and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii).

8   /////

9   /////

10  _____

11  [11]  Defendant HUD asserts that its role in the Community Watershed Resilience Program is
    limited because, as a grant recipient, defendant California HCD assumed all NEPA
    responsibilities for its grant projects.  (Doc. No. 70 at 14–15.)  Courts have held that

12

13              [n]either HUD nor its Secretary ha[ve] a legal obligation under
                NEPA to prepare a separate environmental impact statement; nor
14              [do] they have a duty to critically evaluate the substance of the
                environmental analysis prepared by the . . . grant applicant under the
                HCDA. However, the federal defendants [do] have a duty under the
15              HCDA, 42 U.S.C. § 5304(c)(3), and the APA, 5 U.S.C. § 706(2)(B),
                (c), to review the grant applicant to see that procedural requirements
16              were met and that applicable federal regulations were followed.

17  *Nat'l Ctr. for Pres. Law v. Landrieu*, 496 F. Supp. 716, 731 (D.S.C.), *aff'd*, 635 F.2d 324 (4th Cir.
18  1980).  Because defendant HUD required defendant California HCD to consider and respond to
    plaintiffs' objections (Doc. No. 25-5), and HCD responded to those objections (Doc. No. 25-6),
19  defendant HUD ensured that defendant California HCD met the applicable procedural
    requirements before releasing HUD funds (Doc No. 28-7).  Defendant HUD's NEPA duties were
20  therefore satisfied, and the court will not consider defendant HUD's actions when assessing the
    merits of the NEPA-based claims.
21

22  [12]  The parties disagree over the applicable standard in determining under what circumstances
    HUD regulations requires the preparation of a SEIS.  Plaintiffs argue that, in contrast to NEPA,
23  HUD regulations provide that "*any* new circumstances and environmental conditions that depart
    from those reviewed in the EIS trigger a re-evaluation obligation" and thus require the
24  preparation of a SEIS.  (Doc. No. 67 at 15–16) (citing 24 C.F.R. §§ 58.47, 58.52).  Defendants, on
    the other hand, persuasively argue that plaintiffs have misread the HUD regulations in this regard.
25  (Doc. Nos. 70 at 19–20; 71 at 19–20.)  Plaintiffs erroneously cite the provisions applying to
    environmental *assessments*—a different type of NEPA analysis—not *impact statements*.  As
26  recognized above, the provision applicable to EISs explicitly states only that either *substantial*
    changes to the project or *significant* new circumstances trigger the re-evaluation requirement.  *See*
27  24 C.F.R. § 58.60.  This is corroborated by the provision's mandate that SEISs should be
    prepared as prescribed by CEQ regulations.  *Id.*; *see also* 40 C.F.R. 1502.9.
28

17

> When determining whether to issue a supplemental EIS, an agency must "apply a rule of reason," not supplementing "every time new information comes to light" but continuing to maintain a "hard look" at the impact of agency action when the "new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered.

*League of Wilderness Defs*, 752 F.3d at 760; *see also LaCounte*, 939 F.3d at 1040.  Thus, "[w]hether new information is sufficiently significant to necessitate an SEIS 'turns on the value of the new information to the still pending decisionmaking process.'"[13]  *LaCounte*, 939 F.3d at 1040 (citing *Marsh*, 490 U.S. at 374).

Here, plaintiffs' experts conducted surveys in 2017, through which they claim to have first discovered extensive conifer regeneration in the high-intensity fire areas planned for logging, and submitted this information in commenting on defendant Forest Service's EIS.  (Doc. No. 67 at 27 (citing Doc. No. 28-8 at 33–34.))  Plaintiffs claim that when they presented this data, defendant Forest Service responded by questioning the completeness of the data but indicating that it would continue to monitor the area in question for natural regeneration.[14]  (Doc. No. 67 at 27.)  After receiving this response to their comments, in 2018 plaintiffs surveyed all 4,400 approved logging plots and found, among other things, that:  (1) plots showing natural regeneration increased from 52 percent in 2014/2015 to 70 percent in 2018; and (2) of the plots which defendant Forest

---

[13]  To determine whether circumstances are "significant" as used in NEPA, agencies must consider both context and intensity.  40 C.F.R. § 1508.27 (listing factors for considering context and intensity).

[14]  The court notes it was unable to locate plaintiffs' comment and the response thereto at the citation to the record provided by plaintiffs.  (Doc. No. 67 at 27.)  Moreover, plaintiffs assert that the response was by defendant Forest Service.  (*Id.*)  However, the court has located only defendant California HCD's statement in its January 2018 letter to defendant HUD, responding to plaintiffs' objections to the request for release of funds.  (Doc. No. 25-6 at 6.)  That response by California HCD reads as follows:

> The information provided by the commenter was for only seven units (1% of the total number of reforestation units) and included just 32 plots, all within areas where residual overstory live trees have persisted post-Rim Fire and either outside of the high severity burn areas or adjacent to non-high severity burn areas.  Five of those plots or 16% contained no natural seedling regeneration.

(*Id.*)

1    Service reported had no regeneration in 2014/2015, 70 percent had regeneration by 2018.[15]  (Doc.

2    Nos. 45-1 at 4; 67 at 27.)  Plaintiffs assert that they presented these 2018 survey findings to

3    defendants in letters in 2018 and 2019 (Doc. Nos. 45-1 at 4–7; 68-1; 68-2), and defendants neither

4    disclosed and considered the 2018 survey nor adjusted their plans in light thereof.  (Doc. No. 67

5    at 27.)

6        Despite this evidence, the undersigned concludes that plaintiffs have neither demonstrated

7    likelihood of success nor raised serious questions as to the merits of this claim.  The decision in

8    *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1025 (9th Cir. 1980), is instructive.

9    There, the plaintiffs challenged an SEIS prepared by the Army Corps of Engineers for the

10   construction of a dam.  *Id.* at 1019.  The SEIS, which addressed seismic safety and water quality,

11   assumed that two faults could generate the most destructive force on the proposed dam.  *Id.*  As

12   the Corps prepared their SEIS, it became aware of a United States Geological Survey ("USGS")

13   study indicating that another fault could generate an earthquake of greater magnitude than the

14   dam could withstand.  *Id.* at 1020.  As the court pointed out, while "[t]he Corps merely argued

15   that the environmental considerations raised by [USGS] had been adequately explored," neither

16   the EIS nor SEIS dealt with the specific fault addressed in the study.  *Id.*  Accordingly, the Ninth

17   Circuit concluded that the Corps' response in that case was insufficient to satisfy NEPA.  *Id.*

18       In contrast, plaintiffs' 2018 survey does not appear to "raise[] sufficient environmental

19   concerns to require the [agencies] to take another hard look at the issues."  *See id.*  Whereas the

20   newly discovered fault in *Gribble* was never explored in USGS's analysis, *see id.* at 1020, here

21   defendants accounted for natural regeneration.  At the hearing on the pending motion, plaintiffs'

22   clarified that the essence of their argument is that *some* natural regeneration was contemplated by

23   the EISs, but regeneration to the extent reflected in their 2018 survey was not.  However, the

24   _____

25   [15]  The Chi declaration states that the natural regeneration percentage level has been measured at
     92 percent.  (Doc. No. 19 at 7–8.)  At the hearing on the motion, plaintiffs emphasized that the
26   data they have assembled and rely upon is significant because of this high percentage with respect
     to the level of natural regeneration now occurring.  However, the court remains unclear as to
27   whether the data reflecting that 92 percent regeneration level was ever presented to the agencies
     before this action was filed since that data does not appear in either of plaintiffs' comment letters
28   in 2018 or 2019.  (*See* Doc. Nos. 68-1, 68-2, 45-1.)

1   administrative record reflects that any amount of natural regeneration could not be counted on

2   because other variables would likely inhibit timely regeneration.  The Reforestation EIS found

3   and explained that

4           [w]ithout mature live trees to provide a seed source within close
            proximity to the burned areas, or the lack of a viable and healthy cone
5           crop, natural conifer regeneration cannot be counted on within large
            portions of the Rim Fire.  In addition, brush is already beginning to
6           dominate sites, inhibiting conifer survival and growth.  Conifer seed
            dispersal is often sporadic in nature.  Research in the Sierra Nevada
7           shows that it can take 30 to 50 years for conifers to establish among
            dense sprouting shrubs following high-severity wildfire.   Once
8           established, the intense competition with sprouting vegetation for
            light and water results in slow seedling development.
9

10  (Reforestation EIS at 33; *see also id.* at 266–67; Recovery EIS at 87.)  Federal defendants also

11  note that the Reforestation EIS

12          analyzed and included natural regeneration units as part of their
            decision and included an adaptive management component to
13          adjust/reduce the extent of active reforestation.  In fact, that active
            management, both fuels reduction and reforestation, *is needed even
14          in locations where there is some natural regeneration*—for example,
            fuels reduction, shrub control, and species management.
15

16  (Doc. No. 70 at 18 n. 8 (citing Reforestation EIS at 21–22) (emphasis added) (internal citations

17  omitted.))  In its response to the objections to defendant HUD's release of funds, defendant

18  California HCD pointed out that the Recovery EIS did "not preclude the chance that some natural

19  conifer regeneration will occur" but concluded that without human intervention, survival and

20  growth of natural regeneration would likely be reduced due to the competing vegetation.  (Doc.

21  No. 35-5 at 3–4; *see also id.* at 5–7 (citing the Reforestation EIS as concluding the same); Doc.

22  No. 28-5 at 33–35.)

23          While plaintiffs' data may clarify the extent to which natural regeneration is occurring, the

24  court is not persuaded that plaintiffs have raised even "serious questions" as to whether their data

25  constitutes new information requiring defendants to take a "hard look."  *See Gribble*, 621 F.2d at

26  1025; *Friends of the Clearwater*, 222 F.3d at 558 (stating that it is only "incumbent on the Forest

27  Service to evaluate the existing EIS to determine whether it required supplementation" when

28  presented with new, important information).  The court therefore finds on the present record that

20

1    plaintiffs have not demonstrated a likelihood of success on their claim that defendants violated

2    their duty, and acted arbitrarily and capriciously, by failing to prepare an SEIS.

3                    ii.      Plaintiffs Have Not Shown a Likelihood of Succeeding on the
                              Claim that Defendant California HCD Violated a Duty to Prepare
4                             its Own Environmental Analysis or Modify Defendant Forest
                              Service's EISs
5

6            Plaintiffs' first cause of action also asserts that defendant California HCD violated HUD

7    regulations when it failed to prepare its own environmental analysis or modify defendant Forest

8    Service's EISs before adopting them.[16]  HUD regulations permit a responsible entity to adopt an

9    EIS properly prepared by another agency, but the responsible entity may have to revise and

10   modify the adopted EIS "to adapt it to the particular environmental conditions and circumstances

11   of the project if these are different from the project reviewed in the EIS."  24 C.F.R. § 58.52.

12   Additionally, the responsible entity must prepare a new EIS if an areawide or broad scale EIS has

13   been issued and the EIS did not anticipate a subsequent project requiring an environmental

14   clearance.  *Id.* § 58.53.  HUD regulations require the responsible entity to "maintain a written

15   record of the environmental review undertaken under this part for each project."  *Id.* § 58.38.  The

16   environmental review record must include "the written determinations and other review findings"

17   such as "exempt and categorically excluded projects determinations, [and] findings of no

18   significant impact."  *Id.* § 58.38(a)(4).

19           Here, plaintiffs assert that in June 2017, they wrote to defendant California HCD

20   requesting that it withdraw its proposal to adopt defendant Forest Service's EISs because (1) the

21   data relied upon in those EISs was outdated in considering the natural regeneration, and (2) the

22   EISs did not analyze the environmental impacts of logging for biomass, which involves

23   clearcutting both live and dead vegetation, rather than commercial logging dead trees for

24   dimensional lumber.  (Compl. at ¶ 73.)  Plaintiffs further contend that they explained and

25   demonstrated that the amount of new tree regeneration in the area in question is far greater than

26   the amount anticipated in the final EIS and that recovery of the forest is occurring naturally, thus

27   rendering defendants' predicate analyses inaccurate.  (Doc. No. 67 at 16.)  Several organizations

28   [16]  *See* fn. 11, above.

1    wrote to defendant California HCD in June and October of 2017 expressing the view that

2    environmental conditions and circumstances in the project area had changed since the Recovery

3    and Reforestation EISs.  (*Id.* at 16–17.)  Plaintiffs also attended a site visit to the project area with

4    officials from defendants California HCD and Forest Service, where plaintiffs contend

5    representatives of defendants observed regenerating snag forest but nonetheless stated that

6    delaying the Logging Project was not possible.  (Doc. No. 25 at ¶ 22.)  Plaintiffs allege that as a

7    result, defendants are killing and removing live, green trees even though they provided assurances

8    that they would not do so.  (Doc. No. 67 at 29.)

9        Defendant California HCD responded to these comments and concluded that

10   environmental conditions and circumstances in 2018 were not in fact materially different than

11   those at the time defendant Forest Service prepared the EISs in 2014 and 2016.  As stated above,

12   defendant California HCD noted that the EISs expected and anticipated natural conifer

13   regeneration but also found that those conifers were unlikely to survive without intervention.

14   Defendant California HCD also noted that incidental damage to live trees was also anticipated in

15   defendant Forest Service's original EISs, and that no live trees are being intentionally cut down as

16   part of the Logging Project.  (Doc. Nos. 28-5 at 21; 35-1 at ¶¶ 14, 16; Reforestation EIS at 239–

17   40; 70-3 at ¶ 13.)

18       Having considered the parties' evidence, the court concludes that at this stage of the

19   litigation plaintiffs have not demonstrated a likelihood of success on or raised serious questions as

20   to the claim that defendant California HCD failed to satisfy its duty to consider whether the

21   particular environmental conditions and circumstances of the project reviewed in defendant

22   Forest Service's EISs had changed before adopting the EISs.

23   /////

24   /////

25   /////

26   /////

27   /////

28   /////

b.    *Whether the Logging Project and the Biomass Facility Are Connected or Related*

Plaintiffs' second cause of action asserts that defendant California HCD violated NEPA by failing to evaluate the Logging Project with the Biomass Facility.[17]   (Doc. No. 67 at 18.)

i.    Plaintiffs' Claim is Ripe

First, the court must determine whether plaintiffs' claim is ripe, since the state defendants assert that it is not.  (Doc. No. 71 at 21–22.)  Ripeness of an administrative challenge entails a three-pronged test:  "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented."  *Habeas Corpus Resource Center v. U.S. Dept. of Justice*, 816 F.3d 1241, 1252 (9th Cir. 2016) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).

Here, the state defendants argue that plaintiffs have failed to identify any harm flowing from defendant California HCD's failure to consider the projects together.  (Doc. No. 71 at 21–22.)  However, "a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper."  *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 737.  Indeed, "[f]or ripeness purposes in NEPA challenges, the Ninth Circuit has held that the injury occurred when the allegedly inadequate EIS was promulgated."  *Citizens for Better Forestry*, 341 F.3d at 977 (internal citation and quotation marks omitted); *see also Cottonwood Environmental Law Center v. U.S. Forest Service*, 789 F.3d 1075, 1084 (9th Cir. 2015).  Because plaintiffs in this case allege that the EIS was inadequate due to defendant California HCD's failure to consider the Logging Project and Biomass Facility together, plaintiffs have sufficiently alleged injury or harm.

---

[17] *See* fn. 11, above.  The court also notes that plaintiffs do not bring this cause of action against defendant Forest Service, whose involvement is limited to the extent that the Logging Project involves defendant California HCD passing NDRC grant funds to defendant Forest Service to fund some of the activities contemplated in the Recovery and Reforestation EISs.  (Compl. at ¶ 66.)  Defendant Forest Service claims it is not involved with the Biomass Facility (Doc. No. 70 at 15), and plaintiffs appear to recognize this by omitting defendant Forest Service from this cause of action.

1    Turning to the second and third factors of the test, defendant California HCD argues that

2    were this court to now consider this claim advanced by plaintiffs, it would be improperly

3    interfering in ongoing agency deliberations because it has not yet been determined how the

4    Biomass Facility will be implemented.  (Doc. No. 71 at 22.)  It is true that the ripeness doctrine is

5    in part intended "to protect the agencies from judicial interference *until* an administrative decision

6    has been formalized and its effects felt in a concrete way by the challenging parties." *Cent. Delta*

7    *Water Agency v. U.S. Fish & Wildlife Serv.*, 653 F. Supp. 2d 1066, 1087 (E.D. Cal. 2009)

8    (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967), *abrogated on other grounds by*

9    *Califano v. Sanders*, 430 U.S. 99 (1977)) (emphasis added).  However, here an administrative

10   decision has been formalized; the Logging Project is already underway, and defendant California

11   HCD has moved forward allegedly without contemplating the cumulative impacts of that project

12   alongside the Biomass Facility.  The parties challenging that decision are feeling the effects of it

13   because they contend their environmental interests are being compromised as the project

14   continues to move forward.

15   The state defendants contend that the court would benefit from further factual

16   development because the environmental impacts of the Biomass Facility cannot currently be

17   determined.  (Doc. No. 71 at 22.)  This would appear to be true to some extent, since the

18   feasibility study is now engaged in further factual development.  However, this feasibility study

19   will only determine which iteration of the Biomass Facility will be constructed.  In this respect,

20   the Biomass Facility is not a speculative project that may or may not be undertaken.  Rather,

21   defendant California HCD fully intends to construct the facility.  Though the agency might

22   benefit from further factual development, that development is not necessary, nor perhaps

23   particularly relevant, to the court's resolution of plaintiffs' challenge presented in this claim.

24   Therefore, consideration of whether the court might benefit from further factual development of

25   the issues presented does not outweigh the results of consideration given to the first and second

26   factors.  The court therefore concludes, at least at this stage of the litigation, that this claim is ripe

27   for review.

28   /////

24

ii.       The Biomass Facility is Not Exempt from Environmental Review

Next, defendants argue that under HUD regulations, the Biomass Facility is exempt from environmental review because it is still in its planning phase.  (Doc. Nos. 70 at 21 n.9; 71 at 22.)  The court does not find this argument to be persuasive.  HUD regulations exempt "[e]nvironmental and other studies, resource identification and the development of plans and strategies" from "any environmental review, consultation or other action under NEPA."  24 C.F.R. § 58.34(a)(1).  The state defendants rely on the decision in *Ka Makani 'O Kohala Ohana Inc. v. Water Supply*, 295 F.3d 955, 962 (9th Cir. 2002), in support of their position that the Biomass Facility is presently exempt from environmental review.  In that case, the court found that HUD did not have to prepare an EIS for its administration of a special-purpose grant for a county's use in preparing EISs and other preliminary activities.  *Id.*  The court noted that it was unclear whether HUD had restricted the county's use of grant funds solely to preparing an EIS or had informally approved using the funds for other aspects of the county's project, as described in its application.  *Id.* at 958.  However, any restriction on the funds was found not to be dispositive, because in that case "there [wa]s no doubt that the activities to be funded by the grant were limited to those of a preliminary nature."  *Id.*

Here, as in *Ka Makani*, the record is unclear regarding which activities in California's application are being funded by the released funds.[18]  However, unlike the circumstances presented in *Ka Makani*, in this case it is clear that the entire application is *not* limited to activities of a preliminary nature.  Defendant California HCD's litigation position in the present action is that the NDRC grant is being used "on initial feasibility studies to document [Biomass Facility] project viability."  (Doc. No. 71-10 at 3.)  But the California action plan, which describes the Community Watershed Resilience Program, states that "[t]he location of the Biomass facility will be determined by the feasibility study."  (Doc. No. 35-6 at 18.)  The California action plan is

---

[18]  The record is unclear about whether the NDRC grant is funding solely the Biomass Facility feasibility study.  Monetary amounts for the environmental review exemption forms, which state that released funds are solely being used for planning and administrative activities (Doc. Nos. 71-7, 71-8), do not match up with the amounts that were actually released by defendant HUD and characterized as being for the Biomass Facility.  (Doc. No. 35-3 at 4.)

25

1    therefore not limited to activities of a preliminary nature.  Rather, it has already been determined

2    that the Biomass Facility will be built and, thus, will have environmental consequences.  This

3    preliminary conclusion is further supported by the fact that the California action plan itself lists

4    the Logging Project, Biomass Facility, *and* the feasibility studies as currently being underway.

5    (*See id.*)

6           Based upon the evidence now before the court, it appears the Biomass Facility is not

7    merely the subject of preliminary "development of plans and strategies," and is therefore likely

8    not exempt under 24 C.F.R. § 58.34.

9                      iii.      Plaintiffs Have Raised "Serious Questions" as to the Merits of the
10                              Claim that Defendant California HCD Should Have Analyzed the
                                Biomass Facility Together with the Logging Project
11

12          The court must next determine whether plaintiffs have established a likelihood of success

13   on their claim that defendant California HCD's decision not to analyze the Biomass Facility

14   together with the Logging Project was arbitrary and capricious.  Because one of the purposes of

15   the applicable HUD provision is to ensure that the responsible entity conducts an adequate

16   analysis as set forth in the CEQ regulations at 40 C.F.R. § 1508.25(a), the court will begin by

17   analyzing the strength of plaintiffs' argument as to whether defendants violated the CEQ

18   regulations.  CEQ regulations provide that actions that are "connected" or "cumulative" must be

19   analyzed in a single EIS.  40 C.F.R. § 1508.25(a); *see also Pac. Coast Fed'n of Fishermen's*

20   *Associations v. Blank*, 693 F.3d 1084, 1098 n. 12 (9th Cir. 2012).

21          First, the court turns to the claim that the Logging Project and Biomass Facility are

22   "connected."  An "independent utility" test is to be applied in determining whether multiple

23   actions are "connected."  *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 894 (9th Cir.

24   2002).  "Where each of two projects would have taken place with or without the other, each has

25   'independent utility' and the two are not considered connected actions."  *Id.*  This case is

26   analogous to *Native Ecosystems Council*, in which two restoration projects were found to have

27   independent utility because they "each generate[d] revenue and implement[ed] distinct forest

28   conservation measures, and each plan would go forward without the other."  *Id.* at 893–94.  As of

1    November 2019, when this motion was filed, the Logging Project had been ongoing for over four

2    months, and was halfway complete, while the Biomass Facility was still undergoing feasibility

3    and viability studies.[19] (Doc. No. 70 at 21.) The Logging Project also implements a project that

4    defendant Forest Service proposed long before the Biomass Facility was contemplated. Even if

5    some of the biomass from the Logging Project will be used for the Biomass Facility, the Biomass

6    Facility will process fuel from other sources as well. The Biomass Facility is intended to provide

7    jobs for the area and will continue to operate long after the Logging Project is complete. Thus,

8    plaintiffs have not demonstrated a likelihood of succeeding on their claim that the two projects

9    lack independent utility and are "connected" for purposes of 40 C.F.R. § 1508.25.

10        The court next considers whether the Logging Project and Biomass Facility are

11   "cumulative" actions, or actions "which when viewed with other proposed actions have

12   cumulatively significant impacts and should therefore be discussed in the same impact

13   statement." 40 C.F.R. § 1508.25(a)(2). Separately, CEQ regulations also require agencies to

14   consider "cumulative *impacts*" in an EIS. *Id.* § 1508.25(c) (emphasis added). For example,

15   courts have required a single EIS for timber sales when the sales "formed part of a single timber

16   salvage project, were announced simultaneously, were reasonably foreseeable, and were located

17   in the same watershed." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1305 (9th Cir.

18   2003) (discussing *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214–15

19   (9th Cir.1998)). "[I]n assessing cumulative effects, [an EIS] must give a sufficiently detailed

20   catalogue of past, present, and future projects, and provide adequate analysis about how these

21   projects, and differences between the projects, are thought to have impacted the environment."

22   *Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir. 2005).

23        Here, when defendant California HCD was considering adopting the EISs, plaintiffs wrote

24   to defendants California HCD and HUD and requested that the two projects be analyzed together

25   _____

26   [19] At the hearing on the motion, the parties notified the court that winter weather conditions
     would result in logging being temporarily halted. On March 13, 2020, plaintiffs notified the court
27   of their belief that logging would resume some time in April 2020. (Doc. No. 90 at 2.) Even as
     of April 20, 2020, the date on which plaintiffs filed their request for a temporary restraining order,
28   it remains unclear whether logging has recommenced. (*See* Doc. No. 91 at 2.)

1    because of the cumulative impacts on carbon emissions associated with the two projects.  (Doc.

2    No. 25-3 at 4.)  As plaintiffs note, part of the $70 million NDRC grant was allocated to the

3    Biomass Facility, and defendant California HCD's grant application refers to the Logging Project

4    and the Biomass Facility as two pillars of a composite action:  the Community Watershed

5    Resilience Program.[20]  (Doc. No. 67 at 18–19.)  The Biomass Facility was therefore clearly

6    foreseeable when defendant California HCD adopted the EISs.  While the feasibility studies are

7    still determining the precise site of the facility, the projects will both be located in Tuolumne

8    County.  (*Id.* at 19.)

9         According to plaintiffs, defendants did not respond or provide a rational explanation for

10   why they segregated the projects.  However, the record does reveal some discussion of the

11   Logging Project's cumulative impacts.  (*See, e.g*, Doc. Nos. 28-5 at 23 (responding to plaintiffs'

12   comment and stating that "[t]he analysis completed in 2014 evaluated climate change impacts

13   from the proposed activities and no new information has been brought forward that would change

14   the existing analysis"); 25-6 at 9–10 (discussing the adopted Recovery EIS's analysis on

15   greenhouse gas emissions.))  While the Logging Project and the Biomass Facility are not as

16   obviously bound together as the multiple timber sales discussed in *Blue Mountains*, 161 F.3d

17   1214–15, the record suggests that some form of the Biomass Facility is likely to be implemented

18   and that biomass from the Logging Project will be used to fuel the Biomass Facility.  Yet, as

19   plaintiffs have pointed out, the record does not appear to address whether the Logging Project and

20   Biomass Facility will together have cumulative impacts.

21        Similarly, HUD regulations require the responsible entity to "group together and evaluate

22   as a single project all individual activities which are related either on a geographical or functional

23   basis, or are logical parts of a composite of contemplated actions," or "when a recipient's

24   planning and program development provide for activities to be implemented over two or more

25   /////

26   _____

27   [20]  The grant application states that "each of these pillars and activities build resilience
     individually, but implemented together, they create an economically- and environmentally-
     sustainable model for community and watershed resilience that reduces the risk of fire and
28   supports local economic development."  (Doc. No. 28-1 at 5.)

1    years." 24 C.F.R. § 58.32.  With respect to making that determination, HUD regulations provide

2    as follows:

> In deciding the most appropriate basis for aggregation when
> evaluating activities under more than one program, the responsible
> entity may choose:  functional aggregation when a specific type of
> activity (e.g., water improvements) is to take place in several separate
> locales or jurisdictions; geographic aggregation when a mix of
> dissimilar but related activities is to be concentrated in a fairly
> specific project area (e.g., a combination of water, sewer and street
> improvements and economic development activities); or a
> combination of aggregation approaches, which, for various project
> locations, considers the impacts arising from each functional activity
> and its interrelationship with other activities.

9    *Id.* § 58.32(b).

10           As noted, the two projects were proposed as pillars of the Community Watershed

11   Resilience Program.  Defendants note that NDRC grant requirements mandate that these two

12   components have "independent utility."  (*See* Doc. 28-3 at 2.)  However, the court is unpersuaded

13   that this requirement necessarily means that the two projects are not logically part of a composite

14   of contemplated actions.  At this stage of the litigation, the court concludes that plaintiffs have

15   raised serious questions as to whether defendant California HCD acted arbitrarily and

16   capriciously in deciding not to analyze the Biomass Facility and the Logging Project in a single

17   EIS pursuant to CEQ and HUD regulations.

18           c.      *Whether the Logging Project is an Impermissible Use of Relief Act Funds*

19           Plaintiffs' fourth and final cause of action asserts that defendant HUD's grant of funds is

20   in excess of its statutory authority and is not in accordance with the law because the Logging

21   Project is not an eligible use of the Relief Act's appropriation.[21]  (Doc. No. 67 at 21.)  Plaintiffs

22   argue the Relief Act does not explicitly list logging public lands as an authorized use of HUD

23   funding, and construing the Act to equate clear cut logging in the National Forests with "site

24   _____

25   [21]  Plaintiffs also contend that the logging and reforestation activities are not consistent with
     disaster relief, recovery or resilience, because the best available science shows that they *amplify*

26   wildfire risk to life and property rather than either *reducing* risk or *assisting* with recovery.  (Doc.
     No. 67 at 21.)  However, the court must defer to defendant Forest Service's scientific judgment.

27   *See Weldon*, 697 F.3d at 1051 ("A court generally must be "at its most deferential" when
     reviewing scientific judgments and technical analyses within the agency's expertise under

28   NEPA.").

29

improvements" in the context of housing and community development-focused funding is inconsistent with Congressional intent and due no deference.  (*Id.*)

The court begins its analysis by first turning to the statute's text.[22]  The HCDA's list of eligible activities includes

> the acquisition, construction, reconstruction, or installation (including design features and improvements with respect to such construction, reconstruction, or installation that promote energy efficiency) of public works, facilities (except for buildings for the general conduct of government), and site or other improvements.

42 U.S.C. § 5305(2)(a).  The Relief Act provides "[t]hat funds shall be allocated directly to States and units of general local government at the discretion of the Secretary of Housing and Urban Development."  *Id.*  "Logging" is not explicitly authorized as an eligible activity.  All parties agree that HUD relies on "site or other improvements" to authorize the Logging Project as an eligible activity as defined in the HDCA.  (*See* Doc. Nos.67 at 21; 70 at 23; 71 at 24.)  However, Congress did not define "site or other improvements."  Although the phrase was initially followed by what "was originally purported to be an exclusive listing and contain[ed] restrictions on items that are eligible," Congress amended the statute in 1983 to remove this list.[23]  In other words,

/////

---

[22]  Although plaintiffs and state defendants debate whether defendant HUD's construction of the HCDA is owed deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), (Doc. Nos. 67 at 22–24; 71 at 24–27), the court need not determine whether the agency is owed deference in this particular determination, under either *Chevron* or some lesser degree of deference, because under any arguably applicable standard the outcome here remains the same.

[23]  The repealed language was as follows:

> including neighborhood facilities, senior centers, historic properties, utilities, streets, street lights, water and sewer facilities, foundations and platforms for air rights sites, pedestrian malls and walkways, and parks, playgrounds, and recreation facilities, flood and drainage facilities in cases where assistance for such facilities under other Federal laws or programs is determined to be unavailable, and parking facilities, solid waste disposal facilities, and fire protection services and facilities which are located in or which serve designated community development areas.

Pub. L. 93-383 88 Stat. 641.

1  Congress chose to expand defendant HUD's discretion to determine which projects could be

2  eligible activities.

3        Plaintiffs have failed to raise serious questions, let alone show likelihood of success on the

4  claim that defendant HUD's grant award to defendant California HCA is an impermissible

5  construction of the statute.  At this stage, the court is not persuaded that the Logging Project could

6  not constitute a site improvement intended to restore infrastructure when considering the Relief

7  Act's declaration that funds would be used for "long-term recovery" and "restoration of

8  infrastructure."  At the hearing on the motion, plaintiffs asserted that defendant HUD's use of

9  Relief Act funds on a logging project on federal lands is a far leap from the purpose of the

10  Community Development Fund.  However, defendant HUD maintains that the Logging Project

11  will restore watersheds.  (Doc. No. 70 at 10.)  The declaration of Patrick Talbott—a Housing and

12  Community Development representative at California HCD and the NDRC grant manager—

13  states that California obtains approximately 65 percent of its water supply from watersheds in the

14  Sierra Nevada, and the Rim Fire burned through at least three river watersheds that provide water

15  to Tuolumne County, the San Francisco Bay Area, and parts of the San Joaquin Valley.  (Doc.

16  No. 71-4 at ¶ 14.)  Ultimately, the Rim Fire led to poor water quality, reduced water storage, and

17  increased watershed flooding.  (*Id.*)  The Talbott declaration further provides that fuel build up

18  increases the risk of wildfires that could repeat these events.  (*Id.* at ¶ 13.)  This evidence of an

19  impact on communities is convincing.  Accordingly, plaintiffs have failed to show likelihood of

20  success on this claim.

21        2.   <u>Irreparable Harm</u>

22        Although plaintiffs have raised serious questions going to the merits of their claim that

23  defendant California HCD should have analyzed the Biomass Facility together with the Logging

24  Project, they must also demonstrate that the failure to grant preliminary injunctive relief is likely

25  to result in irreparable harm.  *See All. for the Wild Rockies*, 632 F.3d at 1135.  Plaintiffs argue that

26  the Logging Project and Biomass Facility will irreparably harm their interests by negatively

27  impacting thousands of acres of forest that plaintiffs enjoy.  (Doc. No. 67 at 31.)  According to

28  plaintiffs, they seek out and spend time in naturally recovering young forests that emerge after

31

1   fire, like the Rim Forest, because of the abundant wildlife these forests contain.  (*Id.*)  Plaintiffs

2   contend that their members enjoy the scenic beauty, the ability to view wildlife, spiritual

3   rejuvenation, recreation, and scientific research opportunities.  (*Id.*)

4          The federal defendants challenge plaintiffs' showing in this regard, arguing that

5   irreparable harm must be harm to the plaintiff or its members, not to the environment.  (Doc. No.

6   70 at 25.)  However, "the Supreme Court has instructed us that "[e]nvironmental injury, by its

7   nature, can seldom be adequately remedied by money damages and is often permanent or at least

8   of long duration, i.e., irreparable." *McNair*, 537 F.3d at 1004 (citing *Amoco Prod. Co. v. Vill. of

9   Gambell*, 480 U.S. 531, 545 (1987)).

10         The federal defendants also argue that plaintiffs' alleged harm is de minimis because the

11  Logging Project only treats a small portion of the Rim Fire area.  (Doc. No. 70 at 25.)  The Ninth

12  Circuit, however, has discounted such arguments, as "[i]ts logical extension is that a plaintiff can

13  never suffer irreparable injury resulting from environmental harm in a forest area as long as there

14  are other areas of the forest that are not harmed." *All. for the Wild Rockies*, 632 F.3d at 1135.

15         The federal defendants add that any harms now alleged by plaintiffs have been diminished

16  by their five-month delay in bringing this suit.  (Doc. No. 70 at 25.)  However, the record before

17  the court reflects that plaintiffs engaged in efforts to prevent litigation up until the time they wrote

18  defendants California HCD and HUD a letter on August 19, 2019.  (Doc. No. 25-10.)  Their

19  complaint in this action was filed the following month, on September 16, 2019.  (*See* Compl.)

20  The court is not persuaded that such a brief delay is sufficient to undermine plaintiffs' claim of

21  irreparable harm.  *See, e.g.*, *Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) (finding

22  that the applicants' delay of 110 days before "seeking a stay vitiate[d] much of the force of their

23  allegations of irreparable harm"); *Maryland v. King*, 567 U.S. 1301, 1314 (2012) (finding

24  irreparable harm while acknowledging respondent's argument that petitioner's "eight-week delay

25  in applying for a stay undermine[d] its allegation of irreparable harm" was a "sound point[]")

26         The court therefore concludes that plaintiffs have adequately demonstrated a likelihood

27  that they will suffer irreparable harm if the requested preliminary injunctive relief is not granted.

28  /////

3.      Balance of the Hardships

With respect to applying the traditional four factor test governing both the issuance of stays and preliminary injunctions, the Supreme Court has stated that the final two *Winter* factors, "assessing the harm to the opposing party and weighing the public interest[,] . . . merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Where environmental "injury is sufficiently likely . . . the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987); *Sierra Club v. Trump*, 929 F.3d 670, 706 (9th Cir. 2019). However, where plaintiffs have merely made a showing of serious questions going to the merits, as plaintiffs have done here, the hardships balance must sharply tip in favor of plaintiffs to support issuance of a preliminary injunction. *See All. for the Wild Rockies*, 632 F.3d at 1132.

Here, the court is not at all persuaded that the balance of the hardships tips sharply in favor of plaintiffs. Rather, this case is analogous to *McNair*, in which the Ninth Circuit found that the balance of harms did not tip sharply in favor of the environmental group challenging a Forest Service commercial logging project. 537 F.3d 981. "Though preserving environmental resources is certainly in the public's interest," the court found that the project served the public interest in many other ways, including "decreas[ing] the risk of catastrophic fire, insect infestation, and disease, and further[ing] the public's interest in aiding the struggling local economy and preventing job loss." *Id.* at 1005.

The same is true here. Plaintiffs argue that logging naturally recovering young forests and snag forest habitat will harm several bird species and other animals that currently enjoy these regenerating burned areas. (Doc. No. 67 at 32.) As noted above, plaintiffs' experts have conducted recent studies of these areas and allegedly discovered extensive conifer regeneration. (*Id.*) Notably, plaintiffs claim that because defendant Forest Service has received pass-through funding from HUD, there is no "loss of revenues" to the government to consider here, and, even if there were, that any loss to be suffered as a result of the granting of injunctive relief would not outweigh the irreparable damage posed to the environment by the projects being allowed to continue to proceed. (*Id.* at 32–33.) However, as the Ninth Circuit has noted, "the public interest

33

in preserving nature and avoiding irreparable environmental injury outweighs economic concerns

in cases *where plaintiffs were likely to succeed on the merits* of their underlying claim." *McNair*,

537 F.3d at 1005 (emphasis added).  Here, plaintiffs have merely raised "serious questions" and

have not demonstrated likelihood of succeeding on the merits of their claims.  The undersigned is

not persuaded that, in balancing the hardships, the alleged environmental injuries necessarily

outweigh the economic concerns.

More importantly, it is not merely economic interests that weigh on the other side of the

balance here.  The Logging Project will also serve the public interest by promptly reducing the

fuel load and the risk of another severe wildfire striking the area; protecting and restoring wildlife

and the environment; and providing socioeconomic benefits to local communities impacted by the

fire, such as employing contractors and industrial forest landowners.  (Doc. Nos. 70 at 26–29; 71

at 29–31.)  The declaration of Angela Avery, executive officer of Sierra Nevada Conservancy,

asserts that the Logging Project will

> restore and protect the health of one of California's most vital
> watersheds by:  removing dead material from forests that act as fuel
> for the next fire on approximately 4,600 acres, controlling and
> minimizing the spread of noxious weeds on approximately 3,500
> acres, rebuilding rangeland infrastructure such as fencing and
> wildlife friendly troughs, planting a diverse and resilient mixed
> conifer forest on approximately 4,500 acres, and by creating and
> enhancing strategic fuel breaks to reduce future fire risk throughout
> Tuolumne County.

(Doc. No. 71-5 at ¶ 10.)  Thus, there is evidence before the court that enjoining the Logging

Project could result in increased fire risks to nearby communities.  (*Id.* at ¶ 11.)  Likewise, a draft

Recovery EIS comment letter from Kevin Day, tribal chairman of the Tuolumne Band of Me-

Wuk Indians, stated that the tribe's most significant concern was the alternative of defendant

Forest Service taking no action.

> The number one negative impact would leave tens to hundreds of
> tons of fuel per acre that would be a perfect environment for another
> catastrophic fire.  Leaving existing hazard trees to fall on their own
> as a result of natural forces would cause roads to likely remain closed
> to public access and rending access for firefighting virtually
> impossible.  The cost for future activities where removal of this
> material is essential to implementation would be far more expensive
> and perhaps become cost prohibitive.  The negative impacts to
> recreation would impede public access by administrative access

1
2
3
4

> constrained, closure of areas for dispersed camping and firewood gathering not allowed. Also the potential impact for soil erosion rates will remain high and could be very detrimental in the event of a wet rainy season. The opportunity for research would be lost. Without any proposed actions the forest will become nothing more than brush fields that would have detrimental effects to our forest's health.

5   (Doc. No. 70-5 at 13.)

6       The state defendants also note that enjoining defendant California HCD from using

7   NDRC grant funds may damage its contractual and community relationships. (*Id.* at 31.)

8   Importantly, under defendant California HCD's grant agreement, the expenditure deadline for

9   Relief Act grant funds is September 30, 2022. Notice of National Disaster Resilience

10  Competition Grant Requirements, 81 Fed. Reg. at 36,562 ("Any grant funds that have not been

11  disbursed by September 30, 2022, will be canceled and will no longer be available for

12  disbursement to the Grantee or for obligation or expenditure for any purpose."); *see also* 31

13  U.S.C. § 1552(a).

14      "[T]he less certain the district court is of the likelihood of success on the merits, the more

15  plaintiffs must convince the district court that the public interest and balance of hardships tip in

16  their favor." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003)

17  (internal citation omitted). Here, plaintiffs have only raised "serious questions" on the merits as

18  to one of their claims and therefore must demonstrate that the hardships balance sharply tips in

19  their favor. Plaintiffs have failed to make this showing. Accordingly, plaintiffs' motion for

20  preliminary injunction will be denied.

21  /////

22  /////

23  /////

24  /////

25  /////

26  /////

27  /////

28  /////

## CONCLUSION

For the reasons explained above:[24]

1.    Plaintiffs' motion for a preliminary injunction (Doc. No. 67) is denied;

2.    Defendants' motion to strike (Doc. No. 47) is denied; and

3.    Plaintiffs' April 20, 2020 motion for a temporary restraining order (Doc. No. 91) is denied as moot.

IT IS SO ORDERED.

Dated:   **April 21, 2020**        _____

                                        UNITED STATES DISTRICT JUDGE

---

[24] The court notes that its findings in this order are limited to the context of this preliminary injunction motion and are subject to revision upon further briefing and review of the administrative record on the merits.

36