Meriel L. Darzen, Oregon State Bar ("OSB") No. 113645
Email: meriel@crag.org
Teryn Yazdani, OSB No. 205134
Email: teryn@crag.org
Crag Law Center
3141 E Burnside Street
Portland, Oregon 97214
Phone: (503) 525-2725  Fax: (503) 296-5454
LEAD COUNSEL – *Pro Hac Vice*

*Attorneys for Plaintiffs Earth Island Institute, Greenpeace Inc., and Sequoia ForestKeeper*

Daniel Galpern, OSB No. 061950
Law Offices of Daniel M. Galpern
2495 Hilyard St., Suite A
Eugene, Oregon 97405
Phone: (541)968-7164  Fax: (971)244-9035
Email: dan.galpern@gmail.com
*Pro Hac Vice*

*Attorney for Plaintiff Dr. James E. Hansen*

René P. Voss, California State Bar No. 255758
Natural Resources Law
15 Alderney Road
San Anselmo, CA 94960
Phone: (415) 446-9027  Fax: (267) 316-3414
Email: renepvoss@gmail.com
LOCAL COUNSEL

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| EARTH ISLAND INSTITUTE, et al.<br><br>Plaintiffs,<br><br>v.<br><br>KIMBERLY NASH, et al.,<br><br>Defendants. | No.: 1:19-cv-01420-DAD-SAB<br><br>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**<br><br>Hearing Date: May 18, 2021<br>Time: 9:30 a.m.<br>Courtroom: 5<br>Judge: Honorable Dale A. Drozd |

## <u>NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT</u>

PLEASE TAKE NOTE THAT on May 18, 2021 at 9:30 a.m. before the Honorable Dale A. Drozd, Courtroom 5 of the court for the Eastern District of California located at 2500 Tulare Street, Fresno, California, pursuant to L.R. 260, Plaintiffs Earth Island Institute, Greenpeace Inc., Sequoia ForestKeeper, and Dr. James E. Hansen (collectively, "Plaintiffs") will and hereby do respectfully submit their Motion for Summary Judgment and Memorandum of Support. Pursuant to L.R. 260, the undersigned certified that the Parties have made a good faith effort to resolve the dispute but were unable to do so.

Plaintiffs challenge the final administrative actions by Federal Defendants—the U.S. Forest Service, Jason Kuiken in his official capacity as the Forest Supervisor of the Stanislaus National Forest, the U.S. Department of Housing and Urban Development ("HUD"), and Kimberly Nash in her official capacity as the Director of the Office of Community Planning and Development for Region 9 of HUD—and State Defendants—the State of California's Department of Housing and Community Development ("HCD") and Janice Waddell in her official capacity as the Operations Branch Chief for HCD's Division of Financial Assistance (collectively, "Defendants")—using federal disaster relief money to fund a logging project and the building of a biomass facility in the Rim Fire area of the Stanislaus National Forest. Further, Plaintiffs object to Defendants' failure to conduct an adequate environmental review for this project.

Plaintiffs' claims against the Defendants arise under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., the Disaster Relief Appropriations Act of 2013 ("Disaster Relief Act"), Pub. L. No. 113-2, 127 Stat. 4 (2013), and the HUD Environmental Review Regulations, 24 C.F.R. Part 58. Plaintiffs respectfully move this Court for an order granting summary judgment in their favor on Claims One, Two, Three, and Four of their Complaint. Dkt. # 1.

WHEREFORE, the Plaintiffs respectfully request the following relief from this Court:

*Crag Law Center*
*3141 E. Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

1. Declare that Defendant HCD as violated NEPA and 24 C.F.R. Part 58 by failing to modify, update and supplement the environmental impact statements ("EISs") to address the significant new information, changed circumstances, and changes to the action;

2. Declare that Defendant HCD has violated NEPA and 24 C.F.R. Part 58 by failing to aggregate and analyze together in a single EIS the Forest and Watershed Health Program ("FWHP") logging project and the biomass power plant(s) and/or failing to take a hard look at the direct, indirect, and cumulative impacts of the FWHP logging project and the biomass plant(s);

3. Declare that the Forest Service violated NEPA and 24 C.F.R. Part 58 by failing to modify, update, and supplement the 2014 and 2016 EISs to address the significant new information, changed circumstances, and changes to the action;

4. Declare that the activities proposed in the FWHP part of California's National Disaster Relief Competition ("NDRC") grant application are not eligible for funding with Disaster Relief Act funds, HUD's decision to award $28 million in grant funds to California for these activities is unlawful, and the release of funds to HCD is unlawful;

5. Issue an injunction vacating the HUD decision granting $28 million to California for the FWHP and the HUD decision to release those funds to HCD, vacating the HCD RODs and ordering HCD to return those funds to HUD, and ordering Defendants to cease all logging that is being funded with the disaster relief funds until Defendants HUD and HCD comply with NEPA and 24 C.F.R. Part 58;

6. Issue an injunction ordering the Forest Service to cease all logging that is being funded with disaster relief funds until it complies with NEPA;

7. Award to Plaintiffs their costs, including expenses, expert witness fees, and reasonable attorney fees under applicable law; and such other relief as the Court deems necessary and proper.

*Crag Law Center*
*3141 E. Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

1

2

This motion is supported by the Statement of Undisputed Facts, filed herewith, and the following Supporting Memorandum of Law.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SUPPORTING MEMORANDUM OF LAW

### TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………III

GLOSSARY OF TERMS………………………………………………………………..VI

INTRODUCTION………………………………………………………….…….……..1

FACTUAL BACKGROUND………………………………………………………....…2

STANDARD OF REVIEW…………………………………………………..…………4

APPLICABLE LAW……………………………………………………………....……5

    a.    HUD's Environmental Review Regulations …………………………...…………5

    b.    National Environmental Policy Act……………………………………………6

    c.    Disaster Relief Appropriations Act of 2013……………………………………7

ARGUMENT……………………………………………………………….……………7

    a.    Plaintiffs Have Standing to Bring This Case. ……………………………...…………7

    b.    Under the Governing HUD Regulations, HCD Was Required to Analyze the FWHP Logging Project and Biomass Facility Together. ……………………………………9

        *A.    The FWHP logging project and biomass facility are related as "logical parts of a single contemplated action" and HCD was required to aggregate their review. ……………………………………………………...…………9*

        *B.    The FWHP logging project and biomass facility are related on a geographic basis and HCD failed to meet its obligation to aggregate the projects into a single environmental analysis. ………………………………………………11*

        *C.    The governing regulations also required aggregation of the two projects because they are occurring on a multi-year timeline.…………………………12*

        *D.    Defendant HCD's decision not to aggregate its environmental review of the two projects should not be afforded deference by the Court because their actions are arbitrary, capricious, and not in accordance with law………..13*

    c.    HCD Failed to do the Required Cumulative Impacts Analysis Under NEPA and Thus, Its Actions Were Arbitrary and Capricious and Not in Accordance With the Law…14

*Crag Law Center*
*3141 E. Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

d. Defendants' Use of the Federal Disaster Relief Funding Is Unauthorized and Does Not Support the Intent of the Funding……………………………………………16

e. Defendants Failed to Update Their NEPA Analysis When They Significantly Changed the Project From Lumber-Focused Logging, Which Retains Some Carbon, to Biomass and Pile Burning, Which Emits Far More Carbon………………..……19

f. Under Both NEPA and the HUD Regulations Defendants Were Required to Supplement the Adopted Environmental Analysis in Order to Disclose and Consider the Difference in the Number of Trees Regenerating in the Project Area and the New Information in the North et al. Paper…………………………………………..……22

CONCLUSION…………………………………………..…………………………24

No.: 1:19-cv-01420-DAD-SAB – Plaintiffs' Motion for Summary
Judgment and Supporting Memorandum of Law – II

*Crag Law Center*
*3141 E. Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

# TABLE OF AUTHORITIES

## CASES

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
  67 F.3d 723 (9th Cir. 1995) .................................................................. 21

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, BLM*,
  273 F.3d 1229 (9th Cir. 2001) .............................................................. 19

*Barnes v. Fed. Aviation Admin.*,
  865 F.3d 1266 (9th Cir. 2017) ................................................................ 4

*Bennett v. Spear*,
  520 U.S. 154 (1997)............................................................................... 13

*Blue Mts. Biodiversity Project v. Blackwood*,
  161 F.3d 1208 (9th Cir. 1998) ......................................................... 6, 15

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971)................................................................................. 5

*Dixon v. United States*,
  465 U.S. 482 (1984)............................................................................... 18

*Earth Island Inst. v. U.S. Forest Serv.*,
  351 F.3d 1291 (9th Cir. 2003) .............................................................. 15

*Friends of the Clearwater v. Dombeck*,
  222 F.3d 552 (9th Cir. 2000) .................................................................. 5

*Friends of the Cowlitz v. Fed. Energy Regulatory Comm'n*,
  No. 99-70373, 2001 U.S. LEXIS 28368 (9th Cir. 2001)....................... 18

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)................................................................................. 8

*Glacier Fish Co. Ltd. Liab. Co. v. Pritzker*,
  832 F.3d 1113 (9th Cir. 2016) .............................................................. 18

*Johnson v. Cty. of Chester*,
  413 F. Supp. 1299 (E.D. Pa. 1976) ....................................................... 18

*Ka Makani 'O Kohala Ohana Inc. v. Dept. of Water Supply*,
  295 F.3d 955 (9th Cir. 2002) ................................................................ 13

*Kan. City v. Dep't of Hous. & Urban Dev.*,
  923 F.2d 188 (D.C. Cir. 1991) .............................................................. 18

*Kern v. U.S. BLM*,
  284 F.3d 1062 (9th Cir. 2002) .............................................................. 16

*Klamath-Siskiyou Wildlands Ctr. v. BLM*,
  387 F.3d 989 (9th Cir. 2004) ................................................................ 16

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976)................................................................................. 6

*Lujan v. Def. of Wildlife*,
  504 U.S. 555 (1992)................................................................................. 8

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
  177 F.3d 800 (9th Cir. 1999) .......................................................... 15, 16

*N. Alaska Envtl. Ctr. v. Kempthorne*,
  457 F.3d 969 (9th Cir. 2006) ................................................................ 15

*Nat. Res. Def. Council v. United States DOI*,

*Crag Law Center*
*3141 E. Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

113 F.3d 1121 (9th Cir. 1997) ............................................................................. 16

*Native Ecosystems Council v. Dombeck*,
304 F.3d 886 (9th Cir. 2002) ..................................................................... 14, 16

*Native Ecosystems Council v. U.S. Forest Serv.*,
428 F.3d 1233 (9th Cir. 2005) ................................................................................ 4

*Natural Res. Def. Council v. U. S. Forest Serv.*,
421 F.3d 797 (9th Cir. 2005) ............................................................................... 21

*NLRB v. Brown*,
380 U.S. 278 (1965) ............................................................................................. 19

*Nw. Coal. for Alts. to Pesticides v. U.S. EPA*,
544 F.3d 1043 (9th Cir. 2008) ............................................................................ 13

*Or. Natural Res. Council Action v. U.S. Forest Serv.*,
445 F. Supp. 2d 1211 (D. Or. 2006) ................................................................... 21

*Or. Natural Res. Council Fund v. Brong*,
492 F.3d 1120 (9th Cir. 2007) .............................................................................. 5

*Russell Country Sportsmen v. U.S. Forest Serv.*,
668 F.3d 1037 (9th Cir. 2011). ........................................................................... 22

*Sierra Club v. Bosworth*,
510 F.3d 1016 (9th Cir. 2007) ............................................................................ 13

*Thomas v. Peterson*,
753 F.2d 754 (9th Cir. 1985) ......................................................................... 6, 16

*Wildearth Guardians v. U.S. BLM*,
2020 U.S. Dist. LEXIS 77409 (D. Mont. May 1, 2020) ....................................... 5

*WildEarth Guardians v. Zinke*,
368 F.Supp.3d 41 (D.D.C. 2019) ........................................................................ 12

**STATUTES**

42 U.S.C. § 4332(C) ................................................................................................. 6
42 U.S.C. § 5304 ...................................................................................................... 5
42 U.S.C. § 5305 ................................................................................................ 7, 18
42 U.S.C. §§ 5121 et seq. ......................................................................................... 7
42 U.S.C. §§ 5301 et seq. ................................................................................... 7, 17
5 U.S.C. § 702 .......................................................................................................... 4
5 U.S.C. § 706(1) ..................................................................................................... 5
5 U.S.C. § 706(2)(A) .......................................................................................... 4, 16

**OTHER AUTHORITIES**

Pub. L. No. 113-2, 127 Stat. 4 (2013). .............................................................. 7, 17

**REGULATIONS**

24 C.F.R. § 58.1(b)(1) .............................................................................................. 5
24 C.F.R. § 58.10 ..................................................................................................... 5
24 C.F.R. § 58.32(a) ................................................................................................. 9
24 C.F.R. § 58.32(b) ........................................................................................... 9, 11
24 C.F.R. § 58.32(c) ................................................................................................. 5
24 C.F.R. § 58.32(d) ........................................................................................... 6, 12

*Crag Law Center*
*3141 E. Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

24 C.F.R. § 58.34(a) ................................................................................................ 14
24 C.F.R. § 58.52 ..................................................................................................... 19
24 C.F.R. § 58.60 ..................................................................................................... 19
24 C.F.R. § 58.32 ....................................................................................................... 9
24 C.F.R. § 58.4 ......................................................................................................... 5
24 C.F.R. § 58.5 ......................................................................................................... 5
40 C.F.R. § 1500.1(a) ................................................................................................. 6
40 C.F.R. § 1500.1(b) ................................................................................................. 6
40 C.F.R. § 1502.9(c)(1)(i) ........................................................................................ 7
40 C.F.R. § 1502.9(c)(1)(ii) ...................................................................................... 19
40 C.F.R. § 1508.25(a)(2) .......................................................................................... 6
40 C.F.R. § 1508.25(c) ............................................................................................... 6
40 C.F.R. § 1508.7 ................................................................................................... 14
40 C.F.R. § 1502.16 ................................................................................................... 6
40 C.F.R. § 1506.3 ..................................................................................................... 7
40 C.F.R. § 1508.25(a)(1) .......................................................................................... 9

*Crag Law Center*
*3141 E. Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

# GLOSSARY OF TERMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BUF | Biomass Utilization Facility or biomass facility |
| CDBG or CDBG-NDR | Community Development Block Grant |
| CEQ | Council on Environmental Quality |
| CO$_2$ | Carbon dioxide |
| CWRP | Community Watershed and Resilience Program |
| dbh | Diameter at breast height |
| EIS | Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| FWHP | Forest and Watershed Health Program |
| GHG | Greenhouse gas(es) |
| HCD | State of California Department of Housing and Community Development |
| HCDA | Housing and Community Development Act of 1974 |
| HUD | U.S. Department of Housing and Urban Development |
| NDRC | National Disaster Relief Competition |
| NEPA | National Environmental Policy Act |
| ROD | Record of Decision |
| SEIS | Supplemental Environmental Impact Statement |

## INTRODUCTION

This case presents novel issues of law implicating Congressional prerogatives in funding natural disaster prevention and recovery, as well as agency directives for environmental review of federally funded projects. Here, the State of California, which has experienced tragic losses of homes and lives from wildfires, redirected millions of dollars in federal community disaster relief money away from much needed community infrastructure and housing projects[1] to an unlawful and ineffective Federal logging project. This project has not been subject to adequate environmental review and suffers from fatal procedural flaws. It will neither restore communities nor prevent future disasters because, as discussed below, the best available science establishes that post-fire logging and replanting monoculture forests in lieu of natural regeneration— including Defendants' current activities—fails to reduce wildfire risk and likely *increases* future fire intensity.

Further, Defendants' environmental analysis of the activities completely fails to address not only their obligations under the governing U.S. Housing and Urban Development ("HUD") regulations, but also all cumulative impacts of the proposed biomass facility as required by the National Environmental Policy Act ("NEPA"). The construction of a new biomass power plant, in connection with and in addition to the logging project, has the potential to greatly impact the already degraded environment in Tuolumne County, degrade air quality, and cause other air quality and climate change impacts in the community. Defendants' use of these funds further endangers fire-stricken communities rather than helping them rebuild in a fire-safe way.

Plaintiffs respectfully move that this Court grant a motion for summary judgement in Plaintiffs' favor because the Defendants—two Federal agencies and the State of California— failed to comply with their environmental review obligations and used disaster relief funding for an ineligible purpose. Defendants' wholesale failure to provide an adequate environmental

---

[1] For example, the record includes several references to damages to urban infrastructure following the fire, including the San Francisco Public Utility Commission's hydroelectric infrastructure. RIM_2014_AR_000012.

analysis is arbitrary, capricious, and contrary to the agencies' duties under NEPA, the Disaster Relief Appropriations Act of 2013, and the governing HUD environmental review regulations.

## FACTUAL BACKGROUND

Plaintiffs provide their Statement of Undisputed Facts, filed herewith, and supplement the same with the following relevant facts supported by the record herein.

In 2015, the State of California applied to HUD for $70 million in federal disaster relief funding through the National Disaster Relief Competition ("NDRC"). *See generally* HCD_I.B.0000001 (NDRC Phase II grant application). This application was in response to the Rim Fire of 2013, one of the biggest fires in California's history. HCD_I.B.0000003. California's application proposed to fund a three-pronged programmatic effort called the "Community Watershed and Resilience Program" ("CWRP"). HCD_I.B.0000004. The lead agency administering the grant funding is the State of California's Department of Housing and Community Development ("HCD"). HCD_I.B.0000021. On June 7, 2016, HUD awarded HCD $70 million in federal disaster relief funds through the NDRC block-grant. HCD_I.D.0000048; *see also* HCD_I.D.0000001 (notifying HCD of its future $70 million grant award on January 21, 2016).

Defendant California promoted the CWRP as an "integrated, replicable model for community and watershed resilience." HCD_I.B.0000004. The program consisted of three "pillars": $28 million for the "Forest and Watershed Health" project; $22 million for a "Biomass Utilization Facility"; and $20 million for "Community Resilience Center(s)." HCD_I.D.0000074–76. The Forest and Watershed Health Program ("FWHP") allows for logging on up to 14,897 acres and tree planting on up to 15,217 acres on the Stanislaus National Forest in the Rim Fire area (the "logging project" or the "project"). RIM_POST-2016_AR_000005; RIM_POST-2016_AR_000038. The Biomass Utilization Facility ("biomass facility" or "BUF") involves building one or more new biomass power plants and/or wood processing facilities. *See* HCD_I.D.0000076 (describing the general details of the biomass facility).

No.: 1:19-cv-01420-DAD-SAB – Plaintiffs' Motion for Summary
Judgment and Supporting Memorandum of Law – 2

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

1    In May 2017, HCD issued a public notice for comment on its adoption of two earlier-

2 issued U.S. Forest Service environmental impact statements ("EISs") (the "2014 and 2016

3 EISs") as part of the environmental review of the FWHP logging project component of the

4 California grant program. HCD_III.C.0000026; HCD_II.A.0000001; HCD_II.A.0000005.

5 Plaintiff Earth Island Institute submitted comments to HCD on June 26, 2017 asking HCD to not

6 adopt the 2014 and 2016 EISs and to withdraw its proposal to accept disaster relief funds. *See*

7 *generally* RIM_POST-2016_AR_000082 (Plaintiffs' June 26, 2017 letter). The comment letter

8 also asked Defendants to account for the additional greenhouse gas emissions that the logging

9 project would produce because of the changes to the project from what was first proposed and

10 analyzed in the 2014 and 2016 EISs. RIM_POST-2016_AR_000084–85. Not only did HCD and

11 the Forest Service refuse to complete additional analysis in response to this information, but

12 HCD proceeded to adopt the EISs unchanged and requested release of the HUD funds.

13 RIM_POST-2016_AR_000001 (adopting the 2014 Recovery EIS within the "Rim Fire

14 Recovery" ROD); RIM_POST-2016_AR_000032 (adopting the 2016 Reforestation EIS "Rim

15 Fire Reforestation" ROD).

16    On October 23, 2017 Plaintiffs objected to the release of the disaster relief funds based on

17 the issues raised in their prior letters. *See generally* RIM_POST-2016_AR_000111 (Plaintiffs'

18 October 23, 2017 letter); HCD_III.A.0000001. In a response to HUD, HCD denied the need to

19 update the EISs. HCD_III.A.0000004; HCD_III.A.0000013. On the basis of this response, HUD

20 denied Plaintiffs' objection and released the federal NDRC block-grant funds to HCD without

21 requiring any further environmental review. HCD_III.A.0000014; HCD_III.A.0000028–29.

22 HCD then passed these funds back to the Forest Service to use for logging the Stanislaus

23 National Forest. *See* HCD_III.A.0000014 (showing the release of funds to the Forest Service for

24 project activities).

25    Plaintiffs wrote HCD and HUD once again on June 6, 2018 and provided additional

26 information and data about regeneration in the project area, and requested that HCD address the

27 biomass facility and its cumulative impacts, among other issues. *See generally*

28 HCD_III.B.0000512 (Plaintiffs' June 6, 2018 letter). This letter included updated data and

No.: 1:19-cv-01420-DAD-SAB – Plaintiffs' Motion for Summary
Judgment and Supporting Memorandum of Law – 3

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

photographs from specific treatment units with regeneration, despite the Forest Service previously reporting zero regeneration. HCD_III.B.0000517–19; HCD_III.B.0000522–23. In response to a 2018 FOIA request, the Forest Service confirmed it had not done any additional surveys of conifer regeneration in the project area between 2016 and 2018. *See* HUD AR01548 (stating, in response to a FOIA request for survey data from 2016 to 2018, that initial surveys for conifer regeneration were only done in 2014 and 2015).

Plaintiffs sent a final letter to HCD and HUD on August 14, 2019 documenting additional conifer regeneration information and requested that Defendants once again refrain from logging certain units with intact post-fire snag forests, areas with extensive regeneration, and areas with extensive use by wildlife. *See generally* HCD_III.C.0000013 (Plaintiffs' August 14, 2019 letter). The letter also included a new Forest Service study by North et al. (2019) that raised significant questions about the efficacy and impacts of the planned logging and reforestation activities, as well as information on the carcinogenic nature of the herbicide glyphosate, which the Forest Service was planning to use in the project area. HCD_III.C.0000019 n.3; HCD_III.C.0000020 n.4. Despite Plaintiffs' numerous attempts to persuade Defendants to either update their environmental analyses or stop work on the project, Defendants have repeatedly ignored or declined Plaintiffs' requests.

**STANDARD OF REVIEW**

The Administrative Procedure Act ("APA") confers the right of judicial review on any person adversely affected by agency action, including agency decisions pursuant to the HUD regulations, the Disaster Relief Act, and NEPA. 5 U.S.C. § 702; *Barnes v. Fed. Aviation Admin.*, 865 F.3d 1266, 1269 (9th Cir. 2017); *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238 (9th Cir. 2005) (stating that where statute provides no separate right of enforcement for its provisions, actions are reviewed pursuant to the APA). When reviewing agency action, courts are instructed to "hold unlawful and set aside" any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Although a court is not allowed to substitute its own judgment for that of the agency,

the APA requires the court to "engage in a substantial inquiry" and a "thorough, probing, in-depth review." *Or. Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971)). Thus, a court should only uphold agency actions under this standard when there is a "rational connection" between the facts found and the conclusions in support of the agency action. *Id.*; *Wildearth Guardians v. U.S. BLM*, 2020 U.S. Dist. LEXIS 77409 at *3 (D. Mont. May 1, 2020).

Plaintiffs' challenges include claims relating to Defendants' failure to supplement their environmental analyses based on new information and circumstances. An action based on significant new information or circumstances to compel preparation of a supplemental EIS ("SEIS") arises under 5 U.S.C. § 706(1), and review of such claims is not limited to the administrative record. *Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 560 (9th Cir. 2000).

## APPLICABLE LAW

### a. HUD's Environmental Review Regulations

The Housing and Community Development Act of 1974 ("HCDA") provides for funding for urban development and redevelopment through federal grants administered by HUD. The HCDA requires the recipients of HCDA funding to account for and analyze the environmental impacts of projects and activities receiving federal financial assistance. 42 U.S.C. § 5304. The regulations found at 24 C.F.R. Part 58 govern environmental review for the "responsible entities"—recipients of HUD's HCDA funding. These regulations apply to both the Disaster Relief Act funding and the activities funded. 24 C.F.R. § 58.1(b)(1). Responsible entities are accountable for all environmental reviews, decision-making, and actions that would otherwise be delegated to HUD under NEPA. 24 C.F.R. §§ 58.4, 58.5, 58.10.

The responsible entity also has an obligation to "group together and evaluate as a single project" all individual activities related on a geographical or functional basis and to adequately address, in a single environmental review, "the separate and combined impacts of activities that are similar, connected, or closely related, or that are dependent upon other activities and actions." 24 C.F.R. § 58.32(c). Additionally, when the funded activities are to be implemented over more

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

than two years, the environmental review should consider "the relationship among all component activities of the multi-year project, regardless of the source of funds and address and evaluate their cumulative environmental effects." 24 C.F.R. § 58.32(d). For the purposes of satisfying 24 C.F.R. Part 58, environmental review consists of not only ensuring NEPA compliance for HUD-funded actions but also those actions not funded by HUD but are required to be aggregated pursuant to 24 C.F.R. 58.32.

### b. National Environmental Policy Act

The National Environmental Policy Act ("NEPA") is the nation's basic charter for environmental protection. 40 C.F.R. § 1500.1(a); *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215 (9th Cir. 1998). Under NEPA, agencies must take a "hard look" at the environmental consequences of their decision-making and prepare "detailed statement[s]" regarding their proposed action's impacts. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976); 42 U.S.C. § 4332(C). NEPA requires federal agencies to prepare environmental impact statements ("EISs") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *Blue Mts. Biodiversity Project*, 161 F.3d at 1211–12.

To satisfy NEPA's "hard look" requirement, agencies must analyze the direct, indirect, and cumulative effects of a proposed action. 40 C.F.R. §§ 1502.16, 1508.25(c). Additionally, agencies must consider "cumulative actions" within a single EIS when there are multiple proposed actions having "cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2); *Thomas v. Peterson*, 753 F.2d 754, 759 (9th Cir. 1985). The agencies' analysis is inadequate when the NEPA documentation does not provide the decisionmaker and the public with adequate information, evidence, and analysis to fully assess the potential impacts of the proposed action before decisions are made. *See* 40 C.F.R. § 1500.1(b) (stating general requirements of NEPA documentation).

Although an agency may adopt another federal agency's EIS if the current proposed action is "substantially the same" as the actions covered in the original, adopted EIS, the adopting agency must still comply with the existing standards of an adequate EIS under the CEQ

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

regulations. 40 C.F.R. §§ 1506.3(a)–(b).[2] Further, prior to adoption, the adopting agency must undertake its own individual review of the previous EIS so as to determine "that its comments and suggestions have been satisfied." 40 C.F.R. § 1506.3(c). If, however, the agency makes "substantial changes" to the proposed action that is "relevant to environmental concerns," the agency has a duty to supplement the environmental analysis that it is adopting. 40 C.F.R. § 1502.9(c)(1)(i).

### c.  Disaster Relief Appropriations Act of 2013

The Disaster Relief Appropriations Act of 2013 (the "Disaster Relief Act") was enacted to provide funding for disaster recovery efforts in "the most impacted and distressed areas" resulting from major disasters declared as such pursuant to the Stafford Act, 42 U.S.C. §§ 5121 et seq. Pub. L. No. 113-2, 127 Stat. 4 (2013). The Act allocated funding to HUD's Community Development Block Grant program ("CDBG") for "necessary expenses related to disaster relief, long-term recovery, restoration of infrastructure and housing, and economic revitalization[.]" *Id.* Activities eligible for funding via the Disaster Relief Act are limited to those enumerated in the Housing and Community Development Act of 1974. 42 U.S.C. §§ 5301 et seq. These activities include housing restoration and development as well as land acquisition and local government planning assistance. 42 U.S.C. § 5305.

### ARGUMENT

### a.  Plaintiffs Have Standing to Bring This Case.

Plaintiffs Earth Island Institute, Greenpeace Inc., and Sequoia ForestKeeper are non-profit organizations whose missions and members' interests are harmed by the Defendants' actions. Plaintiff Dr. James E. Hansen is the Director of Climate Science, Awareness and Solutions program at the Earth Institute, Columbia University. Dr. Hansen's interests are harmed by Defendants' actions. Decl. Hansen, filed herewith.

---

[2] Because the current actions began prior to the enactment of the new CEQ regulations on July 16, 2020, the citations for the following cited NEPA regulations are from the previous CEQ regulations from 1978, as amended in 1986 and 2005.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

Plaintiff Hansen resides approximately 2,400 miles from the heart of the Rim Fire-area. His interests in ensuring the natural regeneration of the impacted forest and in thereby enabling restoration of its full carbon sequestration capacity are nonetheless harmed by Defendants' actions.

Plaintiff organizations' members reside near or regularly visit the Stanislaus National Forest, including Rim Fire project area. Those using and enjoying the area derive a variety of recreational, scientific, religious, spiritual, and aesthetic benefits. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."); *see generally* Dkt. # 25 (Declaration of Chad Hanson); Dkt. # 24 (Declaration of Amy Moas); Dkt. # 21 (Declaration of Ara Marderosian); Dkt. # 20 (Declaration of Daniel Brindis).

Plaintiffs' members have firm plans to return to the areas scheduled to be logged by Defendants using the NDRC funding, and have returned to the areas during the course of this litigation. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 564 (1992). Plaintiffs' members' enjoyment of these areas is adversely affected and irreparably damaged and by Defendants' failure to comply with their duties under NEPA, the APA, the governing HUD regulations, and the Disaster Relief Act. These injuries are actual and concrete as the Defendants' actions have already and will continue to adversely affect the landscape of the Stanislaus National Forest, thus adversely impacting the Plaintiffs' members' activities on the land. *Lujan*, 504 U.S. at 560. Further, a favorable decision from this Court granting Plaintiffs' requested declaratory and injunctive relief would definitively redress the aforementioned injuries. *Lujan*, 504 U.S. at 561 ("[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'").

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

### b. Under the Governing HUD Regulations, HCD Was Required to Analyze the FWHP Logging Project and Biomass Facility Together.

> *A. The FWHP logging project and biomass facility are related as "logical parts of a single contemplated action" and HCD was required to aggregate their review.*

Under HUD's environmental review regulations, HCD, as the responsible entity, was required to aggregate its review of the FWHP logging project and biomass facility into a single environmental review because both projects are "logical parts of a single contemplated action."[3] 24 C.F.R. §§ 58.32(a)–(b). Its decision not to aggregate the review and, instead, review the projects piecemeal was arbitrary and capricious.

The record amply demonstrates that the two projects are part of a single contemplated action for the purposes of aggregation under 24 C.F.R. 58.32. HCD intentionally designed the FWHP logging project and the biomass facility as linked "pillars" of the CWRP. *See* HCD_I.D.0000075 (graphic flowchart showing linked activities, shown below); HCD_I.B.0000255–26 (describing proposed project's key objectives); HCD_I.B.0000004 (stating the three pillars are "integrated"); HCD_I.B.0000067 ("However, the integration of the three [pillars] is key to its broader success. The [CWRP] is an interrelated set of activities, which ultimately relies upon each component for successful implementation . . ."); HCD_II.C.0000040 (adding description of projects' interrelation in HCD Reforestation ROD); HCD_II.C.0000008 (adding description of projects' interrelation in HCD Recovery ROD).

HCD's project documents also refer to the projects as "integrated" and "interrelated" pillars, stating that the design innovation behind the CWRP "lies in the interconnection the pillars activity" have. HCD_I.B.0000255–56. Further, both HCD Records of Decision confirm that the projects are linked, each stating: "[t]he proposed action is being conducted *in*

---

[3] This is a different standard than the NEPA standard of "connected actions" found in 40 C.F.R. 1508.25(a)(1). Unlike the NEPA regulation, whether or not the projects have independent utility is not a factor in determining whether projects should be analyzed together in the same environmental review.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

*conjunction with* other CDBG-NDR approved activities in building more resilient forests and communities." HCD_II.C.0000040 (emphasis added); HCD_II.C.0000008 (emphasis added).

HCD conceptualized these two projects with the intent that they be implemented together as a part of a larger, fire-reduction strategy and held them out to the public that way. As the grant application asserted, "[e]ach of these pillars and activities build resilience individually, but implemented together, they create an economically—and environmentally—sustainable model for community and watershed resilience that reduces the risk of fire and supports local economic development." HCD_I.B.0000005. Defendant HCD's own one-page summary of the NDRC grant proposal, which was provided on its website for the public, illustrates the relationship between the FWHP logging project and the proposed biomass facility; these actions are all part of a larger composite action. *See* HCD_I.D.0000075, reproduced below.



*Three pillars of the Community and Watershed Resilience Program*

No.: 1:19-cv-01420-DAD-SAB – Plaintiffs' Motion for Summary
Judgment and Supporting Memorandum of Law – 10

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

1

Finally, HCD initially contemplated that the FWHP logging projects would feed biomass

2

to the biomass facility, linking the projects directly. HCD_I.B.0000004–05. Thus, it was

3

reasonably foreseeable at the time that HCD conducted its environmental review that the two

4

projects were directly connected. The record overwhelmingly demonstrates that these two

5

activities are component parts of a single contemplated action and should have been aggregated

6

analyzed together. HCD has provided no rational explanation for its failure to aggregate the

7

projects as required.

8

        B.  *The FWHP logging project and biomass facility are related on a*

9

           *geographic basis and HCD failed to meet its obligation to aggregate the*
           *projects into a single environmental analysis.*

10

The HUD regulations also required aggregation because of the "geographical"

11

relationship between the projects. Both projects are "dissimilar, but related, activities"

12

concentrated in a "fairly specific project area" and are connected and component parts of the $70

13

million NDRC block grant. 24 C.F.R. § 58.32(b). Both projects are occurring in a "fairly

14

specific" area: the most affected portions of Tuolumne County within the Rim Fire footprint.

15

The collective impacts of these projects may have harmful and irreversible impacts in an

16

already devastated area; thus, their environmental review should be aggregated. *Id.* For example,

17

the biomass facility will cause a long-term large increase in carbon emissions and associated

18

climate change impacts in the county. *See* HCD_III.C.0000018 (highlighting the correlation

19

between the project activities and increased carbon emissions); RIM_POST-2016_AR_000083–

20

86 (describing the climate change impacts of logging). The combustion of burning material in a

21

biomass plant instantaneously releases carbon into the atmosphere as carbon dioxide ("$CO_2$");

22

the addition of a high-carbon emitting facility in Tuolumne County would severely undermine

23

the State of California's goals to combat climate change under the Paris Accord. RIM_POST-

24

2016_AR_000083–84; *see e.g.,* HCD_II.B.0000774 (stating large-scale production of bioenergy

25

from forest biomass is neither sustainable nor greenhouse gas neutral); HCD_II.B.0000639

26

(stating forest bioenergy production has regional greenhouse gas implications);

27

HCD_II.B.0000174 (addressing the wide array of scientific, economic, and technological issues

28

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

related to using forest biomass for energy generation). This reasonably foreseeable increase in greenhouse gas emissions from the new biomass facility—paired with the impacts of diminished carbon storage and sequestration from the FWHP logging project—is likely to have cumulative, environmental consequences to the county that must be evaluated. *See generally WildEarth Guardians v. Zinke*, 368 F.Supp.3d 41 (D.D.C. 2019) (stating that agency failure to quantify greenhouse gas emissions that were reasonably foreseeable during the leasing stage of oil and gas development violated NEPA). Yet despite foreseeable cumulative consequences from both projects on one limited geographic area, Tuolumne County, HCD intentionally segregated its environmental review. HCD's failure to aggregate both projects under geographic aggregation violates the governing HUD regulations and is arbitrary, capricious, and not in accordance with law.

          *C.  The governing regulations also required aggregation of the two projects because they are occurring on a multi-year timeline.*

An aggregated and cumulative review of the two projects was also required under the "multi-year project" prong of the HCD regulations governing mandatory aggregation. 24 C.F.R. § 58.32(d).[4] It is undisputed that the FWHP logging project and the biomass facility are part of the same planning and program development (i.e., the CWRP) and Defendants have been implementing the projects for more than two years. HCD_IV.H.0000036. The CWRP block-grant funding was given to HCD in 2017 and, since then, all three pillars have begun implementation with multi-year timelines. HCD_IV.H.0000036–42. The CWRP funding is due

---

[4] 24 C.F.R. 58.32(d)(1) provides: "Release of funds. When a recipient's planning and program development provide for activities to be implemented over two or more years, the responsible entity's environmental review should consider the relationship among all component activities of the multi-year project regardless of the source of funds and address and evaluate their cumulative environmental effects. The estimated range of the aggregated activities and the estimated cost of the total project must be listed and described by the responsible entity in the environmental review and included in the RROF. The release of funds will cover the entire project period."

*Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. 503-525-2725*

to expire in September 2022, bringing this project well within the multi-year project aggregation requirements.

Defendants must satisfy their obligations under 24 C.F.R. Part 58, in addition to NEPA's environmental review requirements discussed below. *See Ka Makani 'O Kohala Ohana Inc. v. Dept. of Water Supply*, 295 F.3d 955, 961–62 (9th Cir. 2002) (describing the interplay between the HUD regulations and NEPA). The FWHP and the biomass facility fall under all three of the mandatory aggregation scenarios provided in the rules. HCD's decision not to aggregate is arbitrary and capricious and should be set aside.

> *D. Defendant HCD's decision not to aggregate its environmental review of the two projects should not be afforded deference by the Court because their actions are arbitrary, capricious, and not in accordance with the law.*

Defendants' failure to comply with 24 C.F.R Part 58's mandatory provisions is arbitrary and capricious. The APA standard of review is "narrow" and "deferential," but also requires the Court to undertake an "inquiry into the facts [that is] searching and careful." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1022 (9th Cir. 2007) (internal quotation omitted). Further, it is "rudimentary administrative law" that deference to the substance of the ultimate decision does not confer deference to an agency's decision to ignore the required procedures of decision-making. *Bennett v. Spear*, 520 U.S. 154, 172 (1997). A court may only afford deference to well-reasoned, adequately explained agency decisions that are supported by the facts before the agency; a court must reject poorly reasoned or factually unsupported agency action. *See Sierra Club*, 510 F.3d at 1023 ("We will defer to an agency's decision only if it is 'fully informed and well-considered,' and we 'will disapprove of an agency's decision if it made a clear error of judgment[.]'") (internal quotation and citations omitted). No deference is due to an agency decision that is not complete, well-reasoned, or adequately explained, because the "keystone" of a court's review "is to ensure that the [agency] engaged in reasoned decision-making," and "where the agency's reasoning is irrational, unclear, or not supported by the data it purports to interpret, [the court] must disapprove of the agency's action." *Nw. Coal. for Alts. to Pesticides v. U.S. EPA*, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008) (quotation omitted).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

Plaintiffs tried on several occasions to urge Defendants to analyze the FWHP logging project and the biomass facility together; Plaintiffs wrote letters to both HCD and HUD requesting that both projects have an aggregated cumulative impacts analysis. *See* RIM_POST-2016_AR_000082 (Plaintiffs' June 26, 2017 letter); RIM_POST-2016_AR_000111 (Plaintiffs' October 23, 2017 letter); HCD_III.C.0000013 (Plaintiffs' August 14, 2019 letter). Instead of offering a meaningful response, HCD continually failed to provide a rational explanation for the segregated analysis and instead asserted wholesale denials of the projects' impacts. *See* RIM_POST-2016_AR_000063 (stating that concerns about new forest biomass energy production plants were "outside the scope of this decision"); RIM_POST-2016_AR_000027–28. HCD's failure to provide a reasonable explanation for its actions is arbitrary, capricious, and not in accordance with law.

### c.   HCD Failed to do the Required Cumulative Impacts Analysis Under NEPA and Thus, Its Actions Were Arbitrary and Capricious and Not in Accordance With Law.

HCD also violated NEPA when it failed to disclose and consider the cumulative impacts of the biomass facility in its analysis of the FWHP. Cumulative impacts result from the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. For the following reasons, HCD's failure to analyze the cumulative impacts of the biomass facility in its review of the FWHP was arbitrary and capricious and was contrary to NEPA and its implementing regulations.

First, construction of the biomass facility was a reasonably foreseeable, non-speculative future action not exempt from review. *See* 24 C.F.R. § 58.34(a) (listing activities exempt from NEPA review). HCD repeatedly acknowledged the biomass facility in the record, beginning with to the initial NDRC grant application. *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 896 (9th Cir. 2002) (stating agencies "repeatedly acknowledg[ing]" an action in the record makes it reasonably foreseeable); HCD_I.D.0000076; HCD_I.B.0000255–56; HCD_I.B.0000004–05; HCD_II.C.0000040; HCD_II.C.0000008. HCD also issued a press release and notices for public comment about this action, qualifying it as reasonably foreseeable. *Muckleshoot Indian Tribe v.*

No.: 1:19-cv-01420-DAD-SAB – Plaintiffs' Motion for Summary
Judgment and Supporting Memorandum of Law – 14

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

1  *U.S. Forest Serv.*, 177 F.3d 800, 812 (9th Cir. 1999) (stating that actions where an agency issued

2  a press release and a notice to the public are "not too speculative" and can be considered

3  reasonably foreseeable); HCD_I.D.0000025; HCD_II.A.0000001 (Notice of Opportunity to

4  Comment on Recovery FEIS); HCD_II.A.0000005 (Notice of Opportunity to Comment on

5  Reforestation FEIS).

6        Second, the biomass facility is a proposed action that is part of a greater, comprehensive

7  forest recovery strategy; thus, its construction and operation is reasonably foreseeable under the

8  circumstances and requires a cumulative impacts analysis. *N. Alaska Envtl. Ctr. v. Kempthorne*,

9  457 F.3d 969, 980 (9th Cir. 2006) (stating proposed actions are reasonably foreseeable for

10  cumulative impacts purposes); *Blue Mts. Biodiversity Project*, 161 F.3d at 1214–15 (stating all

11  the proposed timber sales that were part of a comprehensive forest recovery plan were

12  reasonably foreseeable and thus required a single EIS to address cumulative impacts); *Earth*

13  *Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1305 (9th Cir. 2003) (citing *Blue Mts.*

14  *Biodiversity Project*, 161 F.3d at 1214–15); *see also* HCD_I.D.0000073 ("The CWRP is

15  designed to address unmet recovery needs in the Rim Fire footprint, while also supporting

16  community protection and resilience.").[5]

17        HCD's failure to disclose the direct, indirect, and cumulative carbon emissions from the

18  proposed actions and analyze the differential impact of logging for dimensional lumber as

19  opposed to burning the material violates NEPA. Plaintiffs wrote Defendants HCD and HUD

20  requesting that the agencies analyze the FWHP logging project and biomass facility together, or

21  at least include a cumulative impacts analysis, in 2017 and again in 2019. RIM_POST-

22  2016_AR_000085; HCD_III.C.0000016. HCD failed to respond or provide any rational

23  explanation for the projects' segregation and lack of cumulative impacts analysis—despite the

24  fact that $22 million of the $70 million NDRC grant is allocated to the construction of the

---

[5] Notably, in the original 2014 EIS, the Forest Service analyzed sixteen other projects as reasonably foreseeable projects that required a cumulative impacts analysis pursuant to NEPA including road reconstruction projects, grazing projects, and other logging projects. RIM_2014_AR_000690–92.

biomass facility. RIM_POST-2016_AR_000063; RIM_POST-2016_AR_000027–28. Without specific, reasoned information about the cumulative impacts of both projects, the agencies' analysis falls short and is unlawful. *See Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 997 (9th Cir. 2004) (finding general statements about cumulative effects to be inadequate—specific information is needed); *Muckleshoot Indian Tribe*, 177 F.3d at 810–11 (finding the challenged EIS fell short by not "account[ing] for the specific impacts" and that "very general and one-sided" cumulative impacts analyses fall short).

Defendants may argue that their failure is harmless procedural error but such failure is not harmless. The purpose of a cumulative impacts analysis is to prevent an agency from "dividing a project into multiple 'actions,' . . . which collectively have a substantial impact." *Thomas*, 753 F.2d at 758. In *Kern v. U.S. Bureau of Land Mgmt.*, the Ninth Circuit noted that failure to cumulatively analyze reasonably foreseeable future impacts of a project "would impermissibly subject the decision-making process contemplated by NEPA to 'the tyranny of small decisions.'" *Kern v. U.S. BLM*, 284 F.3d 1062, 1078 (9th Cir. 2002). HCD cannot evaluate the FWHP and biomass facility in a "piecemeal" fashion when, together, the interlinked nature of the two projects and their proximity will result in cumulative environmental effects. *See Native Ecosystems Council*, 304 F.3d at 897 (stating that NEPA requires a more thorough cumulative impacts analysis of "individually minor but collectively significant actions taking place over a period of time").

HCD unlawfully segmented the CWRP into different environmental analyses rather than analyzing the entire project in one review process. Defendants may claim that it was impractical to combine the analysis; however, even that was the case, NEPA required, at the very least, consideration of the biomass facility as part of the fundamental NEPA requirement of analyzing cumulative impacts. HCD provided no rational explanation for this omission, which is a direct NEPA violation. *See Nat. Res. Def. Council v. United States DOI*, 113 F.3d 1121, 1126 (9th Cir. 1997) (finding an action failed to survive judicial review under 5 U.S.C. § 706(2)(A) where the action agency failed to consider the relevant factors and articulate a rational connection between the facts found and the choice made).

*Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. 503-525-2725*

### d. Defendants' Use of the Federal Disaster Relief Funding Is Unauthorized and Does Not Support the Intent of the Funding.

Defendant HUD improperly approved and disbursed federal disaster relief funding in excess of its statutory authority because Defendants' activities are ineligible for HUD's funding. Wildfires are natural events that have occurred in forests for millennia. In recent years, however, wildfires burning in California forests, including the Rim Fire, have caused substantial damage to communities, including loss of life and property, and have been considered disasters requiring federal relief. Plaintiffs do not dispute that damage from the Rim Fire was disastrous and warranted relief from the federal government to assist with recovery. As discussed below, the scheme concocted by the State of California and the Forest Service to obtain these funds under the guise of urban disaster relief, and then pass them back to the Forest Service use for a run-of-the-mill post-fire logging project, is unlawful and contrary to the letter and spirit of the acts under which the funding was appropriated. Further, the record does not support the proposed rationale that post-fire logging on National Forests will result in any meaningful urban development, recovery or even resilience.

Only those activities enumerated in the Housing and Community Development Act of 1974 ("HCDA") (42 U.S.C. §§ 5301 et seq.) are eligible for HUD's disaster relief funding. Pub. L. No. 113-2, 127 Stat. 4 at 15, 36. HUD approved the use of $28 million of these limited funds for the FWHP logging project, which Defendants admit includes general forest management activities such as "controlling and minimizing the spread of noxious weeds, removing material that acts as fuel for future fires, and replanting conifers, among other activities, within the Rim Fire area of the Stanislaus National Forest." HCD Answer, ¶¶ 64, 66; HCD_IV.H.0000026–27 (describing FWHP activities).  Defendants also claim that these logging activities will improve the health of the area's watershed, thus improving the community's overall health and access to improved water quality. *See* Dkt. # 71-4, ¶¶ 15–16.

Subsection 2(a) of the HCDA identifies as eligible activities:

> [T]he acquisition, construction, reconstruction, or installation (including design features and improvements with respect to such construction, reconstruction, or installation that promote energy efficiency) of public works, facilities (except for

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

buildings for the general conduct of government), and site or other improvements[.]

42 U.S.C. § 5305(a)(2).

Defendants argue that post-fire logging fits into "site or other improvements." The phrase "site or other improvements" does not, in its plain meaning, mean or even imply a rural logging project. But even if such an interpretation was permissible, HUD was required to interpret the phrase consistent with the Congressional intent underlying the statute. *Glacier Fish Co. Ltd. Liab. Co. v. Pritzker,* 832 F.3d 1113, 1120 (9th Cir. 2016) (stating a court will uphold an agency's interpretation if it is consistent with that congressional intent).

The Supreme Court has explained that the HCDA and the CDBG funding program was created to "meet the social, economic and environmental problems facing *cities*. The primary objective of the Act is 'the development of viable *urban* communities.'" *Dixon v. United States*, 465 U.S. 482, 486 (1984) (internal citations omitted) (emphasis added); *see also Kan. City v. Dep't of Hous. & Urban Dev*., 923 F.2d 188, 189 (D.C. Cir. 1991) ("Title I of the HCDA establishes a number of grant programs to assist in the *development of viable urban communities* and in the provision of housing for persons of low and moderate incomes.") (emphasis added); *Johnson v. Cty. of Chester*, 413 F. Supp. 1299, 1302 (E.D. Pa. 1976) ("The passage and approval of the [HCDA] was the congressional response to the increasing deterioration of the nation's urban centers."). HUD's interpretation, which allows for funds to be directed *away* from cities and urban recovery, is patently inconsistent with that intent and the overall framework of community development block grant funding, as explained by the Supreme Court. Thus, HUD's interpretation should be afforded no deference. *See Friends of the Cowlitz v. Fed. Energy Regulatory Comm'n*, No. 99-70373, 2001 U.S. LEXIS 28368, at *15 ("Notably, with respect to statutory interpretation, *Chevron* . . . mandates that absent a clear expression of congressional intent to the contrary, courts should defer to reasonable agency interpretations of ambiguous statutory language.").

Defendants will likely argue that the project protects watersheds that serve cities and it therefore qualifies as eligible for funding. But even if a non-urban logging project on National

Forest land could qualify as "site or other improvements," the record fails to support Defendants' premise that such post-fire logging and reforestation will actually provide any recovery or restoration benefits for distant cities or urban areas. *See Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, BLM*, 273 F.3d 1229, 1236 (9th Cir. 2001) (reviewing courts must not "rubber stamp . . . administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute") (citing *NLRB v. Brown*, 380 U.S. 278, 291–92 (1965)). As discussed below, it is unlikely the reforestation component was even necessary given that natural regeneration was occurring on its own and recent science decries the need and safety of planting at high densities in areas that receive short rotation wildfires.

The diversion of tens of millions of dollars away from needed housing and community development projects[6]—and into a different agency's budget to do work that agency was planning to complete anyway—serves no purpose, other than to increase carbon emissions and the risk of more catastrophic future fire events. HUD's actions awarding and releasing to California $28 million for the FWHP logging project was arbitrary, capricious and not in accordance with law, or, in the alternative, is in excess of statutory authority.

> **e. Defendants Failed to Update Their NEPA Analysis When They Significantly Changed the Project From Lumber-Focused Logging, Which Retains Some Carbon, to Biomass and Pile Burning, Which Emits Far More Carbon.**

HUD regulations require a SEIS "[w]hen substantial changes are proposed in a project or when significant new circumstances or information becomes available during an environmental review." 24 C.F.R. § 58.60; *see also* 24 C.F.R. § 58.52. (stating that if the responsible entity adopts another agency's EIS, it must modify the EIS to adapt to the particular environmental conditions and circumstances if these are different than the project reviewed in the adopted EIS.) Likewise, CEQ regulations require an agency to prepare an SEIS "if [t]here are significant new

---

[6] For example, the Tuolumne Utility District wrote an initial support letter for the NDRC funding outlining its need for funding to construct a pipeline, pump and power generation project to support clean water in the event of a disaster. HCD_1.A.0000066.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).

Under both the HUD regulations and NEPA, Defendants had an obligation to update and reevaluate their environmental review and findings when they changed the focus and implementation of the FWHP from a logging project producing dimensional lumber—which conserves some carbon—to a project that would burn significant amounts of biomass—which releases carbon and other greenhouse gases ("GHGs") and particulate.

One such significant impact of the proposed project, in both its former and current version, is emissions of carbon and other air pollutants, resulting from the logging and processing of the trees cut. The original Forest Service Recovery EIS includes "smoke emissions from machine pile burning" as an environmental consequence of the proposed action. RIM_2014_AR_000250. The EIS included a detailed analysis of the impacts to greenhouse gas emissions and other air quality parameters for each alternative. RIM_2014_AR_000263–71. The analysis in the FEIS (which HCD adopted) acknowledges that the highest emissions come from pile burning, whereas "wood products keep the carbon and other GHG emissions locked up until the end of the product life through the combustion or decomposition." RIM_2014_AR_000267.

 Critically, the calculations in the adopted EIS were based on the alternatives for *that* proposed action (the Forest Service Recovery project), which proposed logging over 27,000 acres of dimensional lumber (salvage logging), ultimately approving over 15,000 acres. RIM_2014_AR_000018 (Alternative 4 Modified). HCD's Recovery ROD, on the other hand, provided for fuels reduction treatments, including biomass logging and pile burning, but *not* logging for dimensional lumber, on 14,897 acres. HCD_II.C.0000008 ("Specifically this project will focus on the treatment of biomass material (dead trees) for fuels reduction."). None of the agencies have ever analyzed this particular scenario, which has significantly different impacts.

Plaintiffs raised the distinction between these two types of logging and their respective carbon and air quality impacts to HCD in their comment letters, noting that the 2014 EIS only analyzed emissions impacts of biomass logging and pile burning small trees on 2,000 acres, but

1  that the implementation of the FWHP involves biomass removal and pile burning on the entire

2  14,897 acres, with removal for lumber.

3         HCD responded "the FEIS demonstrated that pile burning and jackpot burning is likely to

4  have the same carbon dioxide ($CO_2$) emissions as burning material for bioenergy."

5  HCD_II.C.0000027. However, this response misses the point. The significant change between

6  the analysis in the adopted EIS and the FWHP project implementation is that the acres that were

7  slated for salvage logging for lumber are now going to be burned. In other words, the activity

8  that has the least impact with respect to carbon and other air emissions—is no longer part of the

9  project and a different plan is being implemented.

10         Plaintiffs' June 2018 letter commenting on the RODs very specifically explained the

11 significance of the difference and the inadequacy of the analysis. HUD AR 01047. Because the

12 HCD ROD authorizes logging of trees *over* 16 inches in diameter at breast height ("dbh")[7] as

13 well as smaller trees to be incinerated for biomass or pile burned, there is a significant shortfall

14 in the GHG and air quality analysis in the EIS that HCD adopted.

15         "NEPA obliges an agency to revisit its alternatives analysis, including a true no action

16 alternative, whenever there are changed circumstances that affect the factors relevant to the

17 development and evaluation of alternatives." *Or. Natural Res. Council Action v. U.S. Forest*

18 *Serv.*, 445 F. Supp. 2d 1211, 1224–25 (D. Or. 2006) (reduction in acreage indicated need for

19 supplemental NEPA considering a new alternative); *see also Natural Res. Def. Council v. U. S.*

20 *Forest Serv.*, 421 F.3d 797, 809, 813–14 (9th Cir. 2005) (remanding for a fresh consideration of

21 alternatives because the Forest Service used inaccurate data for market demand in developing its

22 original NEPA analysis, rendering that alternatives consideration inadequate because it was

23 impossible to tell what other alternatives the agency might have considered based on accurate

24 information); *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 730–31

25 (9th Cir. 1995) (holding that the elimination of the contract on which the original environmental

26

27         [7] In other words, the HCD ROD authorizes the logging of all large trees, including old
   growth trees and snags. *See* Dkt. # 81-1 at 6–11 (Exhibit to Khosla Declaration) (showing photos
28 of logging impacts in the project area).

No.: 1:19-cv-01420-DAD-SAB – Plaintiffs' Motion for Summary
Judgment and Supporting Memorandum of Law – 21

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

analysis was based affected the range of alternatives the agency might consider). The change in the project from a lumber and salvage project to a biomass and pile burning project is not a "minor variation" in the context of climate change and the carbon and air quality impacts of burning 14,000 acres of trees rather than using them for lumber. Further, a project that involved entirely biomass and pile burning on the designated acreage was never analyzed. Because HCD's final plan ultimately departed substantially from the alternatives described in the adopted EIS, supplemental or updated NEPA was required. *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011).

> **f.  Under Both NEPA and the HUD Regulations Defendants Were Required to Supplement the Adopted Environmental Analysis in Order to Disclose and Consider the Difference in the Number of Trees Regenerating in the Project Area and the New Information in the North et al. Paper.**

HCD adopted two Forest Service EISs to cover the FWHP forest management activities. Essentially, the Recovery EIS covered the logging aspects of the project, and the Reforestation EIS covered the creation of new tree plantations (reforestation) and other vegetation treatments. RIM_2014_AR_000174 (2014 Rim Fire Recovery EIS); RIM_2016_AR_000129 (2016 Rim Fire Reforestation EIS). However, these EISs were outdated and stale by the time the actions were implemented and required supplementation to disclose and consider new and different circumstances in the project area. Defendants failed to update their environmental analysis in response to at least two pieces of significant new information: 1) The increase in natural regrowth of trees, obviating the need for extensive reforestation; and 2) the North et al. paper, which presented best available science on natural regeneration including findings underscoring that reforestation was unnecessary and the planned cutting/planting could increase fire intensity.

As to the first piece of new information, Plaintiffs extensively surveyed the condition of the forests that were to be logged, sprayed and re-planted as part of the project, and found extensive natural post-fire conifer regeneration. RIM_POST-2016_AR_000086; RIM_POST-2016_AR_000092; RIM_POST-2016_AR_000094. Plaintiffs asked Defendants, through letters

and public comment,[8] to disclose and consider this new information and adjust its plans accordingly, including but not limited to refraining from using the funds to replace natural forests with plantations that would exacerbate future fire intensity. However, Defendants refused. Plaintiffs' experts first conducted surveys in 2017 through which they discovered extensive conifer regeneration in the high-intensity fire areas planned for logging, and submitted this information as a comment on the EIS to the Forest Service. RIM_POST-2016_AR_000086; RIM_POST-2016_AR_000092; RIM_POST-2016_AR_000094. The Forest Service responded in the ROD and questioned the completeness of the data, while also indicating that it would continue to monitor for natural regeneration. RIM_POST-2016_AR_000064–66.[9]

The following year Plaintiffs surveyed all of the same locations (plots) the Forest Service had visited in 2014 and 2015 within roughly 2,500 to 3,000 acres of intact, unlogged post-fire habitat in the NDRC grant units, where Defendants claimed that "within the areas proposed for treatment" there was "little to no" conifer regeneration. HUD AR 01024. Plaintiffs presented the new and comprehensive survey results to the Forest Service in letters in 2018 and 2019. HUD AR 01543 (June 12, 2018); RIM_POST-2016_AR_000118 (August 13, 2019); HUD AR 01040 (June 6, 2018). The data showed significant changes on the ground going to the heart of the stated purpose and need of the project: with substantial regeneration within the units, there simply was no need to spend scarce disaster relief funds on replanting.

For the areas where the agency stated there was little to no conifer regeneration, Plaintiffs' surveys showed a massive increase of regeneration in those plots. The data also showed that many of the Forest Service data points were not even in conifer forest nor located

---

[8] Plaintiffs' letters to Defendants are found at RIM_POST-2016_AR_000082 (June 27, 2017); RIM_POST-2016_AR_000111 (October 23, 2017); RIM_POST-2016_AR_000118 (August 13, 2019); HUD AR 01040 (June 6, 2018); HUD AR 01543 (June 12, 2018).

[9] "The information provided by the commenter was for only seven units (1% of the total number of reforestation units) and included just 32 plots, all within areas where residual overstory live trees have persisted post-Rim Fire and either outside of the high severity burn areas or adjacent to non-high severity burn areas. Five of those plots or 16% contained no natural seedling regeneration." RIM_POST-2016_AR_000064.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

where logging had already killed any regeneration, further skewing their results. *See* Dkt. # 19 at 6–8 (describing the differences in the Plaintiffs' results versus the Forest Service's results).

|  | Percentage of Plots with Regeneration |
|---|---|
| Forest Service 2014-15 data | Less than 40%[10] of plots |
| Plaintiffs' 2018 Data | Over 90% of plots[11] |

Plaintiffs also sent a letter on August 13, 2019 to HCD and HUD documenting this additional information and requesting that HUD refrain from logging certain units with intact post-fire snag forests with extensive regeneration and use by wildlife. HUD AR 01555. That letter also included a new Forest Service study by North et al. (2019), which contradicted the claimed need to replant most post-fire areas. RIM_POST-2016_AR_000317. These data, combined with the North et al. (2019) paper, go to the heart of the purpose and need of the project and the need for the funding.

The North et al. (2019) study is significant new information because it undermines the scientific basis for the activities being undertaken in the project area. North et al. (2019) specifically noted two things. First, tree planting following clear-cuts like those implemented in the FWHP, and specifically in the tree-planting density that the Forest Service is conducting in the Rim Fire units as part of the FWHP activities, will tend to increase, not decrease, the intensity of future fires. HUD AR 01561 n.3. Second, tree planting is generally unnecessary in high-severity fire areas within 200 meters of some surviving trees. HUD AR 01561 n.3

Defendants failed to adequately update their data or adjust their analysis in response to this significant new information; nowhere do Defendants address the North paper's conclusion that their planned cutting and planting activities will likely increase future fire intensity. The Court did not address the significance of the North et al. study at the preliminary injunction stage (Dkt #94 at 19–20) and Plaintiffs argue that this study by itself is sufficient to require an SEIS. This failure is arbitrary, capricious and not in accordance with law.

---

[10] RIM_2016_AR_000277.
[11] Dkt. #19 at 7.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*

**CONCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully ask the Court to grant their Motion for Summary Judgment, declare the actions of the Defendants unlawful, and order the relief as set forth above. Plaintiffs respectfully request that if the Court finds in their favor, that separate briefing occur regarding the remedy and form of judgment.

DATED this 21st day of January, 2021.

Respectfully submitted,

*/s/ Meriel Darzen*
Meriel Darzen, *Pro Hac Vice*
Teryn Yazdani, *Pro Hac Vice*
Crag Law Center

*/s/ Daniel Galpern*
Law Office of Daniel M. Galpern

*Attorneys for Plaintiffs*

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. 503-525-2725*