1

2

3

4

5

6

7

8                                    UNITED STATES DISTRICT COURT

9                            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   EARTH ISLAND INSTITUTE, et al.,              No.  1:19-cv-01420-DAD-SAB

12                       Plaintiff,

13          v.                                     ORDER DENYING PLAINTIFFS' MOTION
                                                   FOR SUMMARY JUDGMENT AND
14   KIMBERLY NASH, et al.,                        GRANTING DEFENDANTS' CROSS-
                                                   MOTIONS FOR SUMMARY JUDGMENT
15                       Defendants.
                                                   (Doc. Nos. 115, 121, 122)
16

17

18          This matter is before the court on a motion for summary judgment brought by plaintiffs

19   Earth Island Institute ("Earth Island"), Greenpeace, Inc., Sequoia ForestKeeper, and James

20   Hansen (collectively, "plaintiffs") (Doc. No. 115); a cross-motion for summary judgment brought

21   by defendants Kimberly Nash, United States Department of Housing & Urban Development

22   ("HUD"), Jason Kuiken, and United States Forest Service ("Forest Service") (collectively,

23   "federal defendants") (Doc. No. 121); and a cross-motion for summary judgment brought by

24   defendants Janice Waddell and California Department of Housing and Community Development

25   ("California") (collectively, "state defendants") (Doc. No. 122).  Pursuant to General Order No.

26   617 addressing the public health emergency posed by the COVID-19 pandemic, the motions were

27   taken under submission on the papers.  (Doc. No. 125.)  For the reasons explained below, the

28   court will deny plaintiffs' motion and grant defendants' cross-motions.

                                                  1

1    **BACKGROUND**[1]

2        This case concerns the combined efforts of the State of California and the Federal

3    Government to hinder the impacts of forest fires such as the Rim Fire.  The Rim Fire started on

4    August 17, 2013, in a remote area of the Stanislaus National Forest, about twenty miles east of

5    Sonora, California.  (RIM_2014_AR_000198; Doc. No. 115-1 at 3.)  The fire burned over several

6    weeks and was, at the time, the third largest wildfire in California's history and the largest

7    wildfire in the recorded history of the Sierra Nevada Mountains.  (*Id.*)  Nearly 40 percent of the

8    quarter million acres that burned experienced high-severity fire, which effectively eliminated

9    nearly all vegetation, leaving only occasional patches of shrub, litter, and standing scorched trees.

10   (RIM_2014_AR_000355-56; *see, e.g.*, RIM_2014_AR_001110, 1114, 1121–23, 1140.)  In the

11   wake of this fire, California and the Federal Government sought new ways to prevent forest fires.

12   The history of that effort as it pertains to this case is extremely complicated.  Although those facts

13   have been laid out in the court's previous order denying plaintiffs' motion for a preliminary

14   injunction and motion for a temporary restraining order (Doc. No. 94), the court will undergo a

15   brief, yet comprehensive summary below.

16   **A.      Defendant Forest Service's 2014 Environmental Impact Statement**

17        In 2014, following the Rim Fire, defendant Forest Service adopted the Rim Fire Recovery

18   Project ("Recovery Project") to address the damage caused by the fire.  (RIM_2014_AR_000009,

19   16.)  This project was designed to:  (1) capture economic value through salvage logging; (2)

20   provide for worker and public safety; (3) reduce the presence of fuels[2] to advance future forest

21   resiliency; (4) improve road infrastructure to enhance hydrologic function; (5) enhance wildlife

22   habitat; and (6) provide opportunities for scientific research.  (*Id.*)

23   _____

24   [1]  The relevant facts that follow are from three administrative records prepared by defendants
     California, Forest Service, and HUD, respectively.  All references to defendant California's
     administrative record contain the prefixes "HCD_I," "HCD_II," "HCD_III," "HCD_IV," and

25   "HCD_V."  All references to defendant Forest Service's administrative records contain the
     prefixes "RIM_2014_AR," "RIM_2016_AR," and "RIM_POST-2016_AR."  Lastly, all

26   references to defendant HUD's administrative record contain the prefix "HUD AR."

27
     [2]  "Fuel," in this context, means combustible material that fuels a fire, such as grasses, dead trees,

28   and other types of vegetation.  (Talbott Decl. at ¶ 5.)

1    Pursuant to the National Environmental Policy Act ("NEPA"), an agency must prepare an

2    environmental impact statement ("EIS") for "major Federal actions significantly affecting the

3    quality of the human environment[.]"  42 U.S.C. § 4332(2)(C).  As such, defendant Forest Service

4    issued an EIS in 2014 for the Recovery Project.

5    In issuing its EIS for the Recovery Project, defendant Forest Service notably considered

6    the ability of conifers to regenerate after a fire and found that conifer regeneration in high severity

7    areas would be "limited" because "[l]arger patches of burn areas (such as those in the high

8    severity areas) can result in openings in the forest that are larger than the reach of surviving

9    neighboring conifers, whose seeds cannot cover the open area."  (RIM_2014_AR_000260; *see,*

10   *e.g.*, RIM_2014_AR_001110, 1114, 1121-23, 1140.)

11   **B.    Defendant Forest Service's 2016 EIS**

12   After the Recovery Project was approximately 70 percent complete, defendant Forest

13   Service's focus turned to a second project, its 2016 Rim Fire Reforestation Project

14   ("Reforestation Project").  (RIM_2016_AR_000159.)  Whereas the Recovery Project was

15   directed at salvage logging and fuels reduction, the Reforestation Project was directed at long-

16   term restoration and reforestation.  (RIM_2016_AR_000158–59.)  Specifically, defendant Forest

17   Service aimed to "create a fire resilient mixed conifer forest that contributes to an ecologically

18   healthy and resilient landscape rich in biodiversity."  (RIM_2016_AR_000161.)

19   In preparing its 2016 EIS for the Reforestation Project, defendant Forest Service analyzed

20   the likelihood, extent, and quality of natural conifer regeneration.  (*See, e.g.*,

21   RIM_2016_AR_000161, 387–88, 391–97, 410–12.)  Defendant Forest Service concluded that

22   "[w]ithout mature live trees to provide a seed source within close proximity to the burned areas,

23   or the lack of a viable and healthy cone crop, natural conifer regeneration cannot be counted on

24   within large portions of the Rim Fire."  (RIM_2016_AR_000161.)  Defendant Forest Service

25   further found that "brush is already beginning to dominate sites, inhibiting conifer survival and

26   growth."  (*Id.*)  Accordingly, defendant Forest Service determined that relying on the forest to

27   regenerate entirely by itself was not feasible.  (*See id.*)  Nonetheless, defendant Forest Service

28   included a provision for utilizing natural regeneration when available and adopting adaptive

3

1  management approaches based on conditions as they were found.  (*See* RIM_2016_AR_000175-

2  76.) [3]

3  **C.    Defendant California Applies for Disaster Relief Funding**

4        Separate from defendant Forest Service's efforts to remedy the damage caused by the Rim

5  Fire, defendant California pursued its own additional programs to prevent future forest fires in the

6  Rim Fire region.  On March 25, 2015, the State of California applied to HUD for $70 million in

7  federal disaster relief funding through the National Disaster Resilience Competition ("NDRC").

8  (*See generally* HCD_I.B.0000001.)  California's application proposed to fund a three-pronged

9  programmatic effort called the "Community Watershed and Resilience Program" ("CWRP").

10  (HCD_I.B.0000004.)  The lead agency that would be administering the grant funding was the

11  State of California's Department of Housing and Community Development ("HCD").

12  (HCD_I.B.0000021.)

13        On June 7, 2016, defendant HUD awarded defendant California $70 million in federal

14  disaster relief funds through the NDRC block-grant, which was authorized by the Disaster Relief

15  Appropriations Act of 2013 ("Relief Act").  *See* P.L. 113-2, 127 Stat. 4; (HCD_I.D.0000048;

16  HCD_I.D.0000001) (notifying defendant California of its future $70 million grant award on

17  January 21, 2016).  Defendant California's proposed program—the aforementioned CWRP—is

18  an "integrated, replicable model for community and watershed resilience" and was comprised of

19  three pillars:  $28 million for the Forest and Watershed Health Program ("Logging Project"), $22

20  million for a biomass facility ("Biomass Project"), and $20 million for a Community Resilience

21  Center.  (HCD_I.B.0000004; HCD_I.D.0000074–76.)  Because the motions pending before the

22

23  [3]  The analysis of conifer regeneration in the 2014 EIS and the subsequent 2016 EIS described in

24  this order is particularly relevant to the facts in this case because plaintiffs argue in their motion

25  for summary judgment that "the best available science establishes that post-fire logging and

    replanting monoculture forests in lieu of natural regeneration—including Defendants' current

    activities—fails to reduce wildfire risk and likely *increases* future fire intensity."  (Doc. No. 115

26  at 11.)  Plaintiffs contend that the 2014 and 2016 EISs are no longer applicable to defendants'

    current wildfire prevention efforts because those EISs did not consider new evidence of natural

27  regeneration that allegedly has recently come to light.  (*Id.* at 29.)  The new evidence that

    plaintiffs point to is the "increase in natural regrowth of trees, obviating the need for extensive

28  reforestation."  (*Id.* at 32.)

1    court pertain only to the Logging Project and the Biomass Project, the court will briefly

2    summarize each below.

3        The Logging Project implements and continues the same actions defendant Forest Service

4    studied in its Recovery and Reforestation EISs.  (HUD AR 00896, 899.)  Specifically, the

5    Logging Project is expected to remove dead material from forests that act as fuel, control and

6    minimize the spread of noxious weeds, rebuild rangeland infrastructure, replant a diverse and

7    resilient mixed conifer forest, and create and enhance strategic fuel breaks to reduce future fire

8    risk throughout Tuolumne County.  (Doc. Nos. 35-1 at ¶¶ 6–7, 13, 17; 28-2 at 3.)

9        The Biomass Project was originally proposed as a biomass facility to provide a marketable

10   end-use for biomass removed from within Tuolumne County, reducing the need for open burning

11   of biomass in the forest and reducing greenhouse gases.  (HUD AR 00546.)  Of the $22 million

12   awarded for this facility, $6 million was to be used for feasibility analyses and the remaining $16

13   million was for facility construction and operation.  (HUD AR 00590.)  Prior to using any funds

14   on the facility, defendant California was required to conduct a feasibility study to determine

15   whether the project was viable.  (HCD_I.H.0000110.)  Defendant California performed extensive

16   feasibility studies.  (*See* HCD_I.H.0000077–086, 096–107, 140–281.)  The first part of the

17   feasibility study, completed in October 2018, concluded that the relatively small amount of

18   unutilized biomass material in the surrounding six counties and the relatively high price for the

19   material was "discouraging for the viability" of the facility, but that several uncertain factors

20   "could significantly increase the chances for a viable BUF facility."  (HCD_I.H.0000210,

21   HCD_I.H.0000218.)  The second phase of the feasibility study, completed in January 2019,

22   concluded that five business types were most likely to be viable, including a small-scale sawmill,

23   post and pole manufacturing operation, small-scale biomass power plant, firewood bundling

24   operation, and biomass fuel grinding operation.  (HCD_I.H.0000145, HCD_I.H.0000157.)  The

25   study found that a large-scale biomass power plant had a "fatal flaw" and would not be viable.

26   (HCD_I.H.0000156, HCD_I.H.0000204.)  In other words, no large-scale facility would be built.

27       After the feasibility study was complete, defendant California changed the project name

28   and focus—the biomass *facility* became a biomass *fund* that would provide loans or grants to

1   multiple recipients that utilize biomass at different project sites. [4]  (HCD_I.H.0000282–83;

2   HCD_I.H.0000314–15.)  On April 20, 2020, defendant California contracted to have the Rural

3   Community Assistance Corporation ("RCAC") administer the Biomass Project.

4   (HCD_I.G.0000748–52.)  On May 5, 2020, RCAC issued a loan application, instructions and

5   loan policies for the Biomass Project, which informed potential applicants that applications for

6   the fund were being accepted.  (HCD_I.H.0000285.)  On May 21, 2020, RCAC released a request

7   for qualifications from firms that might be eligible to conduct the environmental review for the

8   Biomass Project recipients, and received several responses.  (HCD_IV.E.0000001–02;

9   HCD_IV.B.0000204.)  RCAC has since received applications from several different business

10  types and is currently in the process of determining whether any of these applicants meet the

11  feasibility, financial, environmental, and HUD grant requirements necessary for them to receive

12  the loans and grants.  (*See* HCD_I.H.0000284; HCD_IV.E.0000001–02.)  In contrast to the

13  Logging Project, defendant HUD has not yet authorized the release of federal funds for

14  implementation of the Biomass Project in its loan and grant program iteration.  (HUD AR 01026–

15  39.)  Nonetheless, as of the time of this order, the Biomass Project is currently still being operated

16  as a fund program.  (*See* HCD_I.H.0000284; HCD_IV.E.0000001–02.)

17  **D.      Defendant California's Adopting of the Recovery and Reforestation EISs**

18          In May 2017, defendant California issued a public notice for comment on its adoption of

19  the Forest Service's Recovery (2014) and Reforestation (2016) EISs as part of its required

20  environmental review of the Logging Project component of the CWRP.  (HCD_III.C.0000026;

21  HCD_II.A.0000001; HCD_II.A.0000005.)  Plaintiff Earth Island submitted comments to

22  defendant California on June 26, 2017, requesting that defendant not adopt the Recovery and

23  Reforestation EISs and to withdraw its proposal to accept Relief Act funds generally for the

24  CWRP.  (*See generally* RIM_POST-2016_AR_000082 (Plaintiffs' June 26, 2017 letter.))  The

25  comment letter also asked defendants to account for any additional greenhouse gas emissions that

26

27  _____

    [4]  Throughout this order, the court will refer to the "Biomass Project" as the project that is being
    proposed and executed, regardless of its iteration as either a facility or loan and grant program.
28  The court will specify when it is specifically referring to either of those iterations.

1   the Logging Project would produce compared to what was first proposed and analyzed in

2   defendant Forest Services' Recovery and Reforestation EISs.  (RIM_POST-2016_AR_000084–

3   85.)  Plaintiffs believed that circumstances had changed in the time since the 2014 and 2016 EISs

4   were issued and that these changed circumstances required defendants to engage in a new

5   environmental study before implementing the Logging Project.

6         Nevertheless, defendant California proceeded to adopt the EISs unchanged and requested

7   release of the HUD funds for the Logging Project.  (RIM_POST-2016_AR_000001 (adopting the

8   Recovery EIS); RIM_POST-2016_AR_000032 (adopting the Reforestation Project EIS).)

9   Defendant California determined that it was appropriate to adopt both EISs "because the area and

10  activities evaluated in the [Recovery and Reforestation EISs] are the same as those funded by the

11  CDBG-NDR grant," and because "the action covered is substantially the same as HCD's

12  proposed action in the HUD approved NDRC application."  (HCD_II.C.0000007;

13  HCD_II.C.0000038.)  On October 5, 2017, HCD issued two Records of Decision ("RODs")—

14  "Rim Fire Reforestation" and "Rim Fire Recovery"—finalizing its decision to adopt the 2014 and

15  2016 Forest Service EISs.  (Doc. No. 115–1 at 6.)

16        On October 23, 2017, plaintiffs again objected to the release of the Relief Act funds based

17  upon the issues raised in their prior letters.  (*See generally* RIM_POST-2016_AR_000111;

18  HCD_III.A.0000001.)  In a response to defendant HUD, defendant California again denied the

19  need to update the EISs.  (HCD_III.A.0000004; HCD_III.A.0000013.)  On the basis of this

20  response, defendant HUD rejected plaintiffs' objections and released the federal NDRC block-

21  grant funds to defendant California for the Logging Project without requiring any further

22  environmental review.  (HCD_III.A.0000014; HCD_III.A.0000028–29.)  Defendant California

23  then passed those funds back to defendant Forest Service for use in logging the Stanislaus

24  National Forest pursuant to the Logging Project.  (*See* HCD_III.A.0000014 (showing the release

25  of funds to defendant Forest Service for project activities).)

26  **E.    Plaintiffs Object to the Lack of Cumulative and Aggregate Analysis by Defendants**

27        In addition to arguing that changed circumstances warranted a new EIS for the Logging

28  Project, plaintiffs also believed that the inclusion of the Biomass Project required defendants to

7

1    analyze the impacts of the Logging Project and the Biomass Project in conjunction, whereas the

2    2014 and 2016 EISs had solely focused on the Logging Project.  Plaintiffs wrote to defendants

3    California and HUD on June 6, 2018, provided additional information and data regarding

4    regeneration in the project area, and requested that defendant California address the Biomass

5    Project and its cumulative impacts, among other issues.  (*See generally* HCD_III.B.0000512.)

6    This letter included updated data and photographs from specific treatment units where

7    regeneration was occurring.  (HCD_III.B.0000517–19; HCD_III.B.0000522–23.)

8    **F.      Plaintiffs' Final Objections to the CWRP**

9            Plaintiffs then sent a final letter to defendants California and HUD on August 14, 2019,

10   documenting additional conifer regeneration information and requesting that defendants refrain

11   from logging certain units with intact post-fire snag forests, areas with extensive regeneration,

12   and areas with extensive use by wildlife.  (*See generally* HCD_III.C.0000013.)  The letter also

13   included a new study by North et al. (2019), which plaintiffs asserted raised significant questions

14   about the efficacy and impacts of the planned logging and reforestation activities.

15   (HCD_III.C.0000019 n.3; HCD_III.C.0000020 n.4.)  Defendants have neither updated their

16   environmental analyses nor ceased work on the project despite these objections by plaintiffs.

17   **G.      Procedural History**

18           On September 16, 2019, plaintiffs filed their complaint in this action asserting the

19   following claims:  (1) a claim against defendants HUD and California for failure to reevaluate,

20   modify and supplement the environmental review when presented with significant new

21   information and changed circumstances, in violation of NEPA, HUD regulations, and the

22   Administrative Procedure Act ("APA"); (2) a claim against defendants HUD and California for

23   failure to analyze the combined impact of the Logging Project and the Biomass Project, in

24   violation of NEPA, HUD regulations, and the APA; (3) a claim against defendant Forest Service

25   for failure to supplement the environmental analysis when presented with significant new

26   information and changed circumstances, in violation of NEPA and the APA; and (4) a claim

27   against defendants HUD and California for the improper use of funds in violation of the Relief

28   /////

8

1   Act and the APA.[5]  (*Id.*)  On April 21, 2020, the court issued an order denying plaintiffs' motion

2   for a preliminary injunction, denying defendants' motion to strike, and denying plaintiffs' motion

3   for a temporary restraining order.  (Doc. No. 94.)

4          On January 21, 2021, plaintiffs filed the present motion for summary judgment.  (Doc.

5   No. 115.)  On March 18, 2021, the federal defendants filed a motion for summary judgment and

6   their opposition to plaintiffs' motion.  (Doc. No. 121.)  On that same day, the state defendants

7   filed a motion for summary judgment and their opposition to plaintiffs' motion.  (Doc. No. 122.)

8   On April 22, 2021, plaintiffs filed their reply in support of their motion, an opposition to the

9   federal defendants' motion for summary judgment, and an opposition to the state defendants'

10  motion for summary judgment.  (Doc. No. 123.)  The federal and state defendants each replied

11  thereto on May 13, 2021.  (Doc. Nos. 126, 127.)

12                                      **LEGAL STANDARD**

13  **A.      Administrative Procedure Act**

14          Compliance with NEPA is reviewed under the APA.  5 U.S.C. §§ 701–706; *Grand*

15  *Canyon Trust v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1016 (9th Cir. 2012).  "The APA

16  sets forth the procedures by which federal agencies are accountable to the public and their actions

17  subject to review by the courts."  *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, __U.S.__,

18  140 S. Ct. 1891, 1905 (2020) (internal quotation marks and citation omitted).  Only "final agency

19  actions are reviewable under the APA."  5 U.S.C. § 704; *see also* 5 U.S.C. § 701 (for purposes of

20  the APA's judicial review provisions, "agency action" has "the meaning[] given" by § 551).  An

21  "'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or

22  the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  Under § 706 of the APA,

23  the court is "to assess only whether the decision was based on a consideration of the relevant

24  /////

---

25  [5]  On September 16, 2019, plaintiffs initiated this action by filing their complaint in the U.S.
    District Court for the Northern District of California.  (Doc. No. 1.)  On October 7, 2019, U.S.
26  District Judge Richard Seeborg of the Northern District of California issued an order denying
    plaintiffs' motion for a temporary restraining order and granting defendants' motion for
27  discretionary transfer of the case to the Eastern District of California, noting that the lands in
    question lie entirely within the boundaries of this district.  (Doc. No. 52.)
28

1    factors and whether there has been a clear error of judgement." *Regents*, 140 S. Ct. at 1905

2    (internal quotation marks and citation omitted).

3          The APA "requires agencies to engage in reasoned decisionmaking, and directs that

4    agency actions be set aside if they are arbitrary and capricious." *Id.* (internal citations and

5    quotation marks omitted).  An agency's "determination in an area involving a 'high level of

6    technical expertise'" is to be afforded deference.  *The Lands Council v. McNair*, 537 F.3d 981,

7    993 (9th Cir. 2008) (*en banc*) (citing 5 U.S.C. § 706(2)(A)).  The district court's role "is simply to

8    ensure that the [agency] made 'no clear error of judgment' that would render its action 'arbitrary

9    and capricious.'" *Id.* citing (*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

10   "Factual determinations must be supported by substantial evidence," and "[t]he arbitrary and

11   capricious standard requires 'a rational connection between facts found and conclusions made.'"

12   *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755,

13   759–60 (9th Cir. 2014) (internal citations omitted).  This requires the court to ensure that the

14   agency has not, for instance:

15          "relied on factors which Congress has not intended it to consider,
           entirely failed to consider an important aspect of the problem, offered
16         an explanation for its decision that runs counter to the evidence
           before the agency, or [an explanation that] is so implausible that it
17         could not be ascribed to a difference in view or the product of agency
           expertise."
18

19   *McNair*, 537 F.3d at 993 (quoting *Motor Vehicle Mfrs. Assn., Inc. v. State Farm Mut. Auto. Ins.*

20   *Co.*, 463 U.S. 29, 43 (1983)); *see also Friends of Santa Clara River v. U.S. Army Corps of*

21   *Engineers*, 887 F.3d 906, 920 (9th Cir. 2018).

22   **B.      Motion for Summary Judgment**

23          Summary judgment is appropriate when the moving party "shows that there is no genuine

24   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

25   Civ. P. 56(a).

26          In summary judgment practice, the moving party "initially bears the burden of proving the

27   absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387

28   (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party

1   may accomplish this by "citing to particular parts of materials in the record, including

2   depositions, documents, electronically stored information, affidavits or declarations, stipulations

3   (including those made for purposes of the motion only), admissions, interrogatory answers, or

4   other materials," or by showing that such materials "do not establish the absence or presence of a

5   genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

6   Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at trial,

7   "the moving party need only prove that there is an absence of evidence to support the non-moving

8   party's case."  *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R.

9   Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after adequate time for

10  discovery and upon motion, against a party who fails to make a showing sufficient to establish the

11  existence of an element essential to that party's case, and on which that party will bear the burden

12  of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an

13  essential element of the nonmoving party's case necessarily renders all other facts immaterial."

14  *Id.* at 322–23.  In such a circumstance, summary judgment should be granted, "so long as

15  whatever is before the district court demonstrates that the standard for the entry of summary

16  judgment . . . is satisfied."  *Id.* at 323.

17          If the moving party meets its initial responsibility, the burden then shifts to the opposing

18  party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita*

19  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the

20  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

21  of its pleadings but is required to tender evidence of specific facts in the form of affidavits or

22  admissible discovery material in support of its contention that the dispute exists.  *See* Fed. R. Civ.

23  P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773

24  (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for

25  summary judgment.").  The opposing party must demonstrate that the fact in contention is

26  material, i.e., a fact that might affect the outcome of the suit under the governing law, *see*

27  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec.*

28  *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the

1    evidence is such that a reasonable jury could return a verdict for the non-moving party, *see*

2    *Anderson*, 477 U.S. at 250; *Wool v. Tandem Computs. Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

3        In the endeavor to establish the existence of a factual dispute, the opposing party need not

4    establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

5    dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

6    trial." *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

7    the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

8    *Matsushita*, 475 U.S. at 587 (citations omitted).

9        "In evaluating the evidence to determine whether there is a genuine issue of fact," the

10   court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v.*

11   *Cent. Contra Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing

12   party's obligation to produce a factual predicate from which the inference may be drawn.  *See*

13   *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d

14   898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do

15   more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where

16   the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

17   there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

18                        **STATUTORY AND REGULATORY SCHEMES**

19   **A.    National Environmental Policy Act ("NEPA")**

20       "[R]ecognizing the profound impact of man's activity on the interrelations of all

21   components of the natural environment," Congress enacted NEPA in 1969.  42 U.S.C. § 4331.

22   NEPA established the Council of Environmental Quality ("CEQ"), which interprets the Act by

23   "promulgat[ing] regulations to guide federal agencies in determining what actions are subject to

24   that statutory requirement." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (citing 40

25   C.F.R. § 1500.3).  NEPA requires an agency to prepare an EIS for "major Federal actions

26   significantly affecting the quality of the human environment[.]"  42 U.S.C. § 4332(2)(C).  Among

27   other specifications, an EIS details the environmental impact of the proposed action, any

28   unavoidable adverse environmental effects, and alternatives to the proposed action.  *Id.*  NEPA

                                          12

1    imposes procedural rather than substantive requirements.  *Robertson v. Methow Valley Citizens*

2    *Council*, 490 U.S. 332, 350 (1989); *Center for Biological Diversity v. IIano*, 928 F.3d 774, 777

3    (9th Cir. 2019).  So long as "the adverse environmental effects of the proposed action are

4    adequately identified and evaluated, the agency is not constrained by NEPA from deciding that

5    other values outweigh the environmental costs."  *Robertson*, 490 U.S. at 350; *see also Conner v.*

6    *Burford*, 848 F.2d 1441, 1450 (9th Cir. 1988) ("NEPA does not require that mitigation measures

7    completely compensate for the adverse environmental effects"); *Japanese Village, LLC v.*

8    *Federal Transit Administration*, 843 F.3d 445, 455 (9th Cir. 2016).

9    **B.      The Disaster Relief Appropriations Act ("Relief Act")**

10         Congress passed the Relief Act to provide "supplemental appropriations for the fiscal year

11   ending September 30, 2013, to improve and streamline disaster assistance for Hurricane Sandy,

12   and for other purposes."  Pub. L. No. 113-2, 127 Stat. 4.  The Act appropriated funds to defendant

13   HUD "for necessary expenses related to disaster relief, long-term recovery, restoration of

14   infrastructure and housing, and economic revitalization in the most impacted and distressed

15   areas[.]"  *Id.*, 127 Stat. at 36; *see also* Notice of National Disaster Resilience Competition Grant

16   Requirements, 81 Fed. Reg. at 36,558.  The Secretary of HUD has discretion to award funds to

17   state or local government grantees for "activities authorized under title I of the Housing and

18   Community Development Act of 1974 (42 U.S.C. § 5301 et seq.) (HCDA)."  Pub. L. No. 113-2,

19   127 Stat. at 36.

20         For any such activities, grantees become the "responsible entity" for NEPA purposes and

21   are tasked with assuming "responsibilities for environmental review, decision making, and

22   action" related to NEPA.  42 U.S.C. § 5304(g)(1); *see also* note 6, below.  HUD regulations set

23   forth "instructions and guidance to recipients of HUD assistance and other responsible entities for

24   conducting an environmental review for a particular project or activity and for obtaining approval

25   of a Request for Release of Funds."  24 C.F.R. § 58.1(a).  When requesting a release of funds, a

26   grantee must certify its consent "to assume the status of a responsible Federal official under

27   [NEPA]."  42 U.S.C. § 5304(g)(3)(D); *see also* 24 C.F.R. § 58.13.  HUD's approval of such a

28   certification "shall be deemed to satisfy [HUD's] responsibilities under [NEPA]" respecting the

1    release of funds.  42 U.S.C. § 5304(g)(2); 24 C.F.R. § 58.77(a).  "Persons . . . seeking redress in

2    relation to environmental reviews covered by an approved certification shall deal with the

3    responsible entity and not with HUD."  24 C.F.R. § 58.77(b).

4    **C.     HUD's Environmental Review Regulations**

5          The Housing and Community Development Act of 1974 ("HCDA") provides for funding

6    for urban development and redevelopment through federal grants administered by HUD.  The

7    HCDA requires recipients of HCDA funding to account for and analyze the environmental

8    impacts of projects and activities receiving federal financial assistance.  42 U.S.C. § 5304.  The

9    regulations found at 24 C.F.R. § 58 govern environmental review for the "responsible entities"—

10   recipients of HUD's HCDA funding.  These regulations apply to both the Relief Act funding and

11   the activities funded.  24 C.F.R. § 58.1(b)(1).  Responsible entities are accountable for all

12   environmental reviews, decision-making, and actions that would otherwise be delegated to HUD

13   under NEPA.  24 C.F.R. §§ 58.4, 58.5, 58.10.

14         The responsible entity also has an obligation to "group together and evaluate as a single

15   project" all individual activities related on a geographical or functional basis and to adequately

16   address, in a single environmental review, "the separate and combined impacts of activities that

17   are similar, connected, or closely related, or that are dependent upon other activities and actions."

18   24 C.F.R. § 58.32(c).  For the purposes of satisfying 24 C.F.R. § 58, environmental review

19   consists of not only ensuring NEPA compliance for HUD-funded actions but also those actions

20   not funded by HUD that are required to be aggregated pursuant to 24 C.F.R. § 58.32.

21                                        **ANALYSIS**

22         In their pending motion, plaintiffs assert that they are entitled to summary judgment on

23   three separate grounds.  Plaintiffs first argue that defendants must supplement the environmental

24   review of the Logging Project because significant new or changed circumstances exist that were

25   not considered in the Forest Service's 2014 and 2016 EISs.  (Compl. at ¶¶ 93–103, 117–123.)

26   Plaintiffs next argue that defendants were required to aggregate their environmental review of two

27   of the three CWRP projects:  The Logging Project and the Biomass Project.  (*Id.* at ¶¶ 104–116.)

28   Lastly, plaintiffs argue that HUD did not have authority to use Congressionally appropriated

                                          14

1  funds from the Relief Act for one of the three CWRP projects—the Logging Project. (*Id.* at ¶¶

2  124–128.) Specifically, plaintiffs contend that it was improper for HUD to award and release

3  Relief Act funds for the Logging Project because, they assert, that project does not fall within one

4  of the categories of permitted activities under the HCDA, and because plaintiffs believe the

5  Logging Project must relate to urban communities. The court will address each of these

6  arguments in turn below.

7  **A.     The Record Demonstrates that Defendants' Decision Not to Update or Supplement
       Their Environmental Analysis Was Not Arbitrary and Capricious**

8

9          Plaintiffs first move for summary judgment on the grounds that defendants failed to

10  update or supplement their environmental analysis when substantial changes to the Logging

11  Project were made and significant new circumstances and information became available well

12  after the 2014 and 2016 EISs were issued. (Doc. No. 115 at 29–32.) These arguments pertain to

13  plaintiffs' first cause of action brought against defendant California and defendant HUD and

14  plaintiffs' third cause of action brought against defendant Forest Service. [6]

15          An agency is required to prepare a supplemental EIS ("SEIS") if "[t]here are significant

16  new circumstances or information relevant to environmental concerns and bearing on the

17

18  [6] Defendant HUD argues that the court should grant summary judgment in its favor as to
    plaintiffs' first and second causes of actions. (Doc. No. 121 at 23.) Defendant HUD asserts that

19  its role in the CWRP is limited because, as a grant recipient, defendant California assumed all
    NEPA responsibilities for its grant projects. (*Id.* at 22–23.) Defendant HUD also argues that

20  plaintiffs seemingly concede that defendant California assumed all of HUD's obligations under
    NEPA. (*Id.* at 21.) Indeed, plaintiffs do not respond to this argument in their opposition to the

21  federal defendants' motion for summary judgment. For purposes of ruling upon plaintiffs'
    motion for preliminary injunction, the court found that defendant HUD had satisfied its NEPA

22  obligations. (Doc. No. 94 at 17 n.11.) The court reaffirms that finding now. *See Nat'l Ctr. for
    Pres. Law v. Landrieu*, 496 F. Supp. 716, 731 (D.S.C.), *aff'd*, 635 F.2d 324 (4th Cir. 1980)

23  ("Neither HUD nor its Secretary ha[ve] a legal obligation under NEPA to prepare a separate
    environmental impact statement; nor [do] they have a duty to critically evaluate the substance of

24  the environmental analysis prepared by the . . . grant applicant under the HCDA. However, the
    federal defendants [do] have a duty under the HCDA, 42 U.S.C. § 5304(c)(3), and the APA, 5

25  U.S.C. § 706(2)(B), (c), to review the grant applicant to see that procedural requirements were
    met and that applicable federal regulations were followed.") (citation omitted). Defendant

26  HUD's NEPA duties were therefore satisfied, and summary judgment must be granted in
    defendant HUD's favor with respect to plaintiffs' first and second causes of action, which were

27  brought pursuant to NEPA.

28

15

proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii); *see also* 24 C.F.R. § 58.60 ("When

substantial changes are proposed in a project or when significant new circumstances or

information becomes available during an environmental review, the recipient may prepare a

supplemental EIS as prescribed in 40 C.F.R. § 1502.9."); 24 C.F.R. § 58.52 (stating that if the

responsible entity adopts another agency's EIS, it must modify the EIS to adapt to the particular

environmental conditions and circumstances if these are different than the project reviewed in the

adopted EIS).  However, "an agency need not supplement an EIS every time new information

comes to light after the EIS is finalized."  *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 373

(1989).  Rather, "NEPA requires an agency to take a 'hard look' at potential environmental

consequences before taking action, and if the proposed action might significantly affect the

quality of the environment, a supplemental EIS is required."  *Klamath Siskiyou Wildlands Ctr. v.*

*Boody*, 468 F.3d 549, 560 (9th Cir. 2006) (internal citations omitted).  The court's evaluation of

whether "the agency took a sufficiently 'hard look'. . . is 'essentially the same' as an abuse of

discretion analysis."  *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir.

2020).

Here, plaintiffs advance four arguments as to why defendants were required to supplement

their environmental review of the Logging Project.  Each argument is addressed under its own

subheading below.

1.     Defendant California's Decision Not to Salvage Lumber

First, plaintiffs argue that defendant California was required to supplement its

environmental review because the Logging Project will *burn* significant amounts of biomass.

(Doc. No. 115 at 30.)  Plaintiffs contend that the significant change between the federal Recovery

Project and the state Logging Project is that the acres that were previously slated for "salvage

logging" for lumber are now to be subject to fuel treatment activities, such as burning.   (Doc. No.

115 at 31.)  Plaintiffs' June 2018 letter commenting on defendant California's RODs explained

that the activity with the least impact with respect to carbon and other emissions (salvage) is no

longer part of the project and a different plan is being implemented, rendering the previous

analysis inadequate.  (HUD AR 01047.)  In sum, plaintiffs argue that the project has substantially

changed because the Logging Project will not engage in the same salvage activities as those that were previously analyzed in the Recovery EIS.

The court is not persuaded by plaintiffs' arguments in this regard. The record demonstrates that the Logging Project did not substantially change the plans set forth in the Recovery EIS. As an initial matter, the court notes that the Recovery Project ROD (which adopted the Recovery Project EIS) authorized salvage activities on 15,382 acres; biomass removal on 2,671 acres; machine piling and burning on 18,381 acres; jackpot burning on 3,238 acres; mastication on 1,150 acres; and drop and lop on 1,450 acres. (RIM_2014_AR_000018.) The Forest Service prioritized salvage activities because "burned timber loses its economic value rapidly." (RIM_2014_AR_000019.) The Recovery EIS further stated that "[f]uel treatments are planned on all acres whether salvage is harvested or not." (RIM_2014_AR_000061; RIM_2014_AR_000247 ("Salvage and Hazard Tree acres overlap with Fuel Reduction acres and do not total.")). Crucially, however, by the time defendant California adopted the Recovery EIS for its Logging Project, defendant Forest Service had already completed the salvage logging work that was studied in the Recovery EIS. (Doc. No. 121-1 at ¶ 2.) The activities defendant California authorized for the Logging Project simply continued the recovery work that the Forest Service had not yet completed. Defendant California authorized the same activities, with the exception of the salvage logging that the Forest Service had already completed. (AR00896; HCD_III.G.0000200 ("The NDRC grant does not propose any new forest health treatments; it only provides funding for the implementation of previously authorized activities.").)

Summarized more simply, the original Forest Service Recovery Project authorized salvage activities followed by removal activities, including pile burning. When defendant California sought to institute its Logging Project—which was a continuation of the previous Recovery Project—the salvage activities had already been completed, meaning that the Logging Project would proceed to implementing the removal aspects of the previously authorized Recovery Project. As such, no new EIS was needed. (HCD_II.C.0000007 ("HCD determined that adopting the FEIS was appropriate because the area and activities evaluated in the FEIS are the same as those funded by the CDBG-NDR grant."); HCD_III.A.0000005 ("The fuel reduction activities

17

1   included in HCD's funding application and authorized in HCD's Recovery Record of Decision

2   (ROD) for funding by the FWHP are the same as those analyzed in the 2014 USFS Recovery

3   FEIS and authorized in the 2014 USFS ROD."))  Moreover, defendant California authorized

4   *fewer* acres for fuel treatments than defendant Forest Service had considered.  (*Compare*

5   RIM_2014_AR_000018 (authorizing biomass removal on 2,671 acres; machine piling and

6   burning on 18,381 acres; jackpot burning on 3,238 acres; mastication on 1,150 acres; and drop

7   and lop on 1,450 acres) *with* HCD_II.C.0000007 (authorizing 14,897 acres of fuel reduction

8   activities which "will only include treatment units and types as described in Modified alternative

9   4" of the Forest Service Recovery ROD).)

10        Based on the foregoing, the court concludes that defendant California was not required to

11   update the EISs due to a shift from salvage logging to the burning of non-salvageable biomass.

12   *See Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1045 (9th Cir. 2011)

13   (adopting the CEQ guidance framework for determining "substantial changes," which does not

14   call for SEIS when "the new alternative is 'qualitatively within the spectrum of alternatives that

15   were discussed in the draft [EIS].'").

16        2.      Defendant California's Plan to Alter the Diameter of Trees Being Removed

17        Second, plaintiffs argue that defendant California's Logging Project authorizes the

18   logging of trees over 16 inches in diameter, which the Recovery EIS and ROD supposedly did

19   not.  (Doc. No. 115 at 31.)  However, as defendants persuasively point out, this assertion is

20   incorrect.  In fact, what both the Recovery EIS and defendant California's adoption of that EIS

21   authorize is the removal of "non-merchantable" trees.  (HCD_II.C.0000029.)  As more time

22   passes, the minimum salvageable diameter will increase because "burned trees begin to lose[]

23   their merchantable value within the first few years after fire."  (Doc. No. 122 at 24.)  As such, the

24   only reason defendants' current plan allows for harvesting larger trees is because with the passage

25   of time, those trees are no longer merchantable.  (*See* HCD_II.C.0000029 ("The FEIS also states

26   that log merchantability will be determined *at time of harvest*.") (emphasis added).)  Accordingly,

27   a supplemental environmental review was not required based solely on the fact that larger

28   diameter trees would be harvested.

3.      Conifer Regeneration

Third, plaintiffs argue that defendant California was required to supplement its environmental review because conifers are naturally regenerating at a higher rate than the Reforestation EIS considered.  (Doc. No. 115 at 32–34.)  Plaintiffs argue that the increase in natural regrowth of trees obviates the need for extensive reforestation.  (*Id.*)

Plaintiffs' experts first conducted surveys on conifer regeneration in 2017, through which they claim they discovered extensive conifer regeneration in the high-intensity fire areas planned for logging, and submitted this information as a comment on the EIS to the Forest Service.  (*Id.* at 33) (citing RIM_POST-2016_AR_000086; RIM_POST-2016_AR_000092; RIM_POST-2016_AR_000094.  Defendant Forest Service responded in its ROD and questioned the completeness of this data, while also indicating that it would continue to monitor for natural regeneration.  (RIM_POST-2016_AR_000064–66.)  Subsequently, in 2018, plaintiffs surveyed all of the same locations defendant Forest Service had visited in 2014 and 2015—locations within roughly 2,500 and 3,000 acres of intact unlogged post-fire habitat in the NDRC grant units— where defendants had stated that "within the areas proposed for treatment" there was "little to no" conifer regeneration.  (HUD AR 01042.)  Plaintiffs presented the survey results to defendant Forest Service in letters in 2018 and 2019.  (HUD AR 01543 (June 12, 2018); RIM_POST-2016_AR_000118 (August 13, 2019); HUD AR 01040 (June 6, 2018)).  Plaintiffs assert that their data showed significant changes on the ground going to the heart of the stated purpose and need for the project:  "with substantial regeneration within the units, there simply was no need to spend scarce Relief Act funds on replanting."  (Doc. No. 115 at 33.)  Plaintiffs also advance that the data reflected that many of defendant Forest Service's data points were not even in conifer forest nor located where logging had already killed any regeneration, further skewing the Forest Service's results.  (*Id.* at 33–34) (citing Doc. No. 19 at 6–8.)  Lastly, plaintiffs sent a letter on August 13, 2019 to defendants California and HUD documenting this information and requesting that defendant HUD refrain from logging certain units with intact post-fire snag forests with

/////

/////

19

1    extensive regeneration and use by wildlife.  (HUD AR 01555.)[7]

2           In denying plaintiffs' motion for a preliminary injunction, the court concluded that

3    plaintiffs' survey did not appear to "raise[] sufficient environmental concerns to require the

4    [agencies] to take another hard look at the issues."  (Doc. No. 94 at 18–19) (citing *Warm Springs*

5    *Dam Task Force v. Gribble*, 621 F.2d 1017, 1020 (9th Cir. 1980)).  The court found at that time

6    that, unlike cases where an environmental consideration raised had never been explored in the

7    agency's prior EIS, in this case both the Reforestation EIS and Recovery EIS stated that any

8    amount of natural regeneration could not be counted on because other variables would likely

9    inhibit timely regeneration.  (*Id.* at 19–20); *see also Gribble*, 621 F.2d at 1025; *Friends of the*

10   *Clearwater v. Dombeck*, 222 F.3d 552, 558 (9th Cir. 2000) (stating that it is only "incumbent on

11   the Forest Service to evaluate the existing EIS to determine whether it required supplementation"

12   when presented with new, important information).  In now moving for summary judgment,

13   plaintiffs have not cited any legal authority materially different from that considered by the court

14   in connection with their motion for preliminary injunction.  The court sees no reason to depart

15   from its prior conclusion.  The undersigned therefore concludes that the evidence on summary

16   judgment does not demonstrate that defendants violated NEPA by failing to prepare an SEIS in

17   response to plaintiffs' surveys and data regarding conifer regeneration.

18           4.      The North, et al. (2019) Paper

19            Plaintiffs' final contention in support of their argument for the granting of summary

20   judgment in their favor on this claim is that a paper by Malcom P. North, et al. (2019) constitutes

21   significant new information because it undermines the scientific basis for the activities being

22   undertaken by defendants in the project area.  (Doc. No. 115 at 34.)  In an August 2019 letter to

23   defendant HUD, plaintiffs pointed to two findings of the North paper:  (1) tree planting following

24   clear-cuts like those implemented in the Logging Project—and specifically in the tree-planting

---

25   [7]  In forest ecology, a snag refers to a standing, dead or dying tree, often missing a top or most of
26   the smaller branches.  *See* Snag Trees and Healthy Ecosystems, available at
     conservationnw.org/our-work/wildlands/snag-trees/ (last visited April 8, 2022).  Snag trees can
27   provide wildlife with shelter or nesting.  *Id.*  Accordingly, plaintiffs appear to have argued in their
     letter that defendants should not log snag trees in areas where regeneration is occurring because
28   such logging risks interfering with natural regeneration and wildlife development.

1    density that the Forest Service is conducting in the Rim Fire units as part of the Logging Project

2    activities— will tend to increase, not decrease the intensity of future fires; and (2) tree planting is

3    generally unnecessary in high-severity fire areas within 200 meters of some surviving trees.

4    (HUD AR 01561 n.3.)  In their August 2019 letter, plaintiffs also asserted that "[t]he Forest

5    Service's [Reforestation] EIS [], at pages 30-38, proposes to plant most areas with an average of

6    125 to 300 or more trees per acre, and does not avoid or generally avoid planting in areas within

7    200 meters of live trees, contrary to the current scientific recommendations of the Forest

8    Service's own scientists."  *Id.*  In layman's terms, plaintiffs argue that defendants are planting

9    their trees too close together.

10           Plaintiffs' contentions that defendants needed to conduct a supplemental EIS due to the

11   findings in the North paper are likewise unpersuasive.  As federal defendants contend in their

12   opposition to plaintiffs' motion for summary judgment, plaintiffs' assertions in connection with

13   this claim are misleading.  (Doc. No. 121 at 39.)  While the North paper does state that "lower

14   stocking density and a more spatially heterogeneous planting pattern may be more resilient to fire

15   . . . than regularly-spaced, densely planted conifers," that paper *also* suggests that a compromise

16   approach "might include varying planting densities, including clusters with relatively narrow

17   spacing, where growing trees more rapidly shade out competing vegetation, intermixed with

18   unplanted areas or areas with widely spaced individual trees, and spotty shrub control to generate

19   fuel and structural heterogeneity."  (*Id.*) (citing RIM_POST-2016_AR 000321–22) (emphasis

20   added)).  Federal defendants persuasively argue that their planting strategy is consistent with the

21   recommendations appearing in the North paper and thus the article cannot be accurately

22   characterized as being "significant new information." [8]  (*Id.*; *see also* RIM_2016_AR 000016–17

23   (discussing a variety of planting strategies as part of alternative strategies in the defendants' plan,

24   _____

25   [8]  The court notes that while plaintiffs did not make this argument in moving for a preliminary
     injunction, they did raise it in their motion for a temporary restraining order before the U.S.

26   District Court for the Northern District of California.  Judge Seeborg concluded that plaintiffs had
     failed to show a likelihood of success on the merits of this claim because the approach

27   recommended in the North paper, "which includes 'planting a combination of clustered and
     regularly spaced seedlings' in areas 'beyond effective seed dispersal range,'" was largely

28   consistent with the Logging Project.  (Doc. No. 52 at 12–13 (quoting Doc. No. 25-10 at 10).)

1   including variable density planting)).

2   　　　The evidence on summary judgment establishes that defendants' decision not to update or

3   supplement their environmental analysis was not arbitrary and capricious.  Accordingly, summary

4   judgment will be granted in favor of the state defendants as to plaintiffs' first cause of action, and

5   in favor of defendant Forest Service as to plaintiffs' third cause of action.[9]  Consequently,

6   plaintiffs' motion for summary judgment will be denied as to those claims.

7   **B.**　　**The Evidence Before the Court on Summary Judgment Establishes that Defendant
8   California's Decision to Analyze the Logging Project and Biomass Project Separately
    Was Not Arbitrary and Capricious**

9   　　　In their second cause of action, plaintiffs assert that defendant California violated NEPA

10  and the APA when it failed to aggregate and analyze together the Logging Project and the

11  Biomass Project.  (Doc. No. 115 at 19–26.)

12  　　　As a threshold matter, defendants contend that the court should not reach the merits of this

13  claim because plaintiffs failed to raise it sufficiently to defendant California during the

14  administrative process, thus failing to exhaust their administrative remedies as to this claim.

15  (Doc. Nos. 121 at 23; 127 at 9-10.)  "The APA requires that plaintiffs exhaust administrative

16  remedies before bringing suit in federal court.  This requirement applies to claims under NEPA."

17  *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 965 (9th Cir. 2006) (citing 5 U.S.C. § 704).

18  　　　In their June 26, 2017 comment letter, plaintiffs asserted as follows:

19  　　　　　　[N]or did the EISs analyze the climate change, or wildlife habitat,
20  impacts of the additional $22 million grant from the Trump
    Administration that would be used to create new forest biomass
21  energy production plants in California.  Consequently, these
    deficiencies must be analyzed in a supplemental draft EIS, as
22  required by the regulations at issue here.

23  (RIM_POST-2016_AR_000085–86.)  The federal defendants assert that these references by

24  plaintiffs in their letter are obscure and did not provide sufficient clarity to show "that the

25  decision maker understands the issue raised."  (Doc. No. 126 at 6 n. 5) (quoting *Lands Council v.*

26  *McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010)).

27  _____

28  [9]  *See* fn. 6, above.

22

1   Although perhaps a close question, the court concludes that plaintiffs did adequately

2   exhaust their administrative remedies before asserting their aggregation claim in this action.

3   While plaintiffs' comment letter was somewhat vague, it at least implies their concern about the

4   connection between the Biomass Project's funding ($22 million) and the Logging Project.  Thus,

5   it appears that plaintiffs "alert[ed] the decision maker to the problem in general terms, rather than

6   using precise legal formulations," and this is sufficient to exhaust their administrative remedies.

7   *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002).  Moreover,

8   plaintiffs were not required to "cite to the requisite federal regulation" in order to "'clearly

9   express[] concern' that the projects were linked."  *Great Basin Mine Watch*, 456 F.3d at 968

10   (citing *Rittenhouse*, 305 F.3d at 966).  The court is therefore persuaded that defendant California

11   was adequately alerted that plaintiffs were raising the aggregation issue in their comment letter.

12   *See Rittenhouse*, 305 F.3d at 965 (explaining that claims need only "be raised with sufficient

13   clarity to allow the decision maker to understand and rule on the issue raised").  Because

14   plaintiffs exhausted their administrative remedies as it pertains to their cumulative impacts and

15   aggregation claim, the court will turn to the merits of that claim on summary judgment.

16       1.   <u>Aggregating and Analyzing the Cumulative Impacts and Effects of the Logging Project and the Biomass Project</u>

17

18   Plaintiffs argue that defendant California was required to consider the cumulative impacts

19   of the Biomass Project and the Logging Project under both NEPA and HUD regulations.  (Doc.

20   No. 115 at 24–26.)  NEPA regulations provide that actions that are "connected" or "cumulative"

21   must be analyzed in a single EIS.  40 C.F.R. § 1508.25(a); *see also Pac. Coast Fed'n of*

22   *Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1098 n.12 (9th Cir. 2012).  Similarly, HUD

23   regulations require that the responsible entity "group together and evaluate as a single project all

24   individual activities which are related either on a geographical or functional basis, or are logical

25   parts of a compositive of contemplated actions," or "when a recipient's planning and program

26   development provide for activities to be implemented over two or more years."  24 C.F.R.

27   § 58.32.

28   /////

1      For the reasons stated in the order denying plaintiffs' motion for a preliminary injunction,

2  the court again concludes that the Logging Project and Biomass Project are not "connected" for

3  purposes of 40 C.F.R. § 1508.25(a) as a matter of law.  (*See* Doc. No. 94 at 26–27) (concluding

4  that because the two projects would have taken place with or without the other, each has

5  independent utility and they cannot be considered "connected" actions).  Accordingly, the court

6  considers only plaintiffs' argument that the projects are cumulative.

7      Cumulative actions are actions, "which when viewed with other proposed actions have

8  cumulatively significant impacts and should therefore be discussed in the same impact

9  statement." 40 C.F.R. § 1508.25(a)(2).  For example, courts have required a single EIS for timber

10 sales when the sales "formed part of a single timber salvage project, were announced

11 simultaneously, were reasonably foreseeable, and were located in the same watershed." *Earth*

12 *Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1305 (9th Cir. 2003).

13     As an initial matter, the court must define what "impacts" mean in this context.  CEQ

14 regulations define "impacts" as:  "changes to the human environment from the proposed action or

15 alternatives that are reasonably foreseeable" and have a reasonably close causal relationship to the

16 proposed action or alternatives, including those effects that occur at the same time and place as

17 the proposed action or alternatives and may include effects that are "later in time or farther

18 removed in distance" from the proposed action or alternatives.  40 C.F.R. § 1508.1(g).[10]

19

---

20 [10]  Although plaintiffs rely on the definition of "cumulative impacts" found at 40 C.F.R.
§ 1508.7—which is "the impact on the environment which results from the incremental impact of
21 the action when added to other past, present, and reasonably foreseeable future actions"—this
definition was repealed by way of a final rule issued July 16, 2020.  *See Update to the*
22 *Regulations Implementing the Procedural Provisions of the National Environmental Policy Act*,
85 Fed. Reg. 43,304, 43,375 (July 16, 2020).  The agency struck this definition in 2020 "to
23 simplify the definition to focus agencies on consideration of effects that are reasonably
foreseeable and have a reasonably close causal relationship to the proposed action."  *Id.* at 43,343.
24 CEQ further stated that "analyses are bound by the definition of effects as set forth in
§ 1508.1(g)(1) and (2) and should not go beyond the definition of effects set forth in those two
25 paragraphs.  The final rule provides considerable flexibility to agencies to structure the analysis of
effects based on the circumstances of their programs."  *Id.* at 43,344.  The court will therefore
26 "apply the current version of the regulations, because [plaintiffs] seek forward-looking injunctive
relief."  *Ka Makani 'O Kohala Ohana Inc. v. Water Supply*, 295 F.3d 955, 961–62 (9th Cir. 2002)
27 (internal citations omitted); (*see also* Doc. No. 1 at 25–26).

28

1    According to plaintiffs, defendant California's failure to consider the environmental

2    cumulative impacts of both the Logging Project and the Biomass Project together resulted in an

3    arbitrary and capricious analysis of the potential environmental harms stemming from the CWRP.

4    (*Id.*)  Defendants counter that the Biomass Project is exempt from environmental review under

5    HUD regulations because it is still in its planning phase.  (Doc. No. 121 at 31.)  The court finds

6    defendants' argument in this regard to be persuasive for the reasons explained below.

7         a.    *The Biomass Project Was Exempt from Environmental Review*

8    HUD regulations provide that "the responsible entity does not have to comply with the

9    requirements of this part or undertake *any* environmental review, consultation or other action

10   under NEPA" for the following exempt activities:  environmental and other studies, the

11   development of plans and strategies, financial services, technical assistance, training, and

12   administrative and management activities.  24 C.F.R. § 58.34(a)(1–3, 9) (emphasis added).  *See*

13   *Ka Makani*, 295 F.3d at 961–62 (acknowledging that § 58.34(a) exempts preliminary planning

14   activities from the environmental review requirements of NEPA and HUD regulations).

15   Defendant California contends that it was required only to consider reasonably foreseeable

16   cumulative impacts and that the Biomass Project was not reasonably foreseeable when defendant

17   California adopted the 2014 and 2016 EISs in May 2017.  (Doc. No. 127 at 13) (citing 40 C.F.R.

18   § 1508.7).  The Biomass Project was therefore a preliminary planning activity according to

19   defendant.

20   Plaintiffs argue that construction of the Biomass Project was reasonably foreseeable and

21   that its environmental impacts should have therefore been considered in conjunction with the

22   impacts stemming from the Logging Project.  (Doc. No. 115 at 25–26.)  Plaintiffs note that $22

23   million of the $70 million NDRC grant is allocated to the construction of the Biomass Project.

24   (*Id.*) (citing RIM_POST-2016_AR_000063; RIM_POST-2016_AR_000027–28).  Plaintiffs

25   further point out that defendant California repeatedly acknowledged the Biomass Project in the

26   record, including in the initial NDRC grant application in 2015, in a press release issued in 2016,

27   and in the notices for public comment about the actions.  (Doc. No. 115 at 24–25) (citing

28   HCD_I.D.0000076; HCD_I.B.0000255–56; HCD_I.B.0000004–05; HCD_II.C.0000040;

1   HCD_II.C.0000008; HCD_I.D.0000025 (press release); HCD_II.A.0000001 (Notice of

2   Opportunity to Comment on Recovery EIS); HCD_II.A.0000005 (Notice of Opportunity to

3   Comment on Reforestation EIS)).  According to plaintiffs, the Biomass Project is a proposed

4   action that is part of a greater, comprehensive forest recovery strategy; thus, its construction and

5   operation was clearly reasonably foreseeable under the circumstances and requires a cumulative

6   impacts analysis.  (*Id.* at 25) (citing HCD_I.D.0000073 ("The CWRP is designed to address

7   unmet recovery needs in the Rim Fire footprint, while also supporting community protection and

8   resilience.")).  Plaintiffs conclude that defendant California therefore failed to disclose the

9   cumulative carbon emissions from the proposed actions.  (*Id.*)

10          To the extent plaintiffs contend that a cumulative impact analysis was necessary pursuant

11  to NEPA or the HUD regulations, their argument ultimately falls short.  Although the court

12  recognizes that "[i]t is not appropriate to defer consideration of cumulative impacts to a future

13  date when meaningful consideration can be given now," it is also the case that courts are not to

14  "require the government to do the impractical, if not enough information is available to permit

15  meaningful consideration."  *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th

16  Cir. 2006) (citing *Kern v. BLM*, 284 F.3d 1062, 1075 (9th Cir. 2002)); *Blue Mountains*

17  *Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215 (9th Cir. 1998) (internal quotation marks

18  and citation omitted).  For the reasons that follow, the court concludes that the Biomass Project

19  was simply not past the point of preliminary development plans and therefore was not subject to

20  environmental review in conjunction with the Logging Project.

21          In the order denying plaintiffs' motion for a preliminary injunction, the undersigned

22  reached the preliminary conclusion that the Biomass Project was *not* exempt from environmental

23  review.  (*See* Doc. No. 94 at 26.)  In coming to that conclusion, however, the undersigned noted

24  that, at the time, it appeared to have already been determined that the Biomass Project would be

25  built and, thus, would have environmental consequences.  (*Id.*)  That preliminary conclusion was

26  further supported at that time by the fact that the California action plan for the CWRP itself listed

27  the Logging Project, the Biomass Project, and the feasibility studies as currently underway.  (*See*

28  Doc. No. 35–6 at 18.)  However, the new evidence presented on summary judgment now

26

1   establishes that the court's preliminary conclusion on this point was incorrect.  The evidence now

2   before the court establishes that the Biomass Project is in fact merely the subject of preliminary

3   development plans and strategies, and is therefore exempt under HUD's regulations.  The court

4   now concludes that although plaintiffs raised "serious questions on the merits" of this claim at the

5   preliminary injunction stage of this litigation, the more comprehensive administrative record now

6   before the court on summary judgment demonstrates that defendant California was not required to

7   include the Biomass Project in a cumulative impact analysis.

8        For example, the evidence now before the court reflects that although defendant HUD

9   approved $22,000,000 for the Biomass Project as part of the overall $70,359,459 grant (Doc. No.

10   35-3), funds were only released for planning activities.  All of the activities that defendants have

11   performed with regard to the Biomass Project are preliminary in nature.  The court quickly

12   summarizes those activities now.  Prior to using any funds to implement the facility, defendant

13   California was required to conduct a feasibility study to determine whether the project was viable.

14   (HCD_I.H.0000110.)  After the feasibility study was completed, and only "if BUF activities show

15   promise of being feasible," then defendant California would ultimately proceed to the second

16   phase of implementation.  (HCD_I.H.0000005.)  On September 26, 2017, defendant California

17   solicited requests for proposals for a study to determine whether a biomass facility was feasible.

18   (HCD_I.H.0000004–08.)  Defendant requested the studies because it needed to know whether the

19   project was feasible before it requested additional funds for implementation.  (HCD_I.H.000110

20   ("HUD requires each project to have an initial feasibility analysis done prior to providing

21   implementation funding."); HCD_I.H.0000005 (after the feasibility study was completed, and

22   only if "BUF activities show promise of being feasible," would HCD then proceed to the second

23   phase of implementing the Biomass Project)).  Defendant California has also performed technical

24   assistance and training activities.  *See* 24 C.F.R. § 58.34(a)(9).  For example, on June 28, 2018,

25   defendant California retained a firm to provide "Technical Assistance (TA) and training" to

26   support defendant California and all partners in the implementation of the three pillars of the

27   CWRP.  (HCD_I.G.0000653.)  Lastly, defendant California has performed planning, financial

28   services, studies, and administrative activities for the Biomass Project, but the project remains in

a phase where only such exempt activities are being performed.  *See* 24 C.F.R. § 58.34(a)(1)–(3).

Critically, after receiving the results of the feasibility study, defendant California changed the

project name from the Biomass Utilization Facility to the Biomass Utilization Fund because the

focus of the potential project changed.  The fund will no longer construct a single biomass

facility; instead, it will provide loans or grants to multiple applicants that utilize biomass.

(HCD_I.H.0000282–83; HCD_I.H.0000314–15.)  Defendants' lack of a solidified plan for how to

use the biomass funding only further supports the conclusion that their activities with respect to

the Biomass Project were purely preliminary and thus not subject to NEPA review.  Given these

facts and evidence, the law does not require (and it would make little sense to require) defendant

California to submit a supplemental EIS for these activities.  *See Ka Makani*, 295 F.3d at 962

("Moreover, for preliminary planning activities which presumably have *no* impact on the physical

environment, the logic of the 'connected actions' provision, which seeks to ensure that combined

impacts of related activities are adequately addressed, and 'connected actions' case law, does not

apply.") (internal citations omitted).

Furthermore, other courts have held that a cumulative impacts determination "must be

governed by considerations of whether other projects are so 'interdependent that it would be

unwise or irrational to complete one without the others,'" and "a court must also consider the

likelihood that a given project will be constructed along with the interdependence of other

projects."  *Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 182 (3d Cir. 2000)

(affirming the district court's finding that an environmental assessment for a HUD funded project

proposing the construction of a 350-room hotel and 500-vehicle garage was not deficient in

omitting the "impact of future development that had been identified in several planning

documents including a proposed 'mega' entertainment complex planned" in the same area of

Philadelphia).  As a general rule, "[t]he more certain it is that a given project will be completed,

the more reasonable it is to require a [grant] applicant to consider the cumulative impact of that

project."  *Id.* at 182.

Here, the Biomass Project, though "proposed in planning documents," was "not

sufficiently concrete to warrant inclusion."  *Id.*  First, the Logging Project was being constructed

1  regardless of the results of the Biomass Project's feasibility studies, and this "does not suggest

2  that [defendant California] could not sever any connection between the [Logging Project] and [the

3  Biomass Project] without destroying the [Logging Project's] functionality." *Id.*; *see also Vieux*

4  *Carre Prop. Owners, Residents & Assocs., Inc. v. Pierce*, 719 F.2d 1272, 1278 (5th Cir. 1983)

5  ("[W]e are here dealing with two projects that are historically distinct, one of which is proposed

6  and the other still in the process of study and design.  In that situation, NEPA does not yet require

7  the [agency] to evaluate the environmental impact of the [second project].") (internal citations

8  omitted).  Put simply, the evidence presented on summary judgment here does not suggest "that

9  realization of [a biomass facility] was, indeed, *expected* to materialize."  *Rendell*, 210 F.3d at 182

10  (emphasis added).

11      Plaintiffs rely on decisions in cases such as *Blue Mountains Biodiversity v. Blackwood* to

12  argue that the Logging Project and Biomass Project were proposed as part of a comprehensive

13  forest recovery strategy, thereby indicating that the Biomass Project was reasonably foreseeable.

14  *Blackwood*, 161 F.3d at 1215 ("[A]ll of the proposed [timber] sales were reasonably foreseeable.

15  They were developed as part of a comprehensive forest recovery strategy.")  This case is

16  distinguishable from those relied upon by plaintiffs, however, because "the parameters of the

17  [Biomass] project were unknown at the time of the [EIS]."  *Env't Prot. Info. Ctr.*, 451 F.3d at

18  1015; *see also Habitat Educ. Ctr. v. U.S. Forest Serv.*, 609 F.3d 897, 903 (7th Cir. 2010) ("In

19  *Blue Mountains*, the nature of all five logging projects was known in advance of the preparation

20  of each project's environmental assessment.  Indeed, all five sales had been disclosed to logging

21  companies, with estimated sale quantities and timelines, before the environmental assessment at

22  issue had even been prepared.  Here, the Forest Service had not yet developed the goals for the

23  Twin Ghost project, let alone forecast the quantity and timing of logging that would take place.")

24  (internal citation omitted).

25      b.    *Rationale Provided for Not Undertaking a Cumulative Analysis*

26      Finally, plaintiffs argue that defendant California provided no rationale or explanation in

27  the record as to why it failed to undertake a cumulative impacts analysis.  (Doc. No. 123 at 17.)

28  /////

1    The evidence on summary judgment shows that defendant California responded to

2   plaintiffs' request for a cumulative analysis with the following:  "This comment is outside the

3   scope of this decision."  (HCD_ll.C.0000031.)  Without determining whether this response was

4   sufficient to dismiss undertaking a cumulative analysis, the court notes that several circuits,

5   including the Ninth Circuit, have suggested that "an agency decision may not be reversed for

6   failure to mention a project not capable of meaningful discussion."  *Habitat Educ. Ctr. v. U.S.*

7   *Forest Serv.*, 609 F.3d 897, 902 (7th Cir. 2010) (citing *Env't Prot. Info. Ctr.*, 451 F.3d at 1014;

8   *Rendell*, 210 F.3d at 182; *Town of Marshfield v. FAA*, 552 F.3d 1, 4–5 (1st Cir. 2008); *City of*

9   *Oxford v. FAA*, 428 F.3d 1346, 1353 (11th Cir. 2005)).  "To hold otherwise would either create an

10   empty technicality—a requirement that agencies explicitly state that they lack knowledge about

11   the details of potential future projects—or paralyze agencies by preventing them from acting until

12   inchoate future projects take shape (by which time, presumably, new inchoate projects would

13   loom on the horizon)."  *Id.* at 902–03.  Moreover, even if the state defendants' initial reasoning

14   for not engaging in a cumulative analysis was vague, they will have an opportunity to conduct a

15   cumulative impacts analysis once (and if) the Biomass Project's parameters materialize.  *Env't*

16   *Prot. Info. Ctr.*, 451 F.3d at 1014; *see also Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.20 (1976)

17   ("Should contemplated actions later reach the stage of actual proposals, impact statements on

18   them will take into account the effect of their approval upon the existing environment; and the

19   condition of that environment presumably will reflect earlier proposed actions and their effects.");

20   *Sierra Nev. Forest Prot. Campaign v. U.S. Forest Serv.*, 166 F. App'x 923, 928 (9th Cir. 2006)[11]

21   ("The cumulative impact of the MVP and any future project will necessarily be considered in the

22   EIS or EA of the future project; that is the appropriate time for such cumulative impact analysis to

23   be conducted.") (Fletcher, J., concurring)).

24    Accordingly, the court concludes, based upon the evidence presented, that it was not

25   arbitrary and capricious for the defendants to omit the Biomass Project from the Logging

26   /////

27   _____

28   [11]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1   Project's environmental impact analysis.  The court will therefore grant summary judgment in

2   favor for the state defendants with respect to plaintiffs' second claim for relief. [12]

3   **C.      Defendants' Use of the Relief Act Funding Is Permissible**

4            Plaintiffs argue in their fourth cause of action that the Logging Project is unlawful and

5   contrary to the letter and spirit of the Acts under which the funding was appropriated.  (Doc. No.

6   115 at 27.)  Specifically, plaintiffs argue that defendant HUD "improperly approved and

7   disbursed federal disaster relief funding in excess of its statutory authority because Defendants'

8   activities are ineligible for HUD's funding."  (*Id.*)  As plaintiffs point out, "[o]nly those activities

9   enumerated in the Housing and Community Development Act of 1974 ("HCDA") (42 U.S.C. §§

10  5301 et seq.) are eligible for HUD's disaster relief funding."  (*Id.*)

11           As it did in its order denying plaintiffs' motion for a preliminary injunction, the court

12  begins its analysis by first looking to the text of the statute.  The HCDA's list of eligible activities

13  include:

14               the  acquisition,  construction,  reconstruction,  or  installation
                 (including design features and improvements with respect to such
15               construction, reconstruction, or installation that promote energy
                 efficiency) of public works, facilities (except for buildings for the
16               general conduct of government), and site or other improvements.

17  42 U.S.C. § 5305(2)(a).  Moreover, the Relief Act provides "[t]hat funds shall be allocated

18  directly to States and units of general local government at the discretion of the Secretary of

19  Housing and Urban Development."  *Id.*

20           "Logging" is not explicitly authorized as an eligible activity under the statute, and all

21  parties agree that HUD relies on "site or other improvements" to authorize the Logging Project as

22  an eligible activity as defined in the HDCA.  (*See* Doc. Nos. 67 at 21; 70 at 23; 71 at 24.)

23  However, Congress did not define "site or other improvements," despite listing it in the text of the

24  HDCA.  Although the phrase was initially followed by what was "originally purported to be an

---

[12]  As stated in footnote 6 above, summary judgment will also be granted in favor of defendant
HUD as to this claim.  The court notes, as it did in denying plaintiffs' motion for preliminary
injunction, that plaintiffs do not bring this claim against defendant Forest Service, whose
involvement is limited to the extent that the state Logging Project involves California transferring
NDRC grant funds to defendant Forest Service to fund some of the activities contemplated in the
Recovery and Reforestation EISs.  (Doc. No. 94 at 23 n.17; *see also* Compl. at ¶ 66.)

exclusive listing and contain[ed] restrictions on items that are eligible," Congress amended the

statute in 1983 to remove this list.[13]  S. Rep. No. 98-142, at 21 (1983).  In so doing, Congress

chose to expand defendant HUD's discretion to determine which projects could be eligible

activities.  The court therefore concludes that the Logging Project constitutes a site improvement

intended to restore infrastructure that is properly subject to funding at HUD's discretion.[14]  This

conclusion is supported by the Relief Act's declaration that the funds would be used for "long-

term recovery" and "restoration of infrastructure."  *See* Relief Act, Pub. L. No. 113-2, 127 Stat.4.

Plaintiffs argue that even if defendants' interpretation of site and other improvements

were permissible, "HUD was required to interpret the phrase consistent with the Congressional

intent underlying the statute" and the statute was created to "meet the social, economic and

environmental problems facing *cities*."  (Doc.  No. 115 at 28.)  Plaintiffs cite to decisions in

which courts have emphasized that the HCDA and the NDRC funding programs were created to

meet problems facing cities, and in particular, urban communities.  (*Id.*) (citing *Dixon v. United

States*, 465 U.S. 482, 486 (1984); *Kan. City v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 189

(D.C. Cir. 1991); *Johnson v. County of Chester*, 413 F. Supp. 1299, 1302 (E.D. Pa. 1976)).

Plaintiffs assert that defendant HUD's interpretation of site or other improvements "allows for

/////

/////

---

[13]  The repealed language was as follows:

> including neighborhood facilities, senior centers, historic properties, utilities, streets, street lights, water and sewer facilities, foundations and platforms for air rights sites, pedestrian malls and walkways, and parks, playgrounds, and recreation facilities, flood and drainage facilities in cases where assistance for such facilities under other Federal laws or programs is determined to be unavailable, and parking facilities, solid waste disposal facilities, and fire protection services and facilities which are located in or which serve designated community development areas.

Pub. L. 93-383 88 Stat. 641.

[14]  Judge Seeborg reached this same conclusion in denying plaintiffs' motion for a temporary restraining order, finding that "the provision does broadly authorize 'site or other improvements,' which could plausibly encompass removing fuel which constitutes a severe fire hazard."  (Doc. No. 52 at 16.)

1    funds to be directed *away* from cities and urban recovery" and is thus contrary to the HCDA's

2    intent.  (Doc. No. 115 at 28.)

3            The court concludes that the Logging Project is a permissible use of Relief Act funding.

4    As noted in the court's order denying plaintiffs' motion for a preliminary injunction:

5            [D]efendant HUD maintains that the Logging Project will restore
             watersheds.  (Doc. No. 70 at 10.)  The declaration of Patrick
6            Talbott—a Housing and Community Development representative at
             California HCD and the NDRC grant manager—states that
7            California obtains approximately 65 percent of its water supply from
             watersheds in the Sierra Nevada, and the Rim Fire burned through at
8            least three river watersheds that provide water to Tuolumne County,
             the San Francisco Bay Area, and parts of the San Joaquin Valley.
9            (Doc. No. 71-4 at ¶ 14.)  Ultimately, the Rim Fire led to poor water
             quality, reduced water storage, and increased watershed flooding.
10           (*Id.*)  The Talbott declaration further provides that fuel build up
             increases the risk of wildfires that could repeat these events.  (*Id.* at
11           ¶ 13.)  This evidence of an impact on communities is convincing.

12   (Doc. No. 94 at 31.)  Federal defendants note that numerous elected officials and interested

13   groups and individuals affiliated with the region believe that using Relief Act funds for the

14   Logging Project supports resilient relief, long-term recovery, restoration of housing and

15   infrastructure, and economic revitalization, including for urban communities.  (Doc. No. 121 at

16   45) (citing Doc. Nos. 70-5 at 3–13, 15–16; 70-6 at 3–6).  It is clear to the court that events in rural

17   areas, such as the Rim Forest, can have a substantial harmful impact on urban communities.

18   (Doc. No. 121 at 45–46) (citing RIM_2014_AR_000011–12 ("The Rim Fire threatened the . . .

19   [w]ater and [p]ower facilities which provide drinking water and power for over 2.5 million San

20   Francisco Bay Area customers . . . The fire also directly impacted [reservoirs]  which serve the

21   greater Modesto, Turlock, and Merced areas[, which] [t]ogether . . . provide drinking water and

22   power for over five hundred thousand . . . customers."); RIM_2014_AR_000011-13 ("An Air

23   Alert was issued for San Joaquin, Stanislaus, Mariposa, Merced, Madera, Fresno, Kings, Tulare,

24   Tuolumne, and Kern Counties due to smoke impacts from the Rim Fire . . . [and] [a]ir quality

25   warnings were issued for Lake Tahoe, Carson City, and Reno.")).

26           The court therefore finds that the evidence before it on summary judgment demonstrates

27   that the CWRP is a permissible use of Relief Act funds because it constitutes a "site or other

28   /////

improvement" within the letter and spirit of the Relief Act.  Accordingly, summary judgment will be granted in favor of defendants California and HUD as to plaintiffs' fourth cause of action.

## CONCLUSION

For all of the reasons explained above:

1.    Plaintiffs' motion for summary judgment (Doc. No. 115) is denied;

2.    The federal defendants' cross-motion for summary judgment (Doc. No. 121) is granted;

3.    The state defendants' cross-motion for summary judgment (Doc. No. 122) is granted; and

4.    The Clerk of the Court is directed to enter judgment in favor of defendants and to close this case.

IT IS SO ORDERED.

Dated:   **June 15, 2022**                                _____

                                                          UNITED STATES DISTRICT JUDGE

34